## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**GUADALUPE QUINTO GALINDO, et al.,**

               **Plaintiffs**,

**v.**

**LUCAS TAYLOR, et al.,**

               **Defendants**.

**Case No. 22-2414-DDC-RES**

## <u>MEMORANDUM AND ORDER</u>

This is a case about two food trucks and a repossession gone awry. Plaintiffs are restauranters in Colby, Kansas, who wanted to purchase a food truck to sell Mexican food. When their first purchase attempt unraveled in June 2019, the seller offered plaintiffs a temporary, less-than-ideal solution—the loan of a used sushi trailer. The Used Sushi Trailer was a repurposed FotoMat trailer—painted black for makeshift use as a sushi stand—with a large white sushi logo across its side. One might imagine a customer's reticence to purchase tacos from a sushi truck. Nonetheless, plaintiffs made do. Time passed and the originally promised (and half paid for) taco truck never arrived. So, in late 2019, plaintiffs found another supplier, purchased a new food truck—the Los Jarochos Trailer—and moved the Used Sushi Trailer to the back of their rented land in Colby, Kansas.

Both food trailers were so situated when a repossession company, Garcia Recovery, LLC, arrived in the spring of 2022. The original seller had hired Garcia Recovery to repossess a food truck from plaintiffs' rented plot of land. Long story short, Garcia Recovery repossessed the Los Jarochos Trailer—not the Used Sushi Trailer. And Officer Lucas Taylor—a police officer

dispatched by the Colby, Kansas Police Department, at plaintiffs' request—assisted the Garcias with that botched repossession. In response, plaintiffs filed this lawsuit.

Plaintiffs brought claims against two groups of defendants. First, plaintiffs asserted multiple liability theories against the original seller, the repossession company, and its owner. These "non-municipal" defendants never answered, and the Clerk of the Court entered default against them on January 24, 2023 (Doc. 44; Doc. 45; Doc. 46). Of more interest here, plaintiffs also brought claims against Officer Taylor, in his individual capacity, and the "municipal defendants"—Police Chief Richard Barrett, in his official capacity, and the City of Colby, Kansas.[1] In response, Officer Taylor and the municipal defendants filed a Partial Motion to Dismiss (Doc. 55), which the court rules below.

Plaintiffs assert multiple theories of liability against Officer Taylor and the municipal defendants. Under federal law, plaintiffs bring civil rights deprivation, conspiracy, failure to intervene in a conspiracy, and First Amendment claims under 42 U.S.C. §§ 1981, 1983, 1985 and 1986. Under state law, plaintiffs bring claims for denial of civil rights, trespass, trespass against chattels, conversion, fraudulent misrepresentation, fraud, defamation, conspiracy, aiding and abetting, and substantial assistance. Defendants Officer Taylor, Chief Barrett, and the City move to dismiss all claims except for one. They exclude from their Motion to Dismiss Count I(1)[2] against Officer Taylor, a claim premised on 42 U.S.C. § 1983.

---

[1]  The Second Amended Complaint includes Officer Taylor in the municipal defendants' category as an employee/agent of the Police Department and the City. *See* Doc. 53 at 4–5 (2nd Am. Compl. ¶¶ 19, 22). While the court recognizes plaintiffs' logic, it must differentiate between Officer Taylor, on the one hand, and the municipal entities, on the other. So, the court takes a different route here. For the purposes of this Order, the term "municipal defendants" refers to Police Chief Richard Barrett of the Colby, Kansas Police Department, in his official capacity, and the City of Colby, Kansas. The term "municipal defendants," as used in this Order, doesn't include Officer Taylor, sued in his individual capacity.

[2]  The court adopts the numbering system plaintiffs employed in their Second Amended Complaint (Doc. 53) to differentiate the various counts. The court acknowledges that their convention is a complex

Below, the court grants defendants' motion in part and denies it in part.  Granting in part, the court dismisses all §§ 1981, 1983 and 1985 claims against the municipal defendants because of the constraints on municipal liability under *Monell*.  And the court dismisses plaintiffs' § 1986 claim against the municipal defendants as insufficiently pleaded.  The court also dismisses all contested federal law claims against Officer Taylor, leaving only the uncontested Count I(1).  And the court dismisses most of plaintiffs' state law claims against all three defendants.  Denying in part, the court concludes that three state law claims survive—Fraudulent Misrepresentation (Count VIII(1)), Fraud (Count VIII(2)), and Aiding and Abetting (Count XI(2)).

To explain its ruling, the court begins with an overview of the background facts in Part I before reciting the legal standard for a Rule 12(b)(6) motion to dismiss in Part II.  Then, in Part III, the court considers the federal law claims against the municipal defendants.  Next, it takes up the federal law claims against Officer Taylor in Part IV, ending with a qualified immunity analysis.  Finally, in Part V, the court works through plaintiffs' state law claims.  And the court's analysis ends by reciting all its conclusions in Part VI.

## I.   Background

The following facts come from plaintiffs' Second Amended Complaint (Doc. 53).  The court accepts these facts as true and views them in the light most favorable to plaintiffs, the party opposing the Motion to Dismiss.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining on a motion to dismiss that the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

---

one.  The mix of Roman and Arabic numerals may confuse more than they clarify.  But, for the sake of continuity, the court believes it best to use plaintiffs' system.

### *Plaintiffs' First Attempt to Buy a Food Trailer*

In April 2019, plaintiffs initiated a food trailer purchase from Sergio Borjas—a food trailer seller and a member of plaintiffs' church congregation, though plaintiffs didn't know him personally. Doc. 53 at 6 (2nd Am. Compl. ¶¶ 30–31). Plaintiffs paid Borjas a $6,000 down payment (half of the trailer's total purchase price) at the end of April. *Id.* at 7 (2nd Am. Compl. ¶ 33). Plaintiffs never received a written contract for the trailer purchase. *Id.*

In June 2019, when the Kansas Department of Agriculture sought to schedule a trailer inspection, the trailer still hadn't arrived. *Id.* (2nd Am. Compl. ¶¶ 34–35). So, plaintiffs tracked down Borjas and demanded either their truck or their money's return, but Borjas could produce neither. *Id.* (2nd Am. Compl. ¶ 36). He offered them instead another trailer—formerly used as a sushi stand—which they could fix up and operate until he delivered their new trailer. *Id.* at 8 (2nd Am. Compl. ¶ 37). Plaintiffs agreed. *Id.* (2nd Am. Compl. ¶ 40). Afterwards, plaintiffs tried several times to convince Borjas to provide the new trailer, a written contract, or a receipt for their down payment from Borjas. *Id.* at 10 (2nd Am. Compl. ¶¶ 46–48). But they never succeeded. *Id.* So, plaintiffs looked for another solution. *Id.* at 10–11 (2nd Am. Compl. ¶¶ 50–51).

### *Plaintiffs' Los Jarochos Food Trailer Purchase*

Plaintiffs ordered a second trailer, dubbed the "Los Jarochos Trailer," from another supplier in Mexico and, in December 2019, brought it to Kansas and placed it on their rented land in Colby. *Id.* at 11 (2nd Am. Compl. ¶¶ 51, 53). Plaintiffs relocated the Used Sushi Trailer to another part of their rented land and began running their food business out of the Los Jarochos Trailer. *Id.* (2nd Am. Compl. ¶ 54). Borjas then asked plaintiffs about the Used Sushi Trailer and also asked them for more money. *Id.* at 12 (2nd Am. Compl. ¶ 55). Plaintiffs responded that Borjas "could come get the old food truck as soon as he refunded them the deposit they had paid

him[.]"  *Id.*  Plaintiffs continued to ask for their money back from Borjas, and Borjas insisted that plaintiffs return the Used Sushi Trailer.  *Id.* (2nd Am. Compl. ¶ 57).

### *The Repossession Before Officer Taylor Arrived*

On April 13, 2022, Antonio Urista Garcia and Jesus Israel Garcia ("the Garcias"), acting as employees and agents of Garcia Recovery, LLC, arrived at plaintiffs' Los Jarochos Trailer to complete a repossession.  *Id.* at 13–14 (2nd Am. Compl. ¶¶ 59, 63, 65).  Although not apparent to plaintiffs at the time, Borjas had hired the Garcias to repossess a food trailer from plaintiffs.  *Id.* at 25, 26 (2nd Am. Compl. ¶¶ 151–52, 156).  When the Garcias arrived, plaintiffs' two employees—who also are plaintiffs' relatives—were staffing the Los Jarochos business.  *Id.* at 13 (2nd Am. Compl. ¶¶ 60–63).  Plaintiffs themselves had gone to close on a building for a second restaurant location in another city.  *Id.*  One of plaintiffs' employees speaks limited English with a noticeable accent, and the other "speaks virtually no English."  *Id.* (2nd Am. Compl. ¶ 60).

Plaintiffs' employees told the Garcias that the trailer belonged to plaintiffs.  *Id.* at 14 (2nd Am. Compl. ¶ 66).  But the Garcias waved papers—which included a photograph of the Los Jarochos Trailer—and said they had an order authorizing them to take custody of it.  *Id.* (2nd Am. Compl. ¶¶ 67–68).  Plaintiffs' employees called plaintiffs.  *Id.* (2nd Am. Compl. ¶ 69).  And plaintiffs rescheduled their real estate closing, started their return to Colby, and decided to retrieve their Los Jarochos Trailer ownership papers on the way.  *Id.* (2nd Am. Compl. ¶ 70).  In the meantime, plaintiffs' daughter called the police "*for help* to protect her parents, their employees, and their family business."  *Id.* at 16 (2nd Am. Compl. ¶ 80) (emphasis in original).  The Police Department dispatched Officer Taylor.  *Id.* (2nd Am. Compl. ¶ 81).  Elsie—a bilingual Los Jarochos customer who had arrived on scene to buy food—agreed to stay and

facilitate communication between plaintiffs' employees and the police. *Id.* at 15, 16 (2nd Am. Compl. ¶¶ 74, 78).

"No court order relating to the Los Jarochos Trailer has ever been provided to Plaintiffs and no such court order ever existed[.]" *Id.* at 17 (2nd Am. Compl. ¶ 87). Garcia Recovery and Borjas, since the repossession, "both admitted the Los Jarochos Trailer belongs to Plaintiffs." *Id.* (2nd Am. Compl. ¶ 86).

### The Repossession After Officer Taylor Arrived

When Officer Taylor arrived, he spoke with the Garcias and Elsie. *Id.* (2nd Am. Compl. ¶ 90). He excluded plaintiffs' employees from those discussions and they "were not included . . . or consulted and never learned most of what was said." *Id.* (2nd Am. Compl. ¶¶ 91–92). Officer Taylor "did not try to slow the conversation down to allow Elsie to translate[.]" *Id.* at 18 (2nd Am. Compl. ¶ 93). Nor did he allow "Plaintiffs [present by phone] or their employees to be heard, or pause the conversation until Plaintiffs could arrive." *Id.* Elsie reported to plaintiffs' employees that the Garcias showed papers to Officer Taylor. *Id.* (2nd Am. Compl. ¶ 96). Elsie also told plaintiffs and their employees that Officer Taylor "said he could not do anything because the Garcias had a court order with pictures of the Los Jarochos Trailer." *Id.* (2nd Am. Compl. ¶ 97).

Despite this statement, Officer "Taylor immediately took charge of the situation" and ordered plaintiffs' employees to leave the trailer. *Id.* (2nd Am. Compl. ¶ 100). The employees, through Elsie, informed Officer Taylor that "the Los Jarochos Trailer was owned by plaintiffs free and clear of any liens" and that plaintiffs would arrive in 30 minutes or less with proof of their ownership. *Id.* at 19 (2nd Am. Compl. ¶¶ 104–05). One employee also showed Officer Taylor and the Garcias the Used Sushi Trailer and identified it as the only trailer for which a court order might exist. *Id.* at 20 (2nd Am. Compl. ¶ 108). To determine which trailer to

repossess, the Garcias "exhaustively searched for VIN and serial numbers" on both trailers but couldn't find one matching their paperwork for either trailer. *Id.* (2nd Am. Compl. ¶¶ 109–13). And so, "the Garcias concluded they could not legally take either trailer." *Id.* (2nd Am. Compl. ¶ 114).

But Officer Taylor told the Garcias "to take the Los Jarochos Trailer anyway because Plaintiffs or their employees must have removed the VIN from the Los Jarochos Trailer to prevent it from being repossessed." *Id.* (2nd Am. Compl. ¶ 115). Then Officer Taylor ordered plaintiffs' employees "to stay out of the truck so the taking could proceed." *Id.* at 21 (2nd Am. Compl. ¶ 119). Upon request, Officer Taylor allowed plaintiffs' employees to remove equipment and food from the Los Jarochos Trailer, but he rushed them, "repeatedly telling them directly to 'hurry up.'" *Id.* (2nd Am. Compl. ¶¶ 120–22). Before plaintiffs' employees had finished removing plaintiffs' belongings from the trailer, the Garcias closed and blocked the doors to that trailer. *Id.* at 22 (2nd Am. Compl. ¶ 128). Officer Taylor "did not order or encourage the Garcias to stop blocking the doors." *Id.* Officer Taylor also "refused repeated pleas" by plaintiffs, through their employees, "to pause the taking until Plaintiffs could reach the scene." *Id.* (2nd Am. Compl. ¶ 127). And when plaintiffs' employee attempted to film the repossession, Officer Taylor ordered him to stop "under color of law." *Id.* at 23 (2nd Am. Compl. ¶ 135). The employee complied. *Id.*

Officer "Taylor remained on Plaintiffs' property until the taking was complete." *Id.* (2nd Am. Compl. ¶ 139). Indeed, he was still on the property when plaintiffs arrived, "possibly 30 minutes but at most 45 minutes from the time" when their employees first called them. *Id.* (2nd Am. Compl. ¶ 141). When plaintiffs showed Officer Taylor their proof of ownership documents,

his response "was to tell Plaintiffs he was sorry [and that] they should find a lawyer[.]"  *Id.* at 24

(2nd Am. Compl. ¶ 143).

### *The Repossession's Aftermath*

Plaintiffs suffered immediate business losses due to the repossession.  They were

required to cancel already-promised Easter orders since they "had lost expensive equipment and

the food they needed" to fill them.  *Id.* (2nd Am. Compl. ¶ 145).  On April 14, 2022, Garcia

Recovery contacted plaintiffs, apologized for taking the wrong trailer, and told plaintiffs they

could come pick up the Los Jarochos Trailer.  *Id.* at 26 (2nd Am. Compl. ¶ 154).  Plaintiffs

responded that Garcia Recovery made the mistake and should return the trailer themselves.  *Id.*

But Garcia Recovery refused.  *Id.*  And Garcia Recovery didn't respond when plaintiffs' counsel

sent an email demanding the trailer's immediate return.  *Id.* at 26–27 (2nd Am. Compl. ¶¶ 157–

58).  Plaintiffs later heard reports from friends and acquaintances of "malicious rumors

circulating that the business had been busted for dealing drugs."  *Id.* at 24–25 (2nd Am. Compl. ¶

146).

On April 20, 2022, plaintiffs found and leased a temporary replacement trailer to keep

their Colby location open.  *Id.* at 27–28 (2nd Am. Compl. ¶¶ 160–61).  On February 27, 2023,

the Garcias returned the Los Jarochos Trailer to plaintiffs.  *Id.* at 28 (2nd Am. Compl. ¶ 165).

The Los Jarochos Trailer had sustained damage and required repairs to return it to its condition at

repossession.  *Id.* at 29 (2nd Am. Compl. ¶ 166).

### II.    Legal Standard for 12(b)(6) Motion to Dismiss

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a

claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a

Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' the complaint fails to state a claim." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Having outlined the relevant legal standard for a motion to dismiss, the court now evaluates plaintiffs' claims under that standard—starting with their federal claims against the municipal defendants, below.

## III.   Federal Claims Against Municipal Defendants

Plaintiffs assert municipal liability for Officer Taylor's actions.  They contend that "official policies, practices, and customs" served as the "moving force" behind the alleged constitutional violations.  Doc. 53 at 48 (2nd Am. Compl. ¶ 340).  Plaintiffs also aver that municipal defendants "acted with deliberate indifference in implementing a policy" which

"inadequately trained and instructed," "inadequately supervised," and "faultily hired" police officers. *Id.* at 48–49 (2nd Am. Compl. ¶¶ 341–45, 350).

Defendants respond that plaintiffs' allegations are "conclusory" because plaintiffs assert "that a policy or custom exists" without alleging "facts that would support such a conclusion." Doc. 56 at 4. And municipal liability cannot lie without factual allegations plausibly alleging a causal link between municipal policy or custom and plaintiffs' injuries. So, defendants ask the court to dismiss all federal law claims against municipal defendants.

## A. Municipal Liability under *Monell*

A plaintiff may not assert a 42 U.S.C. § 1983 claim against a municipal entity unless he establishes that a government policy or custom caused his injuries. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). Municipal liability is limited to those situations "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* at 694. And the limits on municipal vicarious liability extend to claims under 42 U.S.C. §§ 1981 and 1985, as well.[3] To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.'" *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). A plaintiff

---

[3]     The Tenth Circuit has held that the doctrines limiting vicarious liability of municipal entities under 42 U.S.C. § 1983 also restrict claims made under § 1981. *Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1137 (10th Cir. 2006). The same is true for claims based on § 1985. *Howard v. Topeka-Shawnee Cnty. Metro. Plan. Comm'n*, 578 F. Supp. 534, 538–39 (D. Kan. 1983) ("Plaintiff finally argues that the theory of *respondeat superior* can be used to hold these defendants liable under § 1981 or § 1985, even if unavailable as to § 1983 claims. We do not agree. . . . the court [has] held that under § 1981 a defendant must be shown to have been directly involved in a deprivation of plaintiff's civil rights. . . . The same policy should apply to claims under § 1985. We hold that the entity defendants may not be held vicariously liable under plaintiff's claims based on §§ 1981, 1983 or 1985.").

may establish such municipal policy or custom by alleging facts capable of demonstrating one of

the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (internal quotation marks, brackets, and citation omitted).

The fifth method to demonstrate municipal policy or custom—failure-to-train-or-

supervise theory—requires deliberate indifference.  A plaintiff must show either "a pattern of

prior similar misconduct" or that the need for training was "so obvious" and the current

training's inadequacy "so likely to result in the violation of constitutional rights" that

policymakers demonstrated deliberate indifference.  *Waller v. City & Cnty. of Denver*, 932 F.3d

1277, 1288 (10th Cir. 2019) (citation and internal quotation marks omitted).  In other words,

deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51,

61 (2011) (internal quotation marks and citations omitted).  And, while "a local government's

decision not to train certain employees about their legal duty to avoid violating citizens' rights

may rise to the level of an official government policy[,]" this failure-to-train theory is the "most

tenuous" theory which can support municipal liability because it is "nebulous" and "removed

from the constitutional violation."  *Id.* (internal quotation marks and citation omitted.)

Finally, a court cannot impose liability under *Monell* based on "a single incident of

unconstitutional activity . . . unless proof of the incident includes proof that it was caused by an

existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993) (citation omitted). And so, to "survive a motion to dismiss, an official capacity claim must allege sufficient facts to show that a specific policy or custom was the moving force behind the alleged violation." *Dalcour v. City of Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012) (citation omitted).

### B.  Analysis of *Monell* Liability

Here, the Second Amended Complaint asserts two different theories to demonstrate that Officer Taylor acted under the municipal policy or custom of municipal defendants. First, it invokes the failure-to-train-or-supervise theory. Doc. 53 at 48–49 (2nd Am. Compl. ¶¶ 341–45, 350). Second, it alleges more generally that the municipal defendants' "official policies, practices, and customs were the moving force behind the violations of Plaintiffs' constitutional rights." *Id.* at 48 (2nd Am. Compl. ¶ 340).

Under the first theory, plaintiffs contend that municipal defendants—Chief Barrett and the City of Colby, Kansas—"should have hired, trained, and supervised their police officers to keep the peace rather than endorsing breaches of it. . . . [And] to know discrimination based on illegal animus is unconstitutional and illegal." *Id.* at 46, 47 (2nd Am. Compl. ¶¶ 325, 331). But plaintiffs fail to allege facts that could support the requisite deliberate indifference for a failure-to-train-or-supervise theory. They neither cite a "pattern of similar misconduct" nor enumerate the current training's inadequacies, which are "so likely to result in the violation of constitutional rights[.]" *Waller*, 932 F.3d at 1288. And plaintiffs never allege facts that could demonstrate that the municipal defendants here "disregarded a known or obvious consequence of [their] action[s]." *Connick*, 563 U.S. at 61 (citation and internal quotation marks omitted). This absence of such allegations—especially considering the already "tenuous" and "nebulous" nature

of a failure-to-train-or-supervise theory—proves fatal to plaintiffs' first ground for municipal liability.

Plaintiffs' more general allegations about municipal defendants' policies, practices, and customs similarly fail as unsupported.  Although plaintiffs contend such policies were the "moving force" behind the alleged constitutional violations, Doc. 53 at 48 (2nd Am. Compl. ¶ 340), plaintiffs offer no facts suggesting an "existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Butler*, 992 F.2d at 1055 (citation omitted).  Nor do plaintiffs "allege sufficient facts"—or for that matter any facts at all—to identify a "specific policy or custom." *Dalcour*, 492 F. App'x at 930.

The court thus agrees with defendants that these claims are conclusory and subject to dismissal.  And plaintiffs themselves implicitly acknowledge the paucity of factual support in their Opposition (Doc. 59) when they "do not oppose dismissal of their federal claims against" the municipal defendants.  Doc. 59 at 2.  So, the court dismisses all the federal claims against the municipal defendants premised on 42 U.S.C. §§ 1981, 1983 and 1985.

### C.  Dismissal Without Prejudice

Although the parties agree about dismissal of these claims, they disagree whether the court should dismiss them with or without prejudice.  Defendants contend that the court should grant defendants' Motion to Dismiss with prejudice.  Doc. 60 at 1.  They cite for support plaintiffs' failure to respond to defendants' Rule 12(b)(6) arguments and plaintiffs' corresponding "abandonment of claims."  *Id.*  Plaintiffs, on the other hand, ask the court to dismiss their federal claims against the municipal defendants "without prejudice to adding them back later should a basis for doing so emerge."  Doc. 59 at 2.  And plaintiffs ask for preservation and production of "[d]ispatch records, hiring records, training records, records of supervision including evaluations, and City and Department policies, if they exist[.]"  Doc. 53 at 41 (2nd

Am. Compl. ¶ 279).  Plaintiffs also note that municipal defendants admitted they have a policy on civil standbys.  *Id.*

The court doubts plaintiffs will overcome the Second Amended Complaint's dearth of factual support for §§ 1981, 1983 and 1985 claims against the municipal defendants.  But, the "federal policy of deciding cases on the basis of the substantive rights involved rather than on technicalities" must inform the court's dismissal.  5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2023).  This policy "requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. . . . even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading." *Id.*; *see also Surat v. Klamser*, No. 19-CV-0901, 2020 WL 886220, at *9 (D. Colo. Feb. 24, 2020) ("The Court is skeptical that [plaintiff] could amend to state a viable claim, but the Court cannot say with certainty that [plaintiff] could never allege additional facts which would plausibly suggest *Monell* liability.  Accordingly, the Court will dismiss without prejudice.")  And plaintiffs have identified information sources which, with discovery, might allow them to allege additional facts to establish plausible *Monell* liability.  So, the court dismisses the claims against the municipal defendants without prejudice.[4]

Having addressed municipal defendants' liability under plaintiffs' §§ 1981, 1983 and 1985 claims, the court now turns to Officer Taylor's liability under plaintiffs' federal law claims.

---

[4]     Other courts likewise have dismissed without prejudice already-amended complaints.  *See, e.g.*, *Jones v. Loc. 798 of United Ass'n of Journeymen & Apprentices of Plumbing*, No. 420-CV-00585, 2023 WL 3666090, at *7 n.7 (N.D. Okla. May 25, 2023) ("Dismissal under Fed. R. Civ. Pro. 12(b)(6) is generally without prejudice, unless granting leave to amend would be futile.  Although Jones' second amended complaint fails to address the deficiencies identified by the Court in its previous opinion, the Court is not prepared to say amendment would be futile and thus grants Jones leave to amend his complaint for a second time.") (citations omitted).

IV.    **Federal Law Claims Against Officer Taylor[5]**

The court begins with plaintiffs' 42 U.S.C. § 1981 claim because it provides the opportunity to discuss other repossession cases—which supply useful context.  The court then addresses plaintiffs' conspiracy claims premised on 42 U.S.C. §§ 1985(3), 1986, and 1983. Finally, the court evaluates plaintiffs' First Amendment claim and Officer Taylor's qualified immunity defense.

A.  **42 U.S.C. § 1981 Claim Against Officer Taylor—Count I(4)**

Defendants move to dismiss plaintiffs' § 1981 claim against Officer Taylor.  They argue that plaintiffs' allegations don't identify a plausible intent to discriminate sufficient to trigger liability under § 1981.  The court addresses defendants' arguments, below.  But first, the court recites the law governing § 1981 claims.

1.  **Legal Standard for 42 U.S.C. § 1981 Claim**

"Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"  *Reynolds v. Sch. Dist. No. 1, Denver*, 69 F.3d 1523, 1532 (10th Cir. 1995) (quoting 42 U.S.C. § 1981(a)–(b)).  A "prima facie case of discrimination under § 1981" requires the plaintiff to establish:  "(1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981."  *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir. 2001).

---

[5]    Defendants don't ask the court to dismiss plaintiffs' § 1983 claim against Officer Taylor in Count I(1).  *See* Doc. 55 at 1 (explaining that defendants "move the court for an order dismissing . . . all claims asserted against Taylor, except one claim arising under 42 U.S.C. § 1983 [and] arising out of his alleged assistance in the repossession of Plaintiffs' vehicle.")  So, the court doesn't evaluate this claim now. Count I(1) survives.

The Supreme Court recently clarified the causation standard that applies to § 1981 claims.  To prevail on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, *but for race*, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added).[6]  That is, a plaintiff must demonstrate that race didn't just "play[] some role" in the defendant's decision-making process.  *Id.* at 1013–14 (citation and internal quotation marks omitted).  To the contrary, a § 1981 plaintiff plausibly must allege that race explained plaintiff's injuries.  *Id.* at 1013–14 (citation and internal quotation marks omitted).

Here, defendants contend that plaintiffs fail to meet any of the § 1981 prima facie elements, but focus their arguments on the second prong—intent to discriminate on the basis of race.  Doc. 56 at 6.  The court begins its analysis by evaluating the first and third prongs before addressing this second prong—where the heart of the controversy lies.

## 2.  The First Prong:  Members of a Protected Class

Plaintiffs' Second Amended Complaint alleges that plaintiffs are members of a protected class because, among other things, plaintiffs are Hispanic.  Doc. 53 at 43 (2nd Am. Compl. ¶ 299).  Other circuits have held specifically that Hispanic is a race, and thus a protected class,

---

[6]     The parties sharply disagree whether the *McDonnell Douglas* burden shifting framework applies here.  The court concludes that it doesn't.  In *Comcast Corp.*, the Supreme Court explained that "*McDonnell Douglas* can provide *no basis* for allowing a complaint to survive a motion to dismiss when it fails to allege essential elements of a plaintiff's claim."  140 S. Ct. at 1019 (emphasis added).  It's equally true that recent Tenth Circuit precedent applies the *McDonnell Douglas* framework to § 1981 claims.  *See Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1210 (10th Cir. 2022) ("A plaintiff may prove intentional discrimination under the second element with either direct evidence or circumstantial evidence that satisfies the *McDonnell Douglas* burden-shifting framework.").  The court reconciles these two opinions by noting the stage of the relevant pleadings.  The Supreme Court rejects the *McDonnell Douglas* framework for § 1981 claims at the motion to dismiss stage.  *Comcast Corp.*, 140 S. Ct. at 1019. The Tenth Circuit case—*Cruz*—reversed a grant of summary judgment against plaintiff, citing a case limiting the *McDonnell Douglas* burden shifting framework to the summary judgment context.  *Cruz*, 42 F.4th at 1210; *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) ("Importantly, the three-part *McDonnell Douglas* burden-shifting analysis is limited to the summary judgment context.").  Thus, given the motion-to-dismiss stage of the current motion, the court doesn't apply the *McDonnell Douglas* burden-shifting framework.

for purposes of § 1981.  *See, e.g.*, *Vill. of Freeport v. Barrella*, 814 F.3d 594, 605–06 (2d Cir. 2016) ("Hispanics clearly constitute an ethnic group. . . . [I]t has long been settled in this circuit that Hispanics comprise a distinct race for purposes of § 1981."); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 908 (9th Cir. 1999) (equating plaintiff's being Hispanic with "his ancestry and ethnic characteristics").  And defendants concede that "a distinctive ethnic group, such as Mexican Americans, can constitute a protected group under § 1981."  Doc. 56 at 6 (citing *Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs.*, No. CIV 02-1509, 2006 WL 4079033, at *5–6 (D.N.M. June 9, 2006)).

Defendants argue, however, that the alleged discrimination here is "intra-Hispanic" because Officer Taylor demonstrated preferential treatment toward one group of Hispanics over another group of Hispanics.  *Id.*  Defendants imply that this "intra-Hispanic" dynamic negates plaintiffs' prima facie showing that plaintiffs are a protected class.  But defendants' argument more properly addresses the second prong—Officer Taylor's intent to discriminate on the basis of race—and the court will discuss it as part of that element.  For now, the court concludes that plaintiffs—as Hispanic persons—are members of a class that Congress intended to protect under § 1981.

### 3.  The Third Prong:  Interference with a § 1981 Protected Activity

To establish the third prong—that Officer Taylor's conduct interfered with a protected § 1981 activity—plaintiffs aver that Officer Taylor took "away Plaintiffs' inventory, equipment, and place of business during the busy Easter season," harmed "Plaintiffs' business reputation," and limited "Plaintiffs' business operations by forcing them to make do with a less adequate substitute trailer[.]"  Doc. 59 at 2; *see also* Doc. 53 at 24 (2nd Am. Compl. ¶ 145) ("[Plaintiffs] had to call their customers with Easter orders to tell them they would not be able to deliver, and

their customers would need to make other arrangements.").  Defendants retort that "nothing in the 2AC [claim] indicates that Taylor interfered with the few specific rights protected by § 1981."  Doc. 56 at 6.

Our Circuit has recognized that restaurant industry transactions can establish interference with protected § 1981 contractual rights.  *See Hampton*, 247 F.3d at 1102 ("Typically, most litigation involving § 1981 claims has emanated from the right to make and enforce employment contracts. . . . However, the statute has been applied to discrimination claims arising in the retail sector and restaurant industry, when a contract has been established.").  The court thus concludes that the alleged interference with plaintiffs' Easter orders "allows the court to draw the reasonable inference" that Officer Taylor interfered with a protected § 1981 activity.  *Iqbal*, 556 U.S. at 678.  And so, the third prong stands as plausibly pleaded.

### 4.  The Second Prong:  Intent to Discriminate on the Basis of Race

Finally, plaintiffs must allege facts to demonstrate their § 1981 claim's second prong—Officer Taylor's intent to discriminate on the basis of race.  To do so, plaintiffs cite Officer Taylor's behaviors during the repossession:  he ignored plaintiffs and their employees; he didn't include plaintiffs' employees in the discussion; he "kept hurrying Plaintiffs' employees" as they removed plaintiffs' belongings from their trailer; he endorsed non-municipal defendants' "escalation of the situation towards confrontation[;]" he physically blocked plaintiffs' employees from the trailer; he "ignored (and acted to thwart) Plaintiffs' pleas to pause the taking[;]" and he "accorded a bystander more attention and respect than Plaintiffs or their employees[.]"  Doc. 59 at 3–4; *see generally* Doc. 53 at 17–22 (2nd Am. Compl. ¶¶ 90–131).  In sum, plaintiffs allege, Officer Taylor "sided entirely with the other Defendants and ignored the facts presented by Plaintiffs," thereby treating plaintiffs "unequally and discriminatorily."  Doc. 59 at 3.

Defendants reply that plaintiffs neither have demonstrated that Officer Taylor intended to discriminate based on race, nor that he showed his alleged racial discrimination was the but-for cause of his conduct.  Doc. 60 at 2.  The court agrees with defendants.

The Second Amended Complaint fails to allege plausibly that Officer Taylor intended to discriminate on the basis of race, and that, but for racial animus, Officer Taylor would've behaved differently.  In their attempt to establish this second prong, plaintiffs aver that Officer Taylor treated them unequally vis-à-vis the non-municipal defendants.  Plaintiffs provide a long list of Officer Taylor's egregious and preferential conduct, as detailed above.  And plaintiffs argue that Officer "Taylor's misconduct was so exceptional, . . . it is difficult to posit any explanation for it other than racial discrimination."  Doc. 59 at 5 n.3.  Taking plaintiffs' allegations as true—as the court must—it is clear that Officer Taylor sided with one group over the other at the repossession.  But plaintiffs don't allege any fact explaining why he did so.

Officer Taylor's preferential conduct alone, even if egregious, doesn't establish racial animus as its motivating force.  Other case law recites similar police (mis)conduct and preferential treatment incidents in the repossession context.  So, Officer Taylor's misconduct appears not so exceptional—or without alternative explanation—after all.  The court reviews a few such cases, below.

In *Marcus v. McCollum*, a car re-possessor contacted a police officer before the repossession so that the officer would watch and "be aware of the situation."  394 F.3d 813, 816 (10th Cir. 2004), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  During the repossession, the car owner's wife emerged from her residence and protested the re-possessor's right to the car.  *Id.*  Noting the developing dispute, the watching police officer called for backup and four police officers quickly arrived.  *Id.*  Once on the scene, officers allegedly

told the owner's wife and her minor son "to stop their interference" and instructed them to let the re-possessors "do what they're going to do and take it up in small claims court." *Id.* Officers also allegedly warned that "if the situation escalated, 'someone' would be going to jail." *Id.* And officers poked the car owner's minor son forcefully in the chest several times, knocking him backwards. *Id.* The re-possessor showed police nothing more than a piece of paper with a vehicle identification number on it. *Id.* Officers never asked for more documentation. *Id.* As in the present case, the officers in *Marcus* allegedly threw their authority's weight behind the re-possessor—who had presented no more than flimsy documentation—and actively facilitated the repossession. But the court didn't attribute the officers' preferential treatment to racial animus.

Similar police conduct gave rise to claims in *McLinn v. Thomas County Sheriff's Dep't*, 535 F. Supp. 3d 1087 (D. Kan. 2021). There, a re-possessor requested law enforcement presence at a truck's repossession. *Id.* at 1097. An officer arrived at the repossession location at the same time as the re-possessor. *Id.* The truck's owner exited a nearby building, demanded the re-possessor leave the truck alone, and insisted that the re-possessor and the officer leave his property. *Id.* at 1097–98. The officer instructed the owner not to resist and, when the owner became agitated and yelled in response, the officer allegedly placed his hand on his gun. *Id.* at 1098. When the owner attempted to retrieve his personal belongings from the truck, the officer stood between the owner and the truck and, again, put his hand on his gun. *Id.* The re-possessor didn't provide any paperwork to justify the repossession. *Id.* The truck owner continued to protest the repossession, but the officer "ignored his protests" and remained until the re-possessor finished the job. *Id.* *McLinn*'s officer, like Officer Taylor here, ignored the owner's protests, showed no regard for proper repossession documentation, and used his authority—both by standing between the owner and the truck and by repeatedly putting his hand on his gun—to

aid the repossession.  Again, the court didn't attribute the officers' preferential treatment of the re-possessor to racial discrimination.

These police-involved repossession incidents—involving preferential officer behavior markedly similar to the present case—played out without the court so much as mentioning racial animus.  So, Officer Taylor's preferential conduct toward the re-possessors here, without more, establishes at best "a sheer possibility" that he aided the re-possessors based on unlawful racial discrimination.  *Iqbal*, 556 U.S. at 678.  But the plausibility standard requires more than sheer possibility.  *Id.*

And plaintiffs' racial discrimination allegation here inches even closer to a "legal conclusion couched as a factual allegation" when one considers the absence of racial distinction between the two groups present at the repossession.  *Id.* (citation and internal quotation marks omitted).  As defendants aptly point out, plaintiffs' Second Amended Complaint "alleges that Taylor responded to a dispute between parties [who] were *all* of Hispanic origin, and 'sided' with the one set of Hispanics over a different set of Hispanics."  Doc. 56 at 6 (emphasis added).  That is, the group Officer Taylor favored and the group he ignored weren't racially distinct.  So, whatever the reason for Officer Taylor's preferential treatment, a reasonable jury couldn't infer that it was "on the basis of race."  *Hampton*, 247 F.3d at 1102.  Nor can the court infer that race was the but-for cause of Officer Taylor's unequal treatment.  *Comcast Corp.*, 140 S. Ct. at 1019.  Even when the court accepts as true all allegations about Officer Taylor's preferential treatment, the court can't "draw the reasonable inference" that Officer Taylor is liable for racial discrimination.  *Iqbal*, 556 U.S. at 678.

But, plaintiffs don't fold on the point.  They argue that Officer Taylor demonstrated preferential treatment based on the two groups' English language-speaking abilities.  Doc. 53 at

17–18 (2nd Am. Compl. ¶¶ 90–95).  And this basis for Officer Taylor's discrimination, plaintiffs contend, manifests Officer Taylor's illegal racial animus.  Doc 59 at 5.  Plaintiffs cite no authority for their proposition, however, that discrimination based on language skills is a form of legally-recognized racial discrimination.  Nor has the court found any such authority.  Instead, the Tenth Circuit noted that language skills and the language one chooses to speak "'may be used as a covert basis for national origin discrimination.'"  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (quoting *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980)).  But national origin discrimination isn't the same as racial discrimination under the law, and Section 1981 doesn't permit suit based on national origin discrimination.  *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, *rather than solely on the place or nation of his origin*, or his religion, he will have made out a case under § 1981.") (emphasis added).  So—even accepting as true that Officer Taylor discriminated between the two groups because they spoke English at disparate levels of ability—that form of discrimination isn't racial discrimination.  And it doesn't support an action under § 1981.

Because plaintiffs can't demonstrate plausible—as opposed to possible—racial animus by citing Officer Taylor's egregious conduct or language-skills-based preferential treatment, the court considers plaintiffs' racial discrimination pleading conclusory.  In the end, plaintiffs' "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" based on racial animus.  *Warnick*, 895 F.3d at 751 (internal quotation marks and citation omitted).  Plaintiffs' Second Amended Complaint thus hasn't alleged facts sufficient to establish racial discrimination as a plausible basis—much less a but-for cause—of Officer

Taylor's conduct.  So, plaintiffs haven't established a § 1981 claim's requisite second prong. And the court dismisses Count I(4) against Officer Taylor for that reason.

The court turns next to plaintiffs' conspiracy-based federal claims against Officer Taylor.

**B.  42 U.S.C. § 1985(3) Conspiracy Claim Against Officer Taylor—Count I(2)**

Plaintiffs contend that Officer Taylor and the re-possessors "acted in tandem (mirroring and cooperating with one another in their communications and actions)[,]" thereby conspiring "together to deprive Plaintiffs of their civil rights and property."  Doc. 59 at 7–8; *see also* Doc. 53 at 29–30 (2nd Am. Compl. ¶¶ 172–80).  And plaintiffs allege this "conspiracy was motivated by an illegal animus."  Doc. 53 at 52 (2nd Am. Compl. ¶ 378).

Defendants respond that plaintiffs' conspiracy allegations are conclusory.  Doc. 56 at 8. Plaintiffs base their conspiracy claims solely on how Officer Taylor interacted with the parties at the scene of the repossession, defendants contend.  *Id.*  And, at the scene, Officer Taylor "simply . . . responded to . . . calls from the parties, was shown paperwork, and determined that Garcia Recovery should repossess the vehicle[.]"  *Id.* at 8–9.  These interactions, defendants suggest, don't "transform the encounter into a grand conspiracy."  *Id.* at 8–9.

Plaintiffs bring this conspiracy claim under 42 U.S.C. § 1985.  The statute's pertinent portion provides that:

> If two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . [or] cause to be done, any act in furtherance of the object of such conspiracy . . . the party so injured or deprived may have an action for the recovery of damages[.]

42 U.S.C. § 1985(3).  Case law has clarified that, for a viable Section 1985(3) claim, plaintiffs must show "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom."  *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citation omitted).  But even

23

when a plaintiff's conspiracy claim satisfies all four of these elements, "§ 1985(3) does not apply to all tortious, conspiratorial interferences with the rights of others[.]" *Id.* (internal quotation marks and citation omitted). Instead, § 1985(3) applies "only to conspiracies motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (internal quotation marks and citation omitted). So, to state a claim, "a plaintiff must establish that a class-based or racially discriminatory motive lurks behind the conspiratorial activities." *Babbar v. Ebadi*, 216 F.3d 1086, No. 99-3040, 2000 WL 702428, at *9 (10th Cir. 2000). The court analyzes plaintiffs' civil conspiracy claim in light of, first, the requisite racial or class-based discriminatory animus. And then it evaluates whether plaintiffs have alleged enough facts that, if true, reasonably could establish a conspiracy occurred.

### 1. Racial or Class-Based Discriminatory Animus

As discussed in the context of plaintiffs' § 1981 claims above, plaintiffs haven't alleged facts sufficient to support a plausible inference of Officer Taylor's racial animus. And plaintiffs haven't pleaded class-based discriminatory animus. This absence of requisite animus to plead a § 1985(3) claim suffices to dismiss plaintiffs' conspiracy claim against Officer Taylor here. But the court elects to evaluate plaintiffs' claim also under the relevant case law defining the existence of a conspiracy because that analysis helps the court address plaintiffs' other conspiracy claims.

### 2. Showing a Conspiracy:  Meeting of the Minds and Parallel Action

To exist, a "civil conspiracy requires a meeting of the minds or agreement among the defendants and concerted action." *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 770 (10th Cir. 2001). "The bare assertion that certain officials 'conspired' is exactly the kind of conclusory statement [the court shouldn't] consider when assessing a motion to dismiss." *Gowadia v.*

24

*Stearns*, 596 F. App'x 667, 671 (10th Cir. 2014).  And concerted action doesn't follow necessarily from parallel action because "parallel action, oftentimes, is an expected result of innocent behavior and is thus just as consistent with independent actions as it is with conspiracy."  *Id.*

Here, plaintiffs allege Officer Taylor and the re-possessors both communicated before the repossession and cooperated during the repossession.  *See* Doc. 53 at 29–30 (2nd Am. Compl. ¶¶ 172–80).  That communication and cooperation, plaintiffs contend, suffice to support their conspiracy claims against Officer Taylor.  *See* Doc. 59 at 6–7.  Before the repossession, Officer Taylor and the re-possessors "communicated directly . . . to the exclusion of meaningful participation by the Plaintiffs or their employees," "shared papers and photographs" with one another, and "represented that [the re-possessors] had a court order authorizing them to take the Los Jarochos Trailer, whereas no such order existed."  Doc. 53 at 29 (2nd Am. Compl. ¶¶ 172– 74).  During the repossession, Officer Taylor and the re-possessors "cooperated and followed one anothers' lead," "physically excluded [plaintiffs' employees] from the Los Jarochos Trailer," "pressed [plaintiffs' employees] to 'hurry up,'" and "instructed [one employee] to stop filming the illegal events."  *Id.* at 29–30 (2nd Am. Compl. ¶¶ 175–79).  The court now evaluates whether this alleged communication and cooperation suffice to demonstrate a meeting of the minds and concerted action required for a viable conspiracy claim.

On this question, the court finds persuasive a Sixth Circuit repossession case.  In *Hensley v. Gassman*, police officers—summoned to a car repossession—actively aided the re-possessor. 693 F.3d 681, 684 (6th Cir. 2012).  Before the repossession, the officers met the re-possessor and followed him to the scene of the repossession.  *Id.*  The re-possessor provided the officers with a document file, allegedly including a repossession order, which the officers neglected to review.

*Id.*  During the repossession, the car owners protested that they had paid their car payments and thus repossession wasn't merited.  *Id.* at 685.  The officers ignored the owners' explanations, ordered the owners to move out of the way, opined that the re-possessor should take the car, and ignored the owners' demands to leave the property.  *Id.*  Then, when one owner entered the vehicle to thwart the repossession, the officers ordered the owner to exit the vehicle, broke the car's passenger-side window with a hammer to unlock the doors, physically pulled the owner from the car, and then told the owners that if they wanted any personal belongings from the car they should "get it out now."  *Id.*  As it turned out, the re-possessor "had no valid basis to repossess the vehicle in the first place because the creditor had rescinded its repossession order."  *Id.* at 684.

The Sixth Circuit concluded that the officers' "conduct was not only active participation but was instrumental to [the re-possessor's] success in completing the repossession."  *Id.* at 692.  Indeed, their conduct "resolved the stalemate in favor of [the re-possessor]—the party neither factually nor legally entitled to the [car]."  *Id.*  Despite the officers' active and instrumental role, the Sixth Circuit concluded that the officers' conduct during the repossession didn't establish conspiratorial agreement.  *Id.* at 695.  The Sixth Circuit explained that the officers' conduct was "just as consistent with independent conduct as it [was] with a conspiracy."  *Id.*

In the present case, Officer Taylor's conduct resembles that of the officers in *Hensley*, though Officer Taylor didn't break any windows or physically drag anyone.  Like the officers in *Hensley*, Officer Taylor allegedly communicated directly with the re-possessors, who shared papers—supposedly including a court order—with Officer Taylor before the repossession.  And, like the officers in *Hensley*, Officer Taylor ignored the protests of plaintiffs and their employees, cooperated with the re-possessors by ordering plaintiffs' employees to move out of the way,

asserted that the re-possessor would take the trailer, physically excluded plaintiffs' employees from the trailer, and hurried the employees in extracting from the trailer plaintiffs' personal property. *See* Doc. 53 at 17–22, 29–30 (2nd Am. Compl. ¶¶ 90–132, 175–78).  To the extent plaintiffs here rely on Officer Taylor's communication before and parallel action during the repossession to establish a conspiracy's requisite meeting of the minds and concerted action, this court echoes the conclusions of the Sixth Circuit:  Officer Taylor's conduct before and during the repossession doesn't establish conspiratorial agreement.  Officer Taylor's "parallel action," *Gowadia*, 596 F. App'x at 671, is "just as consistent with independent conduct as it is with a conspiracy," *Hensley*, 693 F.3d at 695.  Plaintiffs have failed to allege facts sufficient to support an inference or finding of a conspiracy.  The court thus dismisses plaintiffs' Count I (2) against Officer Taylor.

### C.  42 U.S.C. § 1986 Claim Against Officer Taylor and the Municipal Defendants— Count I(3)

Plaintiffs premise their § 1986 claim on a separate theory of conspiracy from the § 1985 claim discussed above.  They allege that the underlying conspiracy for the claim in this Count involves only the non-municipal defendants—not Officer Taylor himself.  Plaintiffs aver that Officer Taylor violated § 1986 by failing "to thwart a Section 1985 conspiracy among other parties[.]"  Doc. 59 at 8.  Plaintiffs contend that Officer Taylor "had knowledge of the non-Municipal Defendants' section 1985 conspiracy through his participation in it and through his communications and document exchanges with the" re-possessors.  Doc. 53 at 53 (2nd Am. Compl. ¶ 385).  Officer Taylor, plaintiffs assert, "had the ability to aid in the prevention of the wrong to Plaintiffs" but he "neglected or refused to protect Plaintiffs by taking any action to support them or to stop the [re-possessors] from taking the trailer."  *Id.* (2nd Am. Compl. ¶¶ 386–87).

Defendants contest Officer Taylor's knowledge of the alleged non-municipal defendants' conspiracy. They argue that plaintiffs "do not allege that Taylor even knew that Borjas [one of the alleged non-municipal conspirators] existed." Doc. 60 at 3.

Section 1986 "provides an action for neglecting to prevent a violation of Section 1985[.]" *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228, 1230 (10th Cir. 1990). It requires "knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed[.]" 42 U.S.C. § 1986. It also requires a viable conspiracy claim under § 1985. *Vreeland v. Huss*, No. 118-CV-00303, 2020 WL 3447768, at *3 (D. Colo. June 24, 2020) ("Importantly, the finding of a conspiracy under section 1985 is a predicate to liability under section 1986."); *see also Brown v. Reardon*, 770 F.2d 896, 907 (10th Cir. 1985) ("The district court did not err in finding that the § 1986 claim is dependent upon the existence of a valid claim under § 1985."). And, as outlined above, a § 1985(3) conspiracy requires the plaintiff to allege the conspirators were "motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Tilton*, 6 F.3d at 686 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 101–02 (1971)).

Here, plaintiffs fail to allege facts sufficient to support an inference of either the requisite knowledge or the requisite underlying conspiracy to state a § 1986 claim. Officer Taylor only knew and interacted with one party to the alleged non-municipal defendants' conspiracy. Officer Taylor interacted with the Garcias at the repossession. Doc. 53 at 17, 18, 20, 21, 29 (2nd Am. Compl. ¶¶ 90–91, 93–94, 96, 115, 121, 168–73). But plaintiffs never establish that Officer Taylor knew of any wrongs the Garcias conspired to commit with Sergio Borjas—the other party to the underlying conspiracy. Indeed, plaintiffs never allege that Officer Taylor even knew that Borjas existed. Section 1986 requires "knowledge that any of the wrongs conspired to be

done . . . are about to be committed[.]"  42 U.S.C. § 1986.  At most, plaintiffs establish that

Officer Taylor misinterpreted the paperwork held by the Garcias, which admittedly contained

Borjas's name.  Doc. 53 at 22 (2nd Am. Compl. ¶ 131).  But exposure to that paperwork doesn't

suffice for a reasonable inference that Officer Taylor knew about a conspiracy between the

Garcias and Borjas.

      Nor do plaintiffs allege facts sufficient to support that non-municipal defendants

perpetrated the alleged underlying conspiracy.  A § 1986 claim requires a valid § 1985 claim.

*Brown*, 770 F.2d at 907.  Recall that a § 1985 conspiracy requires either racial or class-based

discriminatory animus.  *Tilton*, 6 F.3d at 686.  Plaintiffs assert that "non-Municipal Defendants

were motivated by, [among other things,] discriminatory intent based on an illegal animus" and

that "non-Municipal Defendants would not have violated Plaintiffs' civil rights, but-for this

illegal animus."  Doc. 53 at 52 (2nd Am. Compl. ¶ 378).  But plaintiffs haven't pleaded any facts

to establish the Garcias or Borjas's illegal animus.  While plaintiffs allege they've made a prima

facie showing of discrimination, they simply haven't supported their § 1986 claim with sufficient

factual allegations.  The court finds no basis to infer racial or class-based discriminatory animus.

The animus's absence precludes a § 1985 conspiracy's existence between non-municipal

defendants.  And, without a valid § 1985 underlying conspiracy, no liability follows from

§ 1986.  So, the court dismisses Count I(3) against Officer Taylor and against the municipal

defendants.

### D.  Conspiracy Claim Against Officer Taylor—Count II(1)

      Plaintiffs assert one final federal law conspiracy claim against Officer Taylor.

Unfortunately, the Second Amended Complaint (Doc. 53) and plaintiffs' Response to the Partial

Motion to Dismiss (Doc. 59) make the basis for this claim unclear.  In the Complaint, plaintiffs

allege "Concerted Participation" claims—Counts II(1) and II(2).  Doc. 53 at 54–55 (2nd Am.

Compl. ¶¶ 403–07).  Plaintiffs describe the first claim—Count II(1)—as a conspiracy claim.  *Id.*
at 55 (2nd Am. Compl. ¶ 405).  And the second Concerted Participation claim didn't make it into
the Second Amended Complaint, so the court considers it abandoned.[7]  When the municipal
defendants interpret Count II(1) as a 42 U.S.C. § 1983 conspiracy claim, Doc. 56 at 8, plaintiffs
sometimes adopt defendants' interpretation, but other times, they reject it, *see* Doc. 59 at 6, 8
n.5.[8]  To the extent plaintiffs attempt to assert a federal common-law conspiracy claim under
Count II(1), "courts generally construe such claims as § 1983 conspiracy claims[,]" and the
Tenth Circuit has adopted this approach.  *Banks v. Opat*, 814 F. App'x 325, 337 n.14 (10th Cir.
2020).  So, this court construes Count II(1) as a conspiracy claim under § 1983 and evaluates it
accordingly.

A § 1983 conspiracy deprives "a plaintiff of a constitutional or federally protected right
under color of state law."  *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (internal
quotation marks and citation omitted).  This kind of conspiracy claim requires plaintiffs to
"allege specific facts showing agreement and concerted action amongst the defendants[.]"
*Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (internal quotation marks and citation
omitted).  "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."

---

[7]     Plaintiffs never elaborate on or explain Count II(2) under "Concerted Participation" in the Second
Amended Complaint.  Doc. 53 at 54–55 (2nd Am. Compl. ¶¶ 403–07).  While plaintiffs elaborated on
Count II(2) in the First Amended Complaint, Doc. 25 at 54–55 (1st Am. Compl. ¶¶ 393–98), plaintiffs
omitted those paragraphs from the Second Amended Complaint, *see* Doc. 53 at 54–55 (2nd Am. Compl.
¶¶ 403–07).  But the Second Amended Complaint supersedes the First Amended Complaint.  *See May v.
Segovia*, 929 F.3d 1223, 1229 (10th Cir. 2019) ("The amended complaint, as the operative complaint,
supersedes the original complaint's allegations[.]") (emphasis omitted).  So, the court considers Count
II(2) dropped and dismisses it without prejudice.  *See Jordan W. Cos., Ltd v. Native Rank, Inc.*, No. 18-
CV-2165, 2019 WL 3935201, at *1 (D. Colo. Aug. 20, 2019) (deeming claims plaintiff dropped in
amended complaint dismissed without prejudice).

[8]     Plaintiffs' Response claims at one point that the "2AC provides ample support for Plaintiffs'
conspiracy claims under Section 1985, Section 1983, and Kansas law."  Doc. 59 at 6.  Later in the same
Response, plaintiffs assert that "conspiracy is not an element of Section 1983. . . . Plaintiffs have
concededly pled a Section 1983 claim without reference to any conspiracy."  *Id.* at 8 n. 5.

*Id.* (internal quotation marks and citation omitted).  The Tenth Circuit elaborated on the requisite

elements to allege a conspiracy in *Snell v. Tunnell*:

> The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result.  To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.

920 F.2d 673, 702 (10th Cir. 1990) (internal quotation marks and citations omitted).

Here, plaintiffs allege Officer Taylor communicated and cooperated with non-municipal

defendants present at the repossession through direct conversation, sharing papers and

photographs, and concerted action to exclude plaintiffs' employees and hurry up their evacuation

of the trailer.  *See* Doc. 53 at 29–30 (2nd Am. Compl. ¶¶ 172–80).  But plaintiffs fail to plead a

facially plausible general conspiratorial objective or a single plan, "the essential nature and

general scope of which" was known to Officer Taylor.  *Snell*, 920 F.2d at 702.  In a similar

analysis about conspiratorial agreement under § IV.B.2., above, the conspiracy allegations here

are conclusory, failing to allege specific facts to show the necessary agreement for a § 1983

conspiracy claim.  *Frasier*, 992 F.3d at 1024.  Plaintiffs concede that they themselves called the

police department for help and that unknown "persons at the Department dispatched Taylor to

the scene."  Doc. 53 at 16 (2nd Am. Compl. ¶ 81).  Plaintiffs don't assert that non-municipal

defendants requested Officer Taylor or knew that dispatch would assign him to respond.  So,

plaintiffs' entire conspiracy theory rests solely on Officer Taylor's interactions with non-

municipal defendants at the scene of the repossession.  While Officer Taylor acted together with

non-municipal defendants at the scene, no facts support inferring a general conspiratorial

objective between these parties.  *Snell*, 920 F.2d at 702.  The court thus dismisses plaintiffs

Count II(1) against Officer Taylor as well.

### E.  First Amendment Claim and Standing

Though not identified as a separate count in the Second Amended Complaint's unusual

presentation, plaintiffs appear to bring a First Amendment claim as well.[9]  Officer Taylor moves

for its dismissal.  Plaintiffs' First Amendment claim rests on Officer Taylor allegedly prohibiting

plaintiffs' employee from filming the repossession on his cell phone.  Doc. 53 at 23 (2nd Am.

Compl. ¶¶ 135–38).  Plaintiffs assert that their employee attempted the filming to protect

"Plaintiffs' property and rights[,]" so prohibiting the recording "was also a violation of Plaintiffs'

rights to free speech and to petition government under the First Amendment and of Plaintiffs'

rights to due process under the Fourth and Fourteenth Amendments."  *Id.* (2nd Am. Compl. ¶

138).  Plaintiffs premise their claim on the agency relationship—their employee sought to film

on his employer's behalf to protect his employer's interests.  *Id.* (2nd Am. Compl. ¶¶ 137–38)

("Plaintiff[s'] employee was present in his workplace and acting in his capacity as an employee

of Plaintiffs when Plaintiffs' property was taken . . . the film was clearly attempted . . . in relation

to the protection of Plaintiffs' property and rights[.]").

Defendants argue that plaintiffs lack standing to bring this claim because the offending

conduct occurred outside plaintiffs' presence and was not directed at plaintiffs.  Doc. 56 at 10.

Defendants then invoke the third-party standing doctrine.  *Id.*  Defendants also note that plaintiffs

haven't provided any authority suggesting that an employer may bring a First Amendment claim

on behalf of an employee.  Doc. 60 at 3.  Plaintiffs counter, contending that they assert only their

own First Amendment claim—based on harms imposed on their company when Officer Taylor

---

[9]        The court was generous to recognize this ill-pleaded First Amendment claim against Officer
Taylor.  Bu this generosity won't extend to create a claim against the municipal defendants as well.  So
the court evaluates this First Amendment claim as one made solely against Officer Taylor.

prohibited filming.  Doc. 59 at 9.  And they cite a Northern District of Illinois case from 1979 as legal foundation for a civil rights claim asserted by a company.  *Id.*

The Tenth Circuit analyzes third party standing as a prudential standing element.  *Hill v. Warsewa*, 947 F.3d 1305, 1309 (10th Cir. 2020).  When conducting that analysis, the Tenth Circuit has distinguished between a party who "alleges violation of a right he contends is his own" and a party who "could point to no specific right of its own" but instead "asserted a general interest."  *Id.* at 1310 (citation and internal quotation marks omitted).  And the Tenth Circuit warns that courts must avoid putting "the merits cart before the standing horse."  *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006).  That is, a court must assume a plaintiff's claim "has legal validity"—even if far-fetched—because "far-fetchedness is a question to be determined on the merits."  *Id.*  So, "where the plaintiff presents a nonfrivolous legal challenge, alleging an injury to a protected right such as free speech, the federal courts may not dismiss for lack of standing on the theory that the underlying interest is not legally protected."  *Id.*

Here, plaintiffs assert Officer Taylor violated a protected right they contend belongs to plaintiff Los Jarochos—the right to film police performing police duties.  Doc. 59 at 9.  Plaintiffs' employee attempted to exercise that right during the repossession, allegedly on Los Jarochos's behalf.  Doc. 53 at 23 (2nd Am. Compl. ¶¶ 137–38).  And, if viewed through the agency relationship, Officer Taylor's alleged interference with that filming violated plaintiff Los Jarochos's right to film.  But plaintiffs never cite any authority suggesting that they can establish a First Amendment violation through the agency relationship.  And their reliance on a 45-year-old case from a district court in another circuit suggests their legal theory's future is bleak.  In that sense, plaintiffs' First Amendment claim appears "far-fetched[.]"  *Initiative & Referendum*

*Inst.*, 450 F.3d at 1093.  But how the agency relationship and a First Amendment violation interact is a merits question, not a standing question.  So, even if the court later determines that the underlying employer's interest isn't legally protected when premised on an employee's actions, the court must here assume the claim has legal validity.  So, the court can't dismiss this claim, at least not for lack of standing.  Plaintiffs allege an injury to Los Jarochos's own protected right and thus they have prudential standing.

That the First Amendment claim survives the standing requirement means the court must consider whether Officer Taylor may invoke qualified immunity as a defense, below.

### F.  First Amendment Claim and Qualified Immunity

After dismissing the claims identified above, plaintiffs' only surviving federal law claim is their First Amendment claim discussed in part § IV.E.  So, the court limits its qualified immunity discussion to the First Amendment violation allegedly perpetrated by Officer Taylor when he refused to allow plaintiffs' employee to film the repossession.

"A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show 'both that [1] a constitutional violation occurred and [2] that the constitutional right was clearly established at the time of the alleged violation.'"  *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (quoting *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009)).  That's because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Regardless of the "conduct at issue, Defendant is nonetheless entitled to qualified immunity unless Plaintiff has carried her burden of showing the law was clearly established."  *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020).  Indeed, "the record must clearly demonstrate the plaintiff has

satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) (internal citation and quotation marks omitted).  In such a situation, "'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed." *Losee v. Preece*, No. 2:18-CV-195, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A constitutional right is clearly established if, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.  In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted).  A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 75 (2017), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  "Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier*, 992 F.3d at 1014 (internal citations, quotation marks, and brackets omitted).

Here, plaintiffs' Second Amended Complaint alleges that Officer Taylor interfered to prevent the recording, which violated plaintiffs' free speech, petitioning, and due process rights. Doc. 53 at 23 (2nd Am. Compl. ¶ 138).  Plaintiffs also contend that "[c]ourts have ruled that ordering persons to stop filming police actions, including for self-protection, [is] unconstitutional under the First Amendment as a violation of free speech." *Id.* (2nd Am. Compl. ¶ 137).  Here,

plaintiffs fail to shoulder their burden once Officer Taylor asserts the qualified immunity defense.  Plaintiffs don't respond with a single case holding that interference with filming police actions is unconstitutional or that such a law is clearly established.  Instead, plaintiffs cite two repossession cases.  *See* Doc. 59 at 10 (first citing *Marcus*, 394 F.3d at 818; then citing *McLinn*, 535 F. Supp. 3d at 1102–03).  Not only do plaintiffs fail to carry their burden in their qualified immunity discussion, their First Amendment discussion cites no case law addressing the legality of interfering with filming.  *See id.* at 9–10.  Plaintiffs essentially ignore their qualified immunity burden—and it's a "heavy" one—with a prescribed and significant consequence:  Officer Taylor is entitled to qualified immunity.  *See Felders ex rel. Smedley*, 755 F.3d at 877–78.  Accordingly, the court dismisses plaintiffs' First Amendment claim against Officer Taylor.

Having completed its review of the federal law claims against Officer Taylor, the court takes time to summarize the state of plaintiffs' inventory of claims.  Of the federal law claims, only the 42 U.S.C. § 1983 claim against Officer Taylor (Count I(1))—which defendants didn't seek to dismiss—survives.  No §§ 1981, 1983 or 1985 claims survive against the municipal defendants because of *Monell*'s constraints on municipal liability.  The other federal law claims against Officer Taylor fail because plaintiffs didn't allege—at least not sufficiently to state a claim—discriminatory animus or a conspiratorial meeting of the minds.  And that eliminates plaintiffs' § 1986 claim against the municipal defendants, as well.  Finally, the First Amendment claim fails under Officer Taylor's qualified immunity defense when plaintiffs fail to carry their burden.

So, the court now turns to plaintiffs' state law claims against Officer Taylor and the municipal defendants.  The potential for municipal liability accompanies these state law claims because plaintiffs invoke the Kansas Tort Claims Act (KTCA) to establish vicarious municipal

liability for Officer Taylor's conduct. The court evaluates the state law claims' sufficiency—as leveled against both Officer Taylor and the municipal defendants—below.

## V.  State Law Claims

The court analyzes plaintiffs' state law claims by considering, first, plaintiffs' Count III—a claim alleging defendants violated the KTCA. The court then evaluates plaintiffs' claims premised on Kansas criminal statutes, before moving to their common law tort claims. The court addresses plaintiffs' common law tort claims in the order used by the Second Amended Complaint, as follows:  trespass to chattels; conversion; fraudulent misrepresentation and fraud; defamation; conspiracy; aiding and abetting; and, finally, substantial assistance. In the end, three of plaintiffs' state law claims survive against Officer Taylor and, under the KTCA's vicarious liability provision, against the municipal defendants, as well.

### A.  Count III

Plaintiffs kick off their state law claims by reciting Kan. Stat. Ann. § 75-6103(a). This provision in the KTCA explains governmental entities' liability "for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." Kan. Stat. Ann. § 75-6103(a). Plaintiffs apparently seek, in this "Count," to establish the City and Department's potential for vicarious liability based on Officer Taylor's alleged tortious acts. *See* Doc. 53 at 57 (2nd Am. Compl. ¶ 418). Defendants argue that the court should dismiss Count III because plaintiffs' state law claims against Officer Taylor can't survive. Doc. 56 at 15. And, without any surviving state law claims against their agent, the municipal defendants can't incur vicarious liability under the KTCA. *Id.*

But this "Count" isn't a claim at all. As Kansas courts have explained, the "KTCA does not 'create' a cause of action[.]" *Gehring v. State, Dep't of Transp.*, 886 P.2d 370, 374 (Kan. Ct.

App. 1994).  "Instead, the KTCA removes the immunity granted governmental entities at common law.  By eliminating a defense, the KTCA merely created a remedial, not a substantive, change.  Tort actions against the State are brought *pursuant to* the KTCA.  Such are not brought *in violation of* the KTCA."  *Id.* (emphasis in original).

Because the KTCA and Kan. Stat. Ann. § 75-6103(a) don't create a cause of action, the court dismisses Count III.  It is baseless.

### B.  Claims Based on State Criminal Statutes—Counts IV(1), IV(2), VI(2), VI(3), and VI(4)

Plaintiffs plead five claims under Kansas's criminal statutes—Counts IV(1), IV(2), VI(2), VI(3), and VI(4).  Counts IV(1) and IV(2) both arise under Chapter 21, Article 61, "Crimes Involving Violations of Civil Rights."  Plaintiffs allege defendants intentionally denied plaintiffs' civil rights on a public and private level.  *See* Doc. 53 at 58, 59 (2nd Am. Compl. ¶¶ 427, 432).  On a public level, the Second Amended Complaint alleges defendants denied plaintiffs "the full and equal use and enjoyment of the services, facilities, privileges and advantages of the City Council, the City, Barrett, the Department, and Taylor[,]" violating Kan. Stat. Ann. § 21-6102(a)(1).  *Id.* at 58 (2nd Am. Compl. ¶ 427).  And on a private level, defendants allegedly denied plaintiffs "the full and equal use and enjoyment of the goods, services, facilities, privileges, advantages and accommodations of Plaintiff's own establishment[,]" violating Kan. Stat. Ann. § 21-6102(a)(2).  *Id.* at 59 (2nd Am. Compl. ¶ 432).

Counts VI(2), VI(3), and VI(4) arise under Chapter 21, Article 58, "Crimes Involving Property" as conversion claims.  Count VI(2) invokes the statute defining theft (Kan. Stat. Ann. § 21-5801(a)); Count VI(3) invokes the statute defining criminal deprivation of property (Kan. Stat. Ann. § 21-5803); and Count VI(4) invokes the statute defining criminal threat (Kan. Stat. Ann. § 21-5415).  *See id.* at 63–65 (2nd Am. Compl. ¶¶ 462–76).

For all five criminal-statute-based counts, plaintiffs present—albeit in perfunctory fashion—two bases for liability: (1) civil liability under the "ancient common law" that provides a private right of action. *Id.* at 58, 59, 63, 64, 65 (2nd Am. Compl. ¶¶ 429, 434, 465, 470, 475). And (2), tort liability arising under the Kansas Tort Claims Act (KTCA). *Id.* at 58, 59, 64, 65 (2nd Am. Compl. ¶¶ 430, 435, 466, 471, 476). The court addresses each, in turn, below.

### 1. Criminal Statute Claims and Civil Liability

The Second Amended Complaint contends that "[p]rivate rights of action for the denial of civil rights have been available since at least Reconstruction[.]" *Id.* at 58, 59 (2nd Am. Compl. ¶¶ 429, 434). And the Complaint asserts that theft, criminal deprivation, and criminal threat have lead to "private rights of action" that were "recognized at common law." *Id.* at 63, 64, 65 (2nd Am. Compl. ¶¶ 465, 470, 475). So, plaintiffs assert, defendants are subject to civil liability for allegedly violating the enumerated criminal statutes.

Defendants move to dismiss all five criminal-statute-based claims because the cited statutes don't include a private right of action. Doc. 56 at 12. Defendants' Partial Motion to Dismiss presents, rapid-fire, state and federal court opinions holding that criminal statutes, generally, and these criminal statutes from Kansas, in particular, don't permit civil liability. *Id.* Plaintiffs' Response appears to abandon this theory of civil liability. *See* Doc. 59 at 11. Plaintiffs retort that they "are not asserting private causes of action based on criminal statutes"—notwithstanding the Second Amended Complaint's language to the contrary. *Id.* Instead, plaintiffs contend, they are "asserting torts sounding in negligence and conversion." *Id.* Plaintiffs thus lean into their second basis for liability (discussed below) and abandon their first. So, the court declines to consider the merits of this theory of civil liability. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) (explaining that "when a party intentionally

relinquishes or abandons an argument[,]" the court "usually deem[s] it waived and refuse[s] to consider it") (internal quotation marks and citation omitted).

## 2.   Criminal Statute Claims and the KTCA

Plaintiffs also invoke the KTCA on these five claims.  The Second Amended Complaint, borrowing its language directly from the KTCA, alleges each count presents "negligent or wrongful acts or omissions for which a private person would be liable under the laws of Kansas under the circumstances."  Doc. 53 at 58, 59, 64, 65 (2nd Am. Compl. ¶¶ 430, 435, 466, 471, 476); *see also* Kan. Stat. Ann. § 75-6103(a) (containing the borrowed language and discussed in § V.A. above).  Plaintiffs contend that, because they assert torts sounding in negligence and conversion, the criminal statutes "outline expected conduct that creates the duty necessary to allege a tort claim sounding in negligence."  Doc. 59 at 11 (citing *Shirley v. Glass*, 308 P.3d 1, 5–7 (Kan. 2013)).

Defendants reply that plaintiffs err by relying on *Shirley v. Glass* because it only addresses "the narrow question of whether Kansas criminal statutes can provide a standard of care in a negligence case." Doc. 60 at 4.  And this isn't a negligence case, they argue. Defendants assert that the conduct giving rise to these claims isn't based on negligence, but on intentional conduct.  *Id.* at 4–5.  Indeed, defendants argue, no claims in the Second Amended Complaint are negligence claims, nor did plaintiffs refer to a negligence claim in their 12-105b notice.  *Id.*  So, defendants conclude, the court should dismiss these criminal-statute-based counts.  *Id.* at 5.

The court agrees with defendants.  In *Shirley v. Glass*, plaintiff brought a negligence action against a pawn shop and its owners for selling a firearm.  308 P.3d at 4.  The pawn shop allegedly sold a firearm to a felon's mother, knowing the mother intended the firearm for her

adult son.  *Id.*  Later the same day, the felon used the firearm to kill his son and then himself.  *Id.*
Plaintiff sought to establish the pawn shop and its owners' duty and breach of duty by proving
they violated firearm-transfer statutes.  *Id.* at 7.  When deciding the case, the Kansas Supreme
Court explicitly clarified that the court did "not have to address at [that] time what a party must
prove in order to state a claim that is created by statute."  *Id.* at 6.  Instead, the Court limited its
holding "to considering what role the alleged statutory violations may play in a simple
negligence action[.]"  *Id.*

"Negligence is an *unintentional* breach of a legal duty causing damage reasonably
foreseeable[.]"  *Unruh v. City of Wichita*, 512 P.3d 232, No. 124,254, 2022 WL 2392657, at *3
(Kan. Ct. App. 2022) (internal quotation marks, brackets and citation omitted) (emphasis added).
Recognizing a negligence claim "based on only intentional acts is contrary to the principal that
negligence is unintentional."  *Id.* at *8.

Here, the Second Amended Complaint doesn't include a negligence claim.  Plaintiffs
never used the word "negligence" in all its 81 pages.  *See generally* Doc. 53.  True, plaintiffs use
the word "negligent" when parroting the KTCA's language.  *See, e.g.*, *id.* at 58 (2nd Am. Compl.
¶ 430) ("*KTCA*—These are negligent or wrongful acts or omissions for which a private person
would be liable under the laws of Kansas under the circumstances.").  Nonetheless, the court
can't construe plaintiffs' claims as negligence claims because the underlying alleged conduct is
intentional.

Indeed, plaintiffs explicitly identify defendants' intentional conduct with each criminal-
statute-based claim.  Under Counts IV(1) and IV(2)—denial of civil rights claims—plaintiffs
aver that "Defendants denied Plaintiffs' civil rights by *intentionally* denying them, on the basis
of an illegal animus[.]"  *Id.* at 58, 59 (2nd Am. Compl. ¶¶ 427, 432) (emphasis added).  Under

Counts VI(2) and VI(3)—conversion claims based on theft and criminal deprivation—plaintiffs assert that "Defendants obtained and exerted unauthorized control over Plaintiffs' motor vehicle and other property . . . *with intent to* . . . deprive them of the possession, use, and benefit thereof." *Id.* at 63, 64 (2nd Am. Compl. ¶¶ 463, 468) (emphasis added).  And finally, under Count VI(4)—a conversion claim premised on criminal threat—plaintiffs allege that "Defendants threatened to commit violence communicated *with intent* to place Plaintiffs, directly and through their agents, in fear." *Id.* at 65 (2nd Am. Compl. ¶ 473) (emphasis added).

Given the explicitly identified intentionality of defendants' alleged torts, the court cannot recognize these five criminal-statute-based claims as negligence claims without acting "contrary to the principal that negligence is unintentional." *Unruh*, 2022 WL 2392657 at *8.  And plaintiffs' only argument supporting the idea that one can premise tort claims on violating criminal statutes relies on *Shirley v. Glass*—the case where the Kansas Supreme Court strictly limited this approach to simple negligence actions.  308 P.3d at 7.  Because the court recognizes no simple negligence actions here that could implicate *Shirley v. Glass*, the court dismisses Counts IV(1), IV(2), VI(2), VI(3), and VI(4).  They fail to state a plausible claim as a matter of law.

Having dismissed these criminal statute-based state law claims, the court turns next to the plaintiffs' common law tort claims, starting with trespass to chattels.

## C.  Trespass[10] To Chattels Claim—Count V(2)

Plaintiffs assert that defendants trespassed against chattels when they "occupied, took possession of, and removed the Los Jarochos Trailer to the exclusion of Plaintiffs[.]"  Doc. 53 at

---

[10]    The Second Amended Complaint also brought a trespass against land claim under Kansas law—Count V(1)—but plaintiffs withdrew that claim in their Response "because the land itself was a public business parking lot and Taylor was never asked to leave."  Doc. 59 at 12 n.7.  The court thus considers this claim abandoned and doesn't address Count V(1).

61 (2nd Am. Compl. ¶ 448).  But, defendants argue, Officer Taylor didn't occupy, take possession of, or remove the trailer.  The Garcias—re-possessors—did.  Doc. 56 at 13.  Plaintiffs retort that Officer "Taylor was in charge of the scene, he orchestrated the repossession" and "without his wrongful assistance, the repossession would not have been completed."  Doc. 59 at 13.  So, plaintiffs contend, whether Officer "Taylor was in the trailer or actually driving the repossession vehicle is irrelevant—Garcia removed Plaintiffs' business under the direction and at the instruction of Taylor."  *Id.*  The viability of this claim thus boils down to three issues:  (i) whether Officer Taylor had to interact physically with the trailer to support the claim, and, if not, whether (ii) his role as an enabler of the Garcias or (iii) his barring plaintiffs' access to the chattel can suffice to support a viable claim.  The court considers all these three issues, in turn, below.

"A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."  Restatement (Second) of Torts § 217 (Am. L. Inst. 1965).  Our court has cited with approval the Restatement definition and expounded on part (b) in it, explaining that "a trespass to chattels could occur at common law if there was an intentional 'intermeddling with a chattel in the possession of another,' with 'intermeddling' meaning to bring about a physical contact with the chattel."  *United States v. Otero*, No. 22-10068, 2023 WL 5336714, at *8 (D. Kan. Aug. 18, 2023) (citing Restatement (Second) of Torts § 217 (Am. L. Inst. 1965)).  Commenting on this Restatement provision, Justice Sotomayor likewise emphasized the requisite physical contact, noting that "[t]respass to chattels has traditionally required a physical touching of the property."  *United States v. Jones*, 565 U.S. 400, 426 (2012) (Sotomayor, J., concurring).

But the Restatement also contemplates that dispossession—part (a)—doesn't require physical contact as intermeddling does.  Such dispossession may arise instead via control and dominion, and, thus can support either a trespass to chattels claim (as discussed here) or a conversion claim (as discussed below).  A comment to the Restatement clarifies dispossession in this fashion:

> A dispossession may consist of an assumption of complete control and dominion over the chattel without an actual taking or carrying away.  If the assumption of control effectively deprives the other of all the essential advantages of possession, the dispossession is complete, although the physical position of the chattel may remain unchanged.  Thus a sheriff or other officer may levy upon goods, and thereby dispossess another of them without actually coming into contact with or touching the goods.

Restatement (Second) of Torts § 221 cmt. c (Am. L. Inst. 1965).

Finally, the Restatement also allows dispossession to entail "barring the possessor's access to a chattel," which—the comments clarify—may occur when an "actor by duress and intimidation forcibly prevents another" from retrieving his chattel.  Restatement (Second) of Torts § 221(c) cmt. e (Am. L. Inst. 1965).

Here, plaintiffs never allege that Officer Taylor touched or occupied the trailer.  He had no physical contact with the trailer.  Instead, the Garcias took the trailer from plaintiffs' property.  Doc. 53 at 22 (2nd Am. Compl. ¶ 132).  So, Officer Taylor didn't intermeddle by physical contact with the chattel.  Defendants contend Officer Taylor's lack of intermeddling relieves him of trespass to chattels liability.  But physical contact doesn't always dispose of a trespass to chattels claim—there's also Officer Taylor's alleged role as an enabler and his alleged conduct barring access to the trailer to consider.

Plaintiffs argue Officer Taylor's lack of physical contact is "irrelevant" because he enabled the Garcias; that is, he "orchestrated the repossession," which the Garcias accomplished

"under the direction and at the instruction of Taylor." Doc. 59 at 13. But the dispossession provision via complete control and dominion doesn't salvage plaintiffs' trespass to chattels claim here. Even when the court accepts as true plaintiffs' allegations that Officer Taylor enabled the Garcias' repossession, Officer Taylor still never exercised the control and dominion over the trailer required to create liability for a trespass to chattels. True, he allegedly enabled the Garcias to possess such control and dominion. But plaintiffs have provided no authority—and the court has found none—suggesting that enabling control and dominion—as opposed to exercising it—suffices for a trespass to chattels claim (or, as will become relevant in the next section, a conversion claim).

Nor have plaintiffs pleaded sufficient facts allowing the court plausibly to infer that Officer Taylor used "duress and intimidation forcibly" to bar plaintiffs' access to the trailer. Restatement (Second) of Torts § 221(c) cmt. e (Am. L. Inst. 1965). Plaintiffs allege that Officer Taylor "ordered [plaintiffs' employees] out of the trailer," which a bystander translated to the employees as "instructions along the lines of 'exiting' or 'getting out' of the trailer[.]" Doc. 53 at 18–19 (2nd Am. Compl. ¶ 102). And plaintiffs contend their employees "would not have surrendered the Los Jarochos Trailer" if "not for Taylor's commands." *Id.* at 19 (2nd Am. Compl. ¶ 103). Later, plaintiffs assert that Officer Taylor "ordered [plaintiffs' employees] to stay out of the truck so the taking could proceed," but then "allowed [plaintiffs' employees] to begin removing Plaintiffs' equipment and food" from the trailer. *Id.* at 21 (2nd Am. Compl. ¶¶ 119–20). But these orders and instructions don't rise to the level of "duress or intimidation *forcibly*" to bar access to the chattel. Restatement (Second) of Torts § 221(c) cmt. e (Am. L. Inst. 1965) (emphasis added). And Officer Taylor permitted plaintiffs' employees access to the trailer even after he gave these instructions. Plaintiffs thus haven't pleaded a plausible trespass

to chattels claim against Officer Taylor, so they can't survive a motion to dismiss.  So, the court dismisses Count V(2).

### D.  Simple Conversion Claim—Count VI(1)

Plaintiffs also bring a simple conversion claim.  Plaintiffs allege that defendants "assumed or exercised the right of ownership" over plaintiffs' trailer, and that defendants' "use and disposition of property belonging to Plaintiffs is sufficient to show Defendants' intent." Doc. 53 at 62–63 (2nd Am. Compl. ¶ 459).  Defendants argue that Officer Taylor didn't exercise dominion over the trailer in any degree.  Doc. 56 at 13.  Plaintiffs respond that Officer Taylor "controlled the repossession, coordinated with Garcia, and without his wrongful assistance, the repossession would not have been completed."  Doc. 59 at 13.  In essence, the conversion claim's sufficiency presents one of the same basic questions discussed about trespass to chattels: when Officer Taylor enables the Garcias' control and dominion over the trailer, does his enabling support a claim for conversion?

"The tort of conversion is defined in Kansas as 'the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'"  *Leathers v. Leathers*, 856 F.3d 729, 757 (10th Cir. 2017) (quoting *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)).  Conversion's "'requisite intent is shown by the *use* or *disposition* of property belonging to another[.]'"  *Id.* (quoting *Millennium Fin. Servs., LLC v. Thole*, 74 P.3d 57, 64 (Kan. Ct. App. 2003)) (emphasis added).  Kansas courts routinely have followed the Restatement's provisions about conversion.  *Near v. Crivello*, 673 F. Supp. 2d 1265, 1282 (D. Kan. 2009) (listing cases); *see also Doll v. Chi. Title Ins. Co.*, 246 F.R.D. 683, 692 (D. Kan. 2007) (quoting the Restatement (Second) of Torts § 222A when defining conversion under Kansas law).

The Restatement clarifies that the torts of trespass to chattels and conversion differ only in the extent of damages, so that the "difference between the two becomes almost entirely a matter of degree." Restatement (Second) of Torts § 222A (Am. L. Inst. 1965).

> The importance of the distinction between trespass to chattels and conversion . . . lies in the measure of damages. . . . Conversion is therefore properly limited, and has been limited by the courts, to those serious, major, and important interferences with the right to control the chattel which justify requiring the defendant to pay its full value.

*Id.* at § 222A cmt. c. Indeed, our court has recognized "little, if any, difference" between conversion and trespass to chattels, "except in the area of damages." *Barbee v. BeefAmerica Operating Co*., No. 97 1045, 1998 WL 35178377, at *4 n.4 (D. Kan. Feb. 10, 1998).

Here, the analysis mirrors one aspect of the trespass to chattels analysis: Plaintiffs never allege that Officer Taylor himself assumed or exercised ownership over the trailer. Nor do they contend Officer Taylor used or disposed of the trailer. So, the question becomes whether the officer's role as an enabler can create liability for him—and the municipal defendants—because of the Garcias' control and dominion over the trailer. Before answering, the court notes the recognized similarity between a trespass to chattels and a conversion claim—and that any difference is one of extent or degree, affecting damages alone. Such similarity suggests the court may simply invoke the trespass to chattels analysis here. And thus answer that Officer Taylor's role as an enabler doesn't create liability. Officer Taylor didn't himself dispossess plaintiffs of their trailer and so, whether applying a trespass to chattels or a conversion analysis, liability can't follow. The court thus dismisses plaintiffs' Count VI(1) simple conversion claim.

### E.  Fraudulent Misrepresentation and Fraud Claims—Count VIII(1), VIII(2)

Next up on the common law torts claims list, plaintiffs bring claims alleging fraudulent misrepresentation and fraud. Officer Taylor's statement to plaintiffs and their employees that the Garcias "had a court order authorizing them to take the Los Jarochos Trailer" form the

foundations for these two claims.  Doc. 53 at 71 (2nd Am. Compl. ¶ 525).  Officer Taylor allegedly made this misrepresentation "for the purposes of inducing Plaintiffs and their employees to exit the vehicle, stay outside the vehicle, and allow non-Municipal Defendants to illegally take the trailer."  *Id.*  Plaintiffs also contend that "[n]o reasonable law enforcement officer would understand the documents . . . to be a court order, and Taylor did not believe said documents to be a court order."  *Id.* at 22 (2nd Am. Compl. ¶ 131).  In moving to dismiss, defendants don't differentiate between these two claims but challenge both on detrimental reliance grounds, explaining that it is an essential "element of both fraud and fraudulent misrepresentation."  Doc. 56 at 14.  And so, the court follows suit, evaluating the claims' facial plausibility together, below.

Under Kansas law, the elements for fraudulent misrepresentation and fraud parallel one another.  First, fraudulent misrepresentation—to assert a fraudulent misrepresentation claim under Kansas law, a plaintiff "must establish that the defendant made an untrue statement of fact while knowing it to be untrue and with intent to deceive or with reckless disregard as to the truth, the plaintiff justifiably relied on the statement, and as a result of this justifiable reliance, the plaintiff suffered damage."  *Garver v. Roth Cos.*, No. 19-CV-02354, 2022 WL 228287, at *4 (D. Kan. Jan. 26, 2022) (citing *Gerhardt v. Harris*, 934 P.2d 976, 981 (Kan. 1997)).  Similarly, the Kansas Supreme Court has identified that the "elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment."  *Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004).  Having identified the requisite elements for these claims, the court evaluates the first two elements—making a

knowingly untrue statement and with intent or reckless disregard—next, before turning to defendants' detrimental reliance arguments thereafter.

### 1.  Making a Knowingly Untrue Statement, With Intent or Reckless Disregard

Here, the Second Amended Complaint avers that Officer Taylor told plaintiffs' employees that "he could not do anything because the Garcias had a court order with pictures of the Los Jarochos Trailer."  Doc. 53 at 18 (2nd Am. Compl. ¶ 97).  Plaintiffs thus allege—with plausibility sufficient for the motion to dismiss stage—that Officer Taylor "made an untrue statement of fact" about a court order's existence.  *Garver*, 2022 WL 228287, at *4.  And plaintiffs allege that no "reasonable law enforcement officer would understand the documents . . . to be a court order[.]"  Doc. 53 at 22 (2nd Am. Compl. ¶ 131).  So, the court plausibly may infer that Officer Taylor knew the Garcias didn't have a court order and made an untrue statement about its existence, either "with intent to deceive or with reckless disregard" for "the truth."  *Garver*, 2022 WL 228287, at *4.  Accepting plaintiffs' pleaded facts as true, the court may "draw the reasonable inference" that Officer Taylor's conduct satisfies the first two elements of a fraudulent misrepresentation or fraud claim.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  Indeed, defendants don't move to dismiss the fraudulent misrepresentation and fraud claims on either the knowingly untrue statement or the intent/reckless disregard element.

### 2.  Justifiable Detrimental Reliance

Instead, defendants argue that plaintiffs fail to state a claim because plaintiffs don't plausibly allege justifiable reliance.  Plaintiffs didn't rely, defendants assert, on Officer Taylor's alleged fraudulent statement about a court order during the repossession because Officer Taylor excluded plaintiffs' employees from the discussions.  Doc. 56 at 14.  Instead, plaintiffs'

employees allowed the repossession because of Taylor's orders and commands. *Id.* That is, Officer Taylor's exclusion of the employees from the discussions precludes their detrimental reliance on those same discussions, according to defendants. Plaintiffs retort that, to establish detrimental reliance, they needn't show that their employees acted solely on Officer Taylor's misrepresentation. Doc. 59 at 14. Indeed, they argue, plaintiffs' "employees could have been motivated both by Taylor's assertion that there was a court order and on his orders and directions." *Id.*

The Kansas Supreme Court has identified the degree of justifiable reliance required to state a claim for fraudulent misrepresentation or fraud. The Kansas court has clarified that "the misrepresentations need not be the sole cause of the plaintiff's conduct which results in his injury. It is sufficient if the fraudulent misrepresentations were part of the moving cause, and, absent those misrepresentations, plaintiff would not have acted to his detriment." *Slaymaker v. Westgate State Bank*, 739 P.2d 444, 450 (Kan. 1987) (internal citation omitted). As a result, the controlling question for evaluating fraudulent misrepresentation or fraud's third element— justifiable reliance—is "whether plaintiff did *partially* rely upon the representations . . . and, if so, whether it was reasonable and justifiable for him to do so." *Id.* (emphasis added). And a "person cannot justifiably rely on a representation where he possesses information which would be a red light to any normal person of his intelligence and experience." *Id.* at 452–53 (internal quotation marks and citation omitted).

Here, the Second Amended Complaint alleges that plaintiffs' employees knew about the court order discussions, even if Officer Taylor excluded them from actively participating in them. The Complaint avers, first, that Elsie—a bilingual bystander—reported to plaintiffs' employees that the Garcias had showed their papers to Officer Taylor. Doc. 53 at 18 (2nd Am.

Compl. ¶ 96).  Then, the Complaint recounts that Elsie told the employees Officer Taylor couldn't assist them because of the Garcias' court order with pictures of the Los Jarochos Trailer. *Id.* (2nd Am. Compl. ¶ 97).  And finally, at the point when plaintiffs' employees tried to convince the Garcias to take the Sushi Trailer instead, the Complaint alleges that Officer Taylor and the Garcias insisted the court order directed Garcia Recovery to take the Los Jarochos Trailer, not the Sushi Trailer.  *Id.* at 21 (2nd Am. Compl. ¶ 118).  Only after this insistence did Officer Taylor order plaintiffs' employees "to stay out of the truck so the taking could proceed." *Id.* (2nd Am. Compl. ¶ 119).

Taking these factual allegations as true, the court concludes plaintiffs have met the facial plausibility standard to state a claim for fraudulent misrepresentation or fraud.  Defendants rightly point out that other factors—such as Officer Taylor's orders—likely influenced the employees' decision to leave the trailer before plaintiffs arrived with the paperwork, thus enabling the trailer's repossession.  But the employees' partial reliance on Officer Taylor's statements about the court order is plausible.  The employees plausibly could have exited the trailer believing that a court order required it.  And the employees plausibly could have surrendered arguments about taking the Used Sushi Trailer in justifiable reliance on the Garcias and Officer Taylor's insistence that the court order indicated the Los Jarochos Trailer.  Partial reliance is all that Kansas law requires.  And, given a police officer's assumed familiarity with court orders and the justice system, no "red light" would have suggested unjustified or unreasonable reliance.  So, plaintiffs' claims for fraud and fraudulent misrepresentation survive defendants' Motion to Dismiss.

### F.  Defamation by Libel and/or Slander Claim—Count IX

Count IX asserts a defamation claim, premised on the allegation that the "Garcias and Taylor told Elsie, and on information and belief others, that Garcia Recovery was repossessing

the Los Jarochos Trailer pursuant to a court order because Plaintiffs had failed to pay for it[.]" Doc. 53 at 74 (2nd Am. Compl. ¶ 544).  In a later filing, plaintiffs suggest that Officer Taylor's statement about the plaintiffs' allegedly removing the VIN from the trailer also implicates defamation.  Doc. 59 at 15 (citing Doc. 53 at 20 (2nd Am. Compl. ¶ 115)).  And plaintiffs aver more generally that "[d]efendants communicated to members of the community that Plaintiffs and their employees had done something wrong, were lesser than Defendants, . . . and were not entitled to the full protection of the laws and authorities of the United States or the State of Kansas[.]"  Doc. 53 at 75 (2nd Am. Compl. ¶ 546).  As a result of these alleged "false and defamatory" words, "Plaintiffs have been harmed," *Id.* (2nd Am. Compl. ¶¶ 548–49), and "Plaintiffs and their business have been affected by reputational insults," *Id.* at 33 (2nd Am. Compl. ¶ 209).

Defendants assert that plaintiffs fail to state a defamation claim against Officer Taylor and the municipal defendants.  They argue that no allegation establishes reputational harm.  Doc. 56 at 15.  Plaintiffs retort that the court reasonably may infer reputational harm with Elsie—who was a customer.  Doc. 59 at 15.  So, the viability of the defamation claim rests here on whether plaintiffs pleaded defamation damages sufficiently.

"A defamation claim involves '(1) false and defamatory words; (2) communication to a third person; and (3) harm to the reputation of the person defamed.'"  *Smith v. Williams*, No. 20-CV-2224, 2023 WL 6462904, at *7 (D. Kan. Oct. 4, 2023) (quoting *Byers v. Snyder*, 237 P.3d 1258, 1270 (Kan. Ct. App. 2010)).  Under Kansas law, "a plaintiff may not rest on presumed damages but must allege and prove actual damages in a defamation action."  *Ali v. Douglas Cable Commc'ns*, 929 F. Supp. 1362, 1384 (D. Kan. 1996) (applying Kansas law).  Those damages must include "injury to reputation," because in Kansas "damage to one's reputation is

the essence and gravamen of an action for defamation." *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1243 (Kan. 1982).  Proof of injury to reputation "typically entails showing that persons were deterred from associating with the plaintiff, that the plaintiff's reputation had been lowered in the community, or that the plaintiff's profession suffered." *Ali*, 929 F. Supp. at 1385.

Here, the Complaint attributes to Officer Taylor statements about a court order, about a scratched-off VIN number, and those statements commanding plaintiffs' employees to vacate the trailer.  *See* Doc. 53 at 18–19, 20–21 (2nd Am. Compl. ¶¶ 97, 102, 115, 125–26).  The Complaint attributes the statement that plaintiffs hadn't paid their bills to the Garcias, not to Officer Taylor. *Id.* at 15 (2nd Am. Compl. ¶ 75).  The question thus becomes whether Officer Taylor's alleged "false and defamatory words" about the court order, the VIN number, and vacating the trailer all made to a third person—Elsie—caused reputational harm.  Plaintiffs suggest the court reasonably may infer this harm, presumably due to the alleged statements' content.

But, for the court to infer requires plausibility—that is, "more than a sheer possibility"— and the pleading must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  Even if the court concluded that Elsie's opinion of plaintiffs possibly could have shifted because of Officer Taylor's statements, plaintiffs offer no facts to move the needle from "sheer possibility" to plausibility.  Plaintiffs can't "rest on presumed damages but must allege and prove actual damages in a defamation action." *Ali*, 929 F. Supp. at 1384.  But plaintiffs never allege that the statements—or anything else—deterred Elsie from associating with them.  Nor do plaintiffs allege any facts—beyond conclusory harm and "reputational insults" allegations, Doc. 53 at 33 (2nd Am. Compl. ¶ 209)—that their "reputation had been lowered in the community" or that their business suffered due to Officer Taylor's statements to Elsie, *Ali*, 929 F. Supp. at 1385.

And so, the court holds that plaintiffs fail to state a claim for defamation because they fail plausibly to allege defamation's third prong—harm to their reputation. The court thus dismisses Count IX.

### G. State Conspiracy Claim—Count XI(1)

Plaintiffs also bring a claim for conspiracy under Kansas law, on the same basis as the federal law conspiracy claims discussed above in § IV.B-D. It's been a while, though. So, the court recites again plaintiffs' conspiracy allegations and evaluates them, this time, under state law.

Plaintiffs aver that Officer Taylor and the Garcias engaged in a conspiracy by: sharing papers and photographs before approaching plaintiffs' employees; communicating directly with one another at the repossession without including plaintiffs or their employees in a meaningful way; representing that Garcia Recovery had a court order authorizing them to take the Los Jarochos Trailer; physically excluding plaintiffs' employees from the trailer; and requiring the employees to hurry up when removing plaintiffs' property from the trailer. Doc. 53 at 29–30 (2nd Am. Compl. ¶¶ 172–78). These alleged facts, plaintiffs contend, meet a conspiracy claim's elements because they demonstrate, among other things, that Officer Taylor and the Garcias "sought to accomplish illegal objects," "had meetings of the minds in the objects or courses of action," and "undertook one or more unlawful overt acts in pursuit of such objects[.]" *Id.* at 78 (2nd Am. Compl. ¶ 567).

As with the previously discussed federal law conspiracy claims, defendants challenge plaintiffs' state conspiracy claim as conclusory. Doc. 56` at 8. Defendants argue that plaintiffs fail to provide any "well-pleaded allegations that Taylor coordinated with Borjas or the Garcias." *Id.* And defendants cite two grounds on which to question any alleged coordination: (i) Officer Taylor came "in response to calls by *both* parties," not in conjunction with the Garcias, and (ii)

Officer Taylor and the Garcias disagreed about the proper course of action when they couldn't

match a VIN number to the paperwork. *Id.* (emphasis added). Defendants also identify various

ways that Officer Taylor, according to the Second Amended Complaint, acted independently

of—not in concert with—the Garcias. Officer Taylor's independent actions include remaining

on the scene after the repossession and speaking with plaintiffs about the alleged conspiracy.

Doc. 60 at 3.

Under Kansas law, an "actionable civil conspiracy occurs when the following elements

are proved: '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the

minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as

the proximate result thereof.'" *Hefner v. Deutscher*, 525 P.3d 1173, No. 123,719, 2023 WL

2618765 at *16 (Kan. Ct. App. 2023) (quoting *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220,

1226 (Kan. 1991)). "Because direct evidence is rarely available, a civil conspiracy may be

proved by circumstantial evidence." *Vetter v. Morgan*, 913 P.2d 1200, 1206 (Kan. Ct. App.

1995). So "plaintiffs need not show an express agreement" to demonstrate a meeting of the

minds, but "they must show specific facts which support the inference of an agreement." *In re

Motor Fuel Temperature Sales Pracs. Litig.*, No. 07-1840, 2012 WL 976039, at *8 (D. Kan.

Mar. 22, 2012). To illustrate the types of specific facts can support an inference of agreement in

past cases, the court reviews two Kansas law conspiracy cases, below.

*Skyline Trucking, Inc. v. Freightliner Truck Centercompanies* provides an example of a

successfully pleaded conspiracy allegation at the motion to dismiss stage. No. 22-4052, 2023

WL 4846618 (D. Kan. July 28, 2023). In *Skyline*, this court evaluated the sufficiency of an

alleged "meeting of the minds" and concluded that plaintiff had shouldered "its burden to plead

sufficient facts supporting the elements of a civil conspiracy claim." *Id.* at *10. There, plaintiff

alleged that "all three defendants are interrelated with common interests," that one defendant housed another defendant's "corporate office[,]" and that one defendant "directed" another defendant "to do the complained-of" behavior.  *Id.* at \*9–10 (internal quotation marks and citations omitted).  This court ultimately determined such interrelatedness, common interest, and directed behavior allegations supported inferring agreement, though it deemed that determination a "close" call.  *Id.* at \*9.

The Kansas Court of Appeals likewise considered defendants' interrelatedness and common interest—as well as their position in the corporate hierarchy—when evaluating the sufficiency of meeting of the minds allegations.  *Mid-Continent Anesthesiology, Chartered v. Bassell*, 504 P.3d 1069, 1084 (Kan. Ct. App. 2021).  In *Mid-Continent Anesthesiology*, only two physicians—out of a corporation of shareholder member doctors—had authority to set all the physicians' varying salaries, had regular access to the corporation's detailed financial records, and knew the other doctors' compensation.  *Id.* at 1073, 1084.  The court relied on the two physicians' interrelatedness, their common interest in excess compensation, and their hierarchical position over the other doctors to determine such evidence supported inferring a meeting of the minds sufficient to state a civil conspiracy claim.  *Id.* at 1084.

In the present case, plaintiffs plead no such interrelatedness, common interest, hierarchical position, or directed behavior to establish a meeting of the minds.  Instead, plaintiffs rely on interactions that took place at the repossession.  Sharing documentation with a law enforcement officer at a repossession hardly qualifies the two parties as being interrelated with a common interest.  Nor would the Garcias—the only party on the scene who would benefit from the repossession—sit in any hierarchical position to justify directing Officer Taylor's behavior or persuading him to report a court order erroneously.  While "a civil conspiracy may be proved by

circumstantial evidence," there simply isn't enough evidence here—even circumstantial—from

which to infer Officer Taylor and the Garcias' requisite meeting of the minds.  *Vetter*, 913 P.2d

at 1206.  The court thus concludes that plaintiffs haven't alleged sufficient facts to support

inferring an agreement.  It thus dismisses plaintiffs' Count XI(1).

### H.  Aiding and Abetting and Substantial Assistance Claims—Count XI(2), XI(3)

Last on the common law torts' list sit plaintiffs' aiding and abetting and substantial

assistance claims.  As a preliminary matter, the court must distinguish between the two.

Defendants' Motion to Dismiss argues that substantial assistance is an element of aiding and

abetting under Kansas law, not a separate claim.  Doc. 56 at 9.  Plaintiffs' Response never

addresses defendants' argument directly but discusses substantial assistance solely under the

aiding and abetting heading—and not independently—suggesting acquiescence.  Doc. 59 at 8–9.

The United States Supreme Court has acknowledged that "the concepts of aiding and

abetting and substantial assistance do not lend themselves to crisp, bright-line distinctions[.]"

*Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023).  This acknowledgment suggests that

distinctions between the two claims—though not crisp ones—do exist.  And, when the Kansas

Supreme Court interpreted the Restatement (Second) of Torts § 876, it labeled § 876(a) as civil

conspiracy, § 876(b) as aiding and abetting, but neglected to label § 876(c).  *State ex rel. Mays v.*

*Ridenhour*, 811 P.2d 1220, 1232 (Kan. 1991).  In so doing, the Kansas Supreme Court, first,

endorsed consulting the Restatement to evaluate torts involving "Persons Acting in Concert."  *Id.*

(citing Restatement (Second) of Torts § 876 (Am. L. Inst. 1977)).  *See also Jackson v.*

*Henderson*, No. CIV.A. 02-2480, 2004 WL 48907, at *4 (D. Kan. Jan. 7, 2004) (noting that

Kansas Supreme Court adopted Restatement (Second) of Torts § 876 in addressing vicarious tort

liability).  And second, the Kansas court left open the possibility of a separate substantial

assistance claim under § 876(c)—distinct from aiding and abetting under § 876(b).

Section 876(c) reads:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876(c) (Am. L. Inst. 1979).  Given the similar language used in Restatement § 876(c) and the Second Amended Complaint Count XI(3),[11] the court concludes plaintiffs have asserted both an aiding and abetting claim and a separate substantial assistance claim, as contemplated by Restatement subsections (b) and (c).  With this preliminary matter behind us, the court separately evaluates each claim's sufficiency under the requisite 12(b)(6) standard.

### 1.   Aiding and Abetting—Count XI(2)

While civil conspiracy requires an agreement, "aiding and abetting is a theory used to impose vicarious liability" where the focus isn't on "whether the defendant *agreed* to join wrongful conduct." *Ridenhour*, 811 P.2d at 1231–32 (emphasis added).  "A qualitative difference exists between proving an agreement to participate in a tortious line of conduct and proving knowing action that substantially aids tortious conduct." *Id.* at 1232.  So, "'aiding and abetting focuses on whether a defendant knowingly gave "substantial assistance" to someone who performed wrongful conduct.'" *Jones v. Cmty. Bank of Wichita*, 390 P.3d 127, No. 115,088, 2017 WL 840249, at *7 (Kan. Ct. App. 2017) (quoting *Ridenhour*, 811 P.2d at 1232).

Kansas courts have defined the elements of civil aiding and abetting to include:

---

[11]    The language in plaintiffs' Second Amended Complaint under "Count XI(3) Substantial Assistance" tracks § 876(c) but it's scrambled into a different order.  The Complaint alleges that "Defendants (1) undertook conduct (2) separately constituting a breach of duty to Plaintiffs (3) giving substantial assistance to other Defendants in (4) accomplishing tortious results (5) which caused harm to Plaintiffs."  Doc. 53 at 79 (2nd Am. Compl. ¶ 577).

> (1) The party whom the defendant aids must perform a wrongful act causing injury; (2) at the time the defendant provides assistance, he or she must be generally aware of his or her role in part of an overall tortious or illegal activity; and (3) the defendant must knowingly and substantially assist in the principal violation.

*York v. InTrust Bank, N.A.*, 962 P.2d 405, 424 (Kan. 1998) (citing *Ridenhour*, 811 P.2d at 1232).

And the Kansas Supreme Court has embraced six factors to evaluate whether a given plaintiff's allegations establish the requisite substantial assistance to support an aiding and abetting claim:

> Generally, the cases support using the following five factors identified in the Restatement to determine whether the evidence establishes substantial aid: "[T]he nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind."   Restatement (Second) of Torts  §  876, Comment  *d* . . .   The court . . . added a sixth factor:  duration of the assistance provided.   The court noted that the length of time an alleged aider and abettor has been involved with the tortfeasor affects the quality and extent of their relationship and probably influences the amount of aid provided. The court concluded that it also provided evidence of the defendant's state of mind.

*Ridenhour*, 811 P.2d at 1232 (citations omitted); *see also Rowell v. King*, 234 F. App'x 821, 827 (10th Cir. 2007) ("The Kansas Supreme Court has adopted six factors 'to determine if the aid is sufficient to establish liability under an aiding and abetting theory.'" (quoting *Ridenhour*, 811 P.2d at 1234)).

Here, plaintiffs contend that Officer Taylor provided substantial assistance to the Garcias and Borjas "in accomplishing their tortious aim" to take plaintiffs' trailer, resulting in aiding and abetting.  Doc. 59 at 9.  Defendants argue that plaintiffs have failed "to demonstrate the requisite knowledge or concerted action[.]"[12]  Doc. 56 at 10.  Defendants' arguments appear to challenge

---

[12]     Defendants also argue that plaintiffs "fail to demonstrate that the legal relationship between Taylor and the other Defendants eliminates the possibility of comparing fault."  Doc. 56 at 10.  This failure, defendants assert, negates the applicability of an aiding and abetting theory, relying on *Yount v. Deibert*.  147 P.3d 1065 (Kan. 2006).  But *Yount* addresses the applicability of aiding and abetting to joint liability in a comparative negligence case, not an intentional tort case.  *See id.* at 1068.  And defendants

the pleading's sufficiency in demonstrating aiding and abetting elements (2) and (3)—the defendant's general awareness of and knowing substantial assistance in a tortious activity, respectively. The court addresses each in turn.

Plaintiffs' factual contentions about Officer Taylor's general awareness of the Garcias' tortious activity are plausible. That is, the court reasonably may infer Officer Taylor's general awareness that the Garcias didn't have a court order because plaintiffs argue that a reasonable officer would have understood the Garcias' documents weren't a court order. Doc. 53 at 22 (2nd Am. Compl. ¶ 131). And the court reasonably may infer Officer Taylor's general awareness when he allegedly told the Garcias to take the Los Jarochos Trailer, despite their inability to match a VIN number to their paperwork. *Id.* at 20 (2nd Am. Compl. ¶ 115). At that point, even the Garcias—who stood to benefit from completing the repossessing and taking of the trailer— had "concluded they could not legally take either trailer." *Id.* (2nd Am. Compl. ¶ 114). So, it's facially plausible that Officer Taylor, too, understood that continuing the repossession absent a matching VIN number was tortious activity. The court thus concludes plaintiffs' Second Amended Complaint pleads facts which plausibly satisfy aiding and abetting's second element— general awareness.

The Complaint also pleads facts sufficient to show Officer Taylor's knowing and substantial assistance—an aiding and abetting claim's third element. Of the six factors Kansas courts consider when evaluating substantial assistance, four favor a reasonable inference that Officer Taylor knowingly and substantially assisted the Garcias. Specifically, *first*, the nature of

---

asserted elsewhere that this case doesn't involve negligence. *See* Doc. 60 at 5. So, the court needn't address defendants' argument that an aiding and abetting theory can't apply under *Yount*.

the act alleged is the trailer's conversion by the Garcias.[13]  And *second*, plaintiffs have alleged

significant assistance by Officer Taylor in that conversion.  Plaintiffs plead that the "Garcias

would not have taken the Los Jarochos Trailer if Taylor hadn't told them to," and note that

Taylor "acted with the authority of the state giving an imprimatur of legitimacy and legality to

his decisions and actions[.]"  *Id.* (2nd Am. Compl. ¶ 116–17).  And Officer Taylor allegedly

assisted by ordering plaintiffs' employees "to stay out of the truck so the taking could proceed,"

"repeatedly telling [plaintiffs' employees] to 'hurry up'" when removing plaintiffs' belongings,

thereby assisting the repossession before plaintiffs "could reach the scene with their ownership

papers."  *Id.* at 21 (2nd Am. Compl. ¶¶ 119–22).  The *third* factor—Officer Taylor's presence at

the repossession scene at the time of the tort—also favors finding substantial assistance.  And so

does the *fifth* factor—Officer Taylor's state of mind.  Plaintiffs aver that Officer Taylor ignored

plaintiffs' employees' requests "to wait until [plaintiffs] arrived before allowing the taking to

occur" and that he "kept telling [plaintiffs' employees] there was nothing he could do about it."

*Id.* (2nd Am. Compl. ¶¶ 118, 125).  Given plaintiffs' proximity to the scene (30 to 45 minutes

after their employee's first phone call) and their representation that they possessed the ownership

paperwork to prevent the taking, the court reasonably can infer Officer Taylor's state of mind

preferred the Garcias over the plaintiffs.  *Id.* at 19 (2nd Am. Compl. ¶¶ 104–05); *Id.* at 23 (2nd

Am. Compl. ¶ 141).  Thus, four of the six factors outlined by the Kansas Supreme Court suggest

that Officer Taylor provided substantial assistance sufficient to state a claim for aiding and

abetting.

---

[13]        In a seminal case on aiding and abetting—cited both by the Kansas Supreme Court and the
United States Supreme Court when defining the tort—the D.C. Circuit explained that "the *nature of the
act* involved dictates what aid might matter[.]"  *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)
(emphasis in original); *see also Ridenhour*, 811 P.2d at 1232 (citing *Halberstam*); *Twitter, Inc. v.
Taamneh*, 598 U.S. 471, 506 (2023) (same).  The court thus views the next five substantial assistance
factors through the lens of conversion and whether Officer Taylor's aid mattered to that alleged
conversion.

In contrast, the fourth and sixth factors disfavor a finding of substantial assistance.  The *fourth* factor evaluates Officer Taylor's relationship to the Garcias.  He arrived on the scene by dispatch after plaintiffs' daughter called the police department and asked for help.  *Id.* at 16 (2nd Am. Compl. ¶¶ 80, 91).  And plaintiffs don't plead facts to show plausibly a pre-existing relationship between Officer Taylor and the Garcias.  And the *sixth* factor assesses the aid's duration.  Officer Taylor only assisted in the conversion for a matter of minutes[14]—less than an hour total—though his aid did continue until the Garcias had completed the conversion.  *Id.* at 23 (2nd Am. Compl. ¶¶ 139–41).

The majority of the factors suggest substantial assistance and a reasonable inference that plaintiffs' allegations could meet aiding and abetting's third element.  So, the court concludes, these allegations are sufficient to state a claim under an aiding and abetting theory.  The court thus denies defendants' Motion to Dismiss this claim.

### 2.  Substantial Assistance—Count XI(3)

Finally, Restatement (Second) of Torts § 876 also defines a substantial assistance claim.  Though quoted earlier, the court recites § 876(c) again here for ease of reference.  It reads:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876(c) (Am. L. Inst. 1979).  To support substantial assistance liability under subsection (c), plaintiffs must "have raised [an] argument that the [defendants'] conduct constituted a breach of any duty that [they] had to plaintiffs."  *Kan. Waste Water, Inc. v.*

---

[14]     By contrast, our court, evaluating these factors, found "a period of at least several months" contributed to a finding of substantial assistance.  *TP ST Acquisition v. Lindsey*, No. 2:21-CV-02020, 2021 WL 1750872, at *13 (D. Kan. May 4, 2021).

*Alliant Techsystems, Inc.*, No. 02-2605, 2005 WL 1109456, at *21 (D. Kan. May 9, 2005).

Absent such a breach of duty, the substantial assistance tort doesn't lie.

A survey of the Second Amended Complaint reveals that plaintiffs mention "breach of duty" just twice in all its 81 pages—when they list the substantial assistance elements, Doc. 53 at 79 (2nd Am. Compl. ¶ 579), and, shortly after, when they allege:

> Defendants' breaches of duty were in support of the extended campaign of trying to take advantage of Plaintiffs in addition to each of the specific tortious results enumerated herein and therefore all such Defendants are jointly and severally liable for all damages traceable to each cause of action asserted against them.

*Id.* (2nd Am. Compl. ¶ 577).  While the court recognizes that plaintiffs incorporate by reference the other paragraphs in the Complaint, it nonetheless holds this pleading of defendants' breach insufficient to state a claim for substantial assistance "'that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  And the court refuses to scour the Complaint to find defendants' alleged breach—an element plaintiffs should have pleaded with clarity.  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  So, the court concludes plaintiffs insufficiently pleaded their substantial assistance claim.  It can't survive a motion to dismiss, so the court dismisses Count XI(3).

## VI.      Conclusion

The court grants in part and denies in part defendants' Partial Motion to Dismiss (Doc. 55).  The court grants defendants' motion in part, dismissing all §§ 1981, 1983 and 1985 claims against defendants Chief Richard Barrett and the City of Colby, Kansas under *Monell*'s municipal liability constraints.  And the court dismisses plaintiffs' § 1986 claim against defendants Chief Richard Barrett and the City of Colby, Kansas as insufficiently pleaded.  No federal law claims remain against the municipal defendants.  The court also dismisses all federal

law claims against Officer Lucas Taylor except Count I(1), under 42 U.S.C. § 1983, which defendants didn't seek to dismiss. And the court dismisses all but three of the state law claims against defendants. Specifically, the court denies defendants' motion in part and allows Count VIII(1)—Fraudulent Misrepresentation, Count VIII(2)—Fraud, and Count XI(2)—Aiding and Abetting to survive.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Lucas Taylor, Richard Barrett, and the City of Colby, Kansas's Partial Motion to Dismiss is granted in part. Counts I(2), I(3), I(4), II(1), II(2), III, IV(1), IV(2), V(2), VI(1), VI(2), VI(3), VI(4), IX, XI(1), XI(3) and plaintiffs' First Amendment claim are dismissed. Count I(1) is also dismissed solely against defendants Richard Barrett and the City of Colby, Kansas.

**IT IS FURTHER ORDERED THAT** defendants' Partial Motion to Dismiss is denied in part. Counts VIII(1), VIII(2) and XI(2) survive against all remaining defendants.

Count I(1) survives as uncontested against defendant Lucas Taylor alone.

**IT IS SO ORDERED.**

**Dated this 14th day of March, 2024, in Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
