IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GUADALUPE QUINTO GALINDO, et al.,

     **Plaintiffs,**

v.

LUCAS TAYLOR, et al.,

     **Defendants.**

Case No. 22-2414-DDC

## MEMORANDUM AND ORDER

This case arises from repossession of plaintiffs' food trailer in Colby, Kansas. Plaintiffs Guadalupe Quinto Galindo, Enedino Mendez Preza (Enedino),[1] and Los Jarochos Mexican Food LLC assert Officer Lucas Taylor aided an unlawful repossession, violating their Fourth and Fourteenth Amendment rights. And they assert Officer Taylor and the City of Colby, Kansas, are liable for fraud, fraudulent misrepresentation, and aiding and abetting. Plaintiffs also sued other alleged tortfeasors for their role in repossessing plaintiffs' trailer. Those parties aren't before the court on the motions decided by this Order.

This Order considers four motions: *First*, plaintiffs' Motion to Strike (Doc. 100) the argument section of defendants' summary judgment brief. *Second*, defendants' Motion for Summary Judgment (Doc. 89) requesting summary judgment against all of plaintiffs' remaining causes of action. *Third*, plaintiffs' Motion for Summary Judgment (Doc. 93) seeking summary judgment in their favor on their § 1983, fraud, and fraudulent misrepresentation claims. And,

---

[1] Two individuals involved in this case have the same surnames. To avoid confusion, and without disrespecting those individuals, the court refers to plaintiff Enedino Mendez Preza as Enedino and witness Gabino Mendez Preza as Gabino.

*fourth*, defendants' Motion to Designate Wichita as the Place of Trial (Doc. 91).

To preview, the court addresses plaintiffs' Motion to Strike and another threshold procedural issue, first. The court declines to strike defendants' summary judgment argument section.

Next, the court assesses together the parties' cross motions for summary judgment—to the extent possible. It evaluates plaintiff Los Jarochos Mexican Food LLC's standing first and concludes the business has standing to proceed as a plaintiff. The court then evaluates plaintiffs' § 1983 claim, concluding—on defendants' motion—that plaintiffs have carried their burden to overcome qualified immunity. And on plaintiffs' motion, the court concludes this case presents the rare situation where disputed facts preclude a summary judgment ruling on qualified immunity. After evaluating qualified immunity, the court turns to plaintiffs' state-law claims. It addresses both parties' arguments on fraud and fraudulent misrepresentation—and denies both motions. Then, the court denies summary judgment for defendants against plaintiffs' aiding and abetting claim. In the final act of the summary judgment section, the court evaluates defendants' damages-based arguments: (1) that some of plaintiffs' damages are speculative and not caused by defendants; (2) that defendants are entitled to apportionment of some damages on plaintiffs' § 1983 claim; and (3) that plaintiffs can't recover punitive damages. Bottom line—the court grants in part and denies in part defendants' summary judgment motion. It denies plaintiffs' motion in its entirety.

At the end, the court evaluates defendants' motion requesting a trial in Wichita, instead of Kansas City. Weighing the relevant factors, the court denies the motion and preserves the trial location (Kansas City) chosen by plaintiffs.

The court begins with two procedural issues before outlining the summary judgment

facts.

## I.    Procedural Issues

### A.    Plaintiffs' Motion to Strike (Doc. 100)

Plaintiffs have moved to strike the argument section of defendants' Motion for Summary Judgment.  Doc. 100 at 1.  They invoke Fed. R. Civ. P. 12(f), arguing that rule allows the court to strike defendants' argument for failing to comply with Fed. R. Civ. P. 56.  *Id.*  In plaintiffs' view, defendants' argument section doesn't provide citations to the record and asserts facts not listed in their statement of facts.  *Id.*  The court rejects plaintiffs' argument for three distinct reasons.

*First*, Fed. R. Civ. P. 12(f) doesn't provide the proper mechanism to address plaintiffs' concerns.  That rule allows the court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from a *pleading*.  Fed. R. Civ. P. 12(f).  A motion for summary judgment isn't a pleading.  *See* Fed. R. Civ. P. 7 (distinguishing "Motions and Other Papers" from "Pleadings" and listing the seven types of pleadings—a list that doesn't include a summary judgment motion).  So, the court can't strike under Rule 12(f) here.  *See Fed. Nat. Mortg. Ass'n v. Milasinovich*, 161 F. Supp. 3d 981, 994 (D.N.M. 2016) ("Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike." (ellipses in original) (quotation cleaned up)); *cf. also Sheldon v. Khanal*, No. 07-2112-KHV, 2008 WL 474262, at *3 n.4 (D. Kan. Feb. 19, 2008) ("In any event, plaintiffs' reply [to motion to reconsider] is not a 'pleading' which the Court may strike under Rule 12(f).").

*Second*, there's no requirement that a summary judgment movant include record citations in the argument section of their brief.  While such a practice significantly assists the court's work, it's not required by the governing rules.  Rule 56(c) certainly requires record support.  But D. Kan. Rule 56.1(a) highlights that a movant can meet that burden by including a section with

record citations in the beginning segment of its brief. Failing to repeat those record citations throughout the argument section isn't a compelling reason to strike any part of defendants' argument, much less its entirety.

*Finally*, plaintiffs don't identify any portions of defendants' argument that rely on facts not addressed in their facts section. They argue that defendants "assert facts that Plaintiffs cannot find in [defendants'] fact section." Doc. 100 at 1. But they don't identify which facts those are. "Judges are not like pigs, hunting for truffles buried in briefs." *Rocky Mtn. Wild, Inc. v. U.S. Forrest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) (quotation cleaned up). So, the court declines to do plaintiffs' work trying to identify the purportedly unsupported facts.

Striking defendants' entire argument section is a severe sanction. And plaintiffs haven't provided a basis for the court to do so. The court denies plaintiffs' Motion to Strike (Doc. 100).

### B.   Plaintiffs' Opposition Statement of Genuinely Disputed Material Facts

In response to defendants' Motion for Summary Judgment (Doc. 89), plaintiffs failed to comply with the federal and local rules of procedure. The Federal Rules require a summary judgment nonmovant to support a "genuinely disputed" fact by "citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A); *see also* D. Kan. Rule 56.1(b)(1) (opposition brief must number each fact in dispute and "refer with particularity to those portions of the record upon which the opposing party relies").

Instead of heeding this instruction, plaintiffs copied and pasted some of defendants' facts and simply designated them as genuinely disputed—full stop. *See* Doc. 99 at 2–6. Plaintiffs provided no record cites to demonstrate that these disputes are genuine disputes, thus never referring "with particularity to those portions of the record upon which" they rely. D. Kan. Rule 56.1(b)(1).

Plaintiffs' approach doesn't comply with our court's procedural requirements. And it makes the court's work far more difficult. On summary judgment, the responding party must shoulder the burden "to ensure that the factual dispute is portrayed with particularity[.]" *Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quotation cleaned up). The district court has no obligation "to comb the record in order to make [the party's] arguments for him." *Id.* (quotation cleaned up). The court won't do so here. It thus deems all the facts in defendants' Motion for Summary Judgment uncontroverted for purposes of resolving that motion, unless otherwise stated. *See* Fed. R. Civ. P. 56(e)(2). In contrast, this decision doesn't affect the court's assessment of the facts applied to resolve plaintiffs' Motion for Summary Judgment.

But the court pauses here long enough to isolate one important fact where this doesn't ring true. Also, the court excepts this fact from its conclusion that it will consider all of defendants' stated facts uncontroverted for purposes of ruling defendants' motion.

Plaintiffs didn't provide record citations to controvert the following fact asserted by defendants: "Taylor believed Garcia Recovery was entitled to conduct repossession based on his mistaken belief that they possessed a court order." Doc. 90 at 7 (citing Doc. 90-2 at 1–2 (Taylor Aff. ¶¶ 9–11)). But plaintiffs' argument section plainly tries to refute this fact with record evidence. Plaintiffs argue Officer Taylor "most likely knew that he did not have" a court order. Doc. 99 at 29–32 (describing features visible on the supposed court order, that he noticed the notary stamp, and that part of the document was in Spanish); *cf. id.* at 19 (arguing if "Taylor had actually believed he was dispatched to enforce a court order, surely he would have insisted on compliance with its terms").

And in response to plaintiffs' motion, defendants presented the same fact. Doc. 97 at 8. There, plaintiffs attempted to controvert the fact, stating it was "controverted by Taylor's entire

course of action and the admitted reasonableness of Plaintiffs' alternative interpretation[.]" Doc.
102 at 3. Plaintiffs then cited some facts about the reasonableness of Officer Taylor's conduct,
his efforts to rush plaintiffs' employees to vacate the trailer, and his alleged violation of Police
Department policy. *Id.* at 3–4.[2]

Plaintiffs' briefing seems to jump back and forth. Sometimes, it seems to assume Officer
Taylor believed in the purported court order. Elsewhere, plaintiffs appear to assume that he
didn't believe in the order.[3] The court can't resolve the parties' dispute about this fact or weigh
the evidence on one side or the other. So, although plaintiffs' position seems to change
throughout their briefs, the court must treat Officer Taylor's belief that the Garcias had a court
order to repossess the Los Jarochos Trailer as controverted for summary judgment purposes. It's
a disputed fact. And, as explained throughout this Order, this dispute dooms the parties'
summary judgment motions in many respects.

## II.    Summary Judgment Facts

The following facts are uncontroverted for purposes of *both* parties' summary judgment
motions, unless otherwise noted.

---

[2]    Plaintiffs also argue this fact comes from Officer Taylor's self-serving affidavit. Doc. 102 at 3.
While the court won't consider "conclusory and self-serving affidavits" at summary judgment, this
affidavit is based on Officer Taylor's "personal knowledge[.]" *Ellis v. J.R.'s Country Stores, Inc.*, 779
F.3d 1184, 1201 (10th Cir. 2015). Of the three paragraphs referenced by defendants' stated fact, the court
concludes just one of them is improperly conclusory and self-serving. *See* Doc. 97 at 8 (DSOF 15 citing
Doc. 97-2 at 1–2 (Taylor Aff. ¶¶ 9–11)). Officer Taylor affirmed his personal knowledge of his own
experience at the standby request, his own understanding of the situation, and his own goals for the
repossession. *See* Doc. 97-2 at 1–2 (Taylor Aff. ¶¶ 9–11). But, to the extent his affidavit alleges he "had
no malice towards" plaintiffs and their employees, the court concludes this is a conclusory statement that
the court won't consider at summary judgment.

[3]    *See* Doc. 94 at 8 (plaintiffs' statement of facts explaining "[o]nce Taylor decided he had a court
order, he followed it" and he "decided he had a court order"); Doc. 99 at 31 (arguing in response to fraud
argument that Officer Taylor "most likely knew that he did not have" a court order); Doc. 102 at 7
("Taylor's action is only understandable as showing that he knew he could not show them a court order."
(emphasis omitted)). But defendants at one point acknowledge that the evidence "at very least, creates a
genuine dispute of fact" about Officer Taylor's belief in the court order. Doc. 97 at 18.

### *Plaintiffs' Business Dealings with Sergio Borjas*

From 2019 to present, plaintiffs have operated a Mexican food restaurant out of a food trailer in Colby, Kansas.  Doc. 87 at 2 (Pretrial Order ¶ 2.a.i.).  In April 2019, Galindo and Enedino agreed to purchase a food trailer from Sergio Borjas.  *Id.* (Pretrial Order ¶ 2.a.ii.).  They sent Borjas a $6,000 deposit for the trailer.  *Id.* at 3 (Pretrial Order ¶ 2.a.iii.).  By June 2019, Borjas still hadn't delivered the food trailer to Galindo and Enedino.  Doc. 87 at 3 (Pretrial Order ¶ 2.a.iv.).  That same month, Borjas offered to provide Galindo and Enedino a different trailer— which the parties call the "Used Sushi Trailer"—until the other trailer was ready.  *Id.* (Pretrial Order ¶ 2.a.v.).  Borjas never delivered the original trailer to plaintiffs.  Doc. 87 at 3 (Pretrial Order ¶ 2.a.viii.).  Borjas and plaintiffs agreed that Borjas would repay the $6,000 down payment if plaintiffs would release the Used Sushi Trailer.  Doc. 99-1 at 2–3 (Galindo Aff. ¶ 7).  But that was plaintiffs' last communication with Borjas—he never responded to any other communication efforts.  *Id.* at 3 (Galindo Aff. ¶ 8).

Galindo purchased a food trailer—described as the "Los Jarochos Trailer"—in December 2019 from JR's Food Trailers LLC for $16,000.  *Id.* (Pretrial Order ¶¶ 2.a.ix.–x.).  Galindo paid for this trailer in full.  *Id.* (Pretrial Order ¶ 2.a.x.).  Galindo and Enedino operated the Los Jarochos Trailer from 990 S. Range Avenue in Colby, Kansas.  *Id.* (Pretrial Order ¶ 2.a.xiv.).  They stored the Used Sushi Trailer on this property as well.  *Id.*

### *Garcia Recovery's Attempted Repossession*

On April 13, 2022, Galindo and Enedino left the Los Jarochos Trailer in the care of two employees, Gabino Mendez Preza (Gabino) and Martin Anastacio Ortiz.  *Id.* at 4 (Pretrial Order ¶ 2.a.xviii.).  Gabino and Ortiz both speak limited English.  *Id.*  That afternoon, Antonio and Jesus Garcia arrived at 990 S. Range Avenue.  *Id.* (Pretrial Order ¶ 2.a.xix.).  Borjas had hired

Antonio Garcia's business—Garcia Recovery—to tow away the Los Jarochos Trailer. *Id.* (Pretrial Order ¶¶ 2.a.xx.–xxi.).

The Garcias told Gabino and Ortiz that "they had an order allowing them to take the Los Jarochos Trailer at any time of the day" without the business knowing. *Id.* (Pretrial Order ¶ 2.a.xxiii.). Borjas had provided Garcia Recovery with a notarized document purporting to authorize repossession of a vehicle with VIN number 411-2E. *Id.* (Pretrial Order ¶ 2.a.xxv.). A photograph of the Los Jarochos Trailer at 990 S. Range was attached to this document. *Id.* The Garcias wouldn't provide a copy of the document to Preza and Ortiz. *Id.* (Pretrial Order ¶ 2.a.xxvi.). Garcia Recovery's "order" wasn't issued by a court. *Id.* (Pretrial Order ¶ 2.a.xxiv.).

### Colby City Police Department Arrives

At one point, Adriana Turner—plaintiffs' daughter—called the Colby City Police Department. *Id.* (Pretrial Order ¶ 2.a.xxviii.). Turner provided her contact information to the department and explained that Galindo and Enedino had purchased and held title to the Los Jarochos Trailer. *Id.* at 5 (Pretrial Order ¶¶ 2.a.xxxi.–xxxii.). At 2:12 p.m., Jesus Garcia also called the Colby City Police Department, requesting a civil standby. *Id.* at 4 (Pretrial Order ¶ 2.a.xxix.).

Colby Police Officer Lucas Taylor responded to the civil standby request. Doc. 94-3 at 11–12 (Taylor Dep. 10:25–11:16). Before arriving at the scene, Officer Taylor had never met nor spoken to Enedino, Galindo, Gabino, or Ortiz. Doc. 87 at 5 (Pretrial Order ¶ 2.a.xxxv.). Likewise, he had never met nor spoken to the Garcias or any representatives of Garcia Recovery. Doc. 90-2 at 1 (Taylor Aff. ¶ 5). Also, Officer Taylor had never met Borjas.[4] *Id.* (Taylor Aff.

---

[4]     Plaintiffs labor in vain to dispute this fact. Doc. 102 at 3 (responding to DSOF 1). But their record citations don't refute it. Instead, plaintiffs argue Officer Taylor's self-serving affidavit is entitled to no weight. *Id.* The requisite statement reflects Officer Taylor's personal knowledge of his own interactions with others—here, that he hadn't met Borjas and wasn't aware of plaintiffs' history with him

¶ 7).

### *Repossession Documentation*

Jesus Garcia told Officer Taylor they had "an order of repossession done by the owner of the old trailer that was never paid off." Doc. 90-6 (Def. Ex. E) (Dashcam Video 00:48–53). Someone showed that paperwork to Taylor. Doc. 90-4 at 27–28 (Taylor Dep. 203:20–204:5). Taylor skimmed the document, "too quickly." *Id.* at 21 (Taylor Dep. 146:19–24). Taylor noted the "State of Kansas, Seward County" notary stamp, and along with the Garcias' description of the document as an order, he believed that Garcia Recovery had a court order for repossession— although the parties dispute this point. *Id.* at 16 (Taylor Dep. 139:3–17). Officer Taylor's reliance on the Garcias' statements may have played a part in his decision not to read the order more thoroughly. *Id.* at 22 (Taylor Dep. 147:6–10). On April 13, 2022, Officer Taylor knew that a court order was required to remove disputed property. Doc. 94-3 at 144, 167–68 (Taylor

---

before the lawsuit began. The court declines to find Officer Taylor's affidavit improperly self-serving, much less in a disqualifying way.

Plaintiffs also cite evidence that, they argue, suggests Officer Taylor had met Borjas or knew about his dealings with plaintiffs before the litigation began. They explain that Officer Taylor failed to read the order and provided plaintiffs with Garcia Recovery's phone number. Doc. 102 at 3 (citing no record evidence in support). They also suggest the plaintiffs concluded Officer Taylor acted with prejudice or criminal intent. *Id.* (citing no record evidence supporting plaintiffs' belief). And they explain that defendants produced Borjas's Certificate of Origin for an imported food trailer with details that didn't match the Los Jarochos Trailer and were not contained in the official police file. *Id.* (citing Doc. 99-5 at 7 (Def. Ex. 5) and Doc. 99-11 at 22 (Marks Dep. 21:13–25)). Plaintiffs further suggest that this Certificate of Origin also wasn't included in the tow paperwork produced by Antonio Garcia. *Id.* (citing no record evidence in support).

The court has no idea how these stated facts (even assuming each one was supported by record evidence) controvert Officer Taylor's statement that he had never met Borjas. At best, these facts could undercut Officer Taylor's statement that he had no knowledge of Borjas's dealings with plaintiffs before the litigation began. The court isn't in the business of weighing evidence at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter[.]"). The court deems Officer Taylor's statement that he had never met Borjas uncontroverted. The court deems controverted Officer Taylor's statement that he had no knowledge of Bojas's dealings with plaintiffs before the lawsuit began, but as illuminated throughout this Order, that dispute doesn't affect the court's summary judgment conclusions.

Dep. 143:16–18; 166:24–167:10).

### *Repossession Conversations and Towing the Trailer*

A bilingual bystander, Elsie Bennett, informed the Garcias that the Los Jarochos Trailer wasn't the same as the trailer slotted for repossession. Doc. 87 at 5 (Pretrial Order ¶ 2.a.xl.); Doc. 90-6 (Def. Ex. E) (Dashcam Video 4:23–26). Bennett spoke with Galindo over the phone and relayed to Officer Taylor two messages from Galindo: One, Galindo had proof that the Los Jarochos Trailer was paid off, Doc. 90-6 (Def. Ex. E) (Dashcam video 05:53–06:04); and two, Galindo asked Officer Taylor to wait for Galindo to arrive in Colby, Doc. 90-6 (Def. Ex. E) (Dashcam Video 08:20–08:26). Officer Taylor responded that he couldn't wait because Garcia Recovery "had a job to do," but that he would speak with her when she arrived in Colby. *Id.* (Dashcam Video 08:28–08:37). Officer Taylor hurried the tow to ensure it would finish before the plaintiffs arrived at the scene. *Id.* (Dashcam Video 19:55–20:15; 20:35–53; 21:00–22:02).

Officer Taylor then spoke with Galindo directly over the phone. *Id.* (Def. Ex. E) (Dashcam Video 09:25–09:29). Officer Taylor told plaintiffs, both directly and through Bennett, that the Garcias had a court order to repossess the Los Jarochos Trailer. Doc. 87 at 5 (Pretrial Order ¶ 2.a.xliii.); Doc. 90-6 (Def. Ex. E) (Dashcam Video 07:10–07:40). Officer Taylor emphasized that they couldn't wait, but that Galindo could go to court and get the trailer back. *Id.* (Dashcam Video 10:14–11:00). Much later, Bennett reported that Galindo was sending a copy of the title to the Los Jarochos Trailer for Officer Taylor to review. *Id.* (Dashcam Video 27:35–28:27). Officer Taylor again repeated that Galindo would need to go to court. *Id.*

The Garcias couldn't find a VIN number on the Los Jarochos Trailer. Doc. 87 at 5 (Pretrial Order ¶ 2.a.xlv.). They informed Officer Taylor that the VIN number should've appeared near the hitch, but it looked like someone had welded over it. Doc. 94-5 at 6 (Pl. Ex. 4)

(Def. ROG Response No. 7). But Officer Taylor compared the two trailers with the photograph Garcia Recovery showed him. Doc. 87 at 6 (Pretrial Order ¶ 2.a.liii.). And the photographs matched the Los Jarochos Trailer exactly. Doc. 90-4 at 8 (Taylor Dep. 21:20–22); Doc. 90-7 (Def. Ex. F) (photo of trailer).

At one point, plaintiffs told Taylor that the Used Sushi Trailer was on the property as well, asking if that was the trailer subject to the court order. Doc. 87 at 5 (Pretrial Order ¶ 2.a.xlvi.). Officer Taylor and Bennett looked at the Used Sushi Trailer. *Id.* (Dashcam Video 13:30–35). Officer Taylor explained again that Galindo needed to go to court to resolve the issues because Garcia Recovery had the necessary documentation for the repossession. *Id.* (Dashcam Video 17:28–18:00). Officer Taylor described himself as the "mediator." *Id.* (Dashcam Video 18:50–19:05). He believed the dispute was about *which* trailer Garcia Recovery was authorized to take. Doc. 90-4 at 28 (Taylor Dep. 204:6–16).

As Garcia Recovery prepared to tow the trailer, Officer Taylor asked if they planned to close the windows before driving it away. Doc. 90-6 (Def. Ex. E) (Dashcam Video 25:30–42). Officer Taylor helped close the windows and kicked the trailer hitch. *Id.* (Dashcam Video 25:30–25:42; 35:00–35:05). Garcia Recovery towed the Los Jarochos Trailer from Colby, Kansas, to Dodge City, Kansas. Doc. 87 at 6 (Pretrial Order ¶ 2.a.lvi.). Later, Officer Taylor remarked to himself that it "suck[ed]" that plaintiffs' trailer was towed. Doc. 90-6 (Def. Ex. E) (Dashcam Video 34:44–50).

Plaintiffs arrived at 990 S. Range Avenue around 3:00 p.m. to find their trailer missing, but Officer Taylor still was on the scene. Doc. 87 at 6 (Pretrial Order ¶ 2.a.l.). Galindo showed Officer Taylor some paperwork, and Officer Taylor again emphasized that plaintiffs would need to go to court to resolve the dispute. Doc. 90-10 (Def. Ex. I) (Dashcam Video 8:00–10:26).

*Aftermath*

Shortly after the trailer was towed away, Antonio Garcia notified Galindo that the company had towed the wrong trailer. Doc. 87 at 6 (Pretrial Order ¶ 2.a.lxi.). The parties dispute the details of conversations between Garcia and Galindo about the trailer's return.[5] Plaintiffs never tried to retrieve the Los Jarochos Trailer from Dodge City. Doc. 90-13 at 5 (Galindo Dep. 47:6–13). Instead, plaintiffs rented a different trailer beginning on April 20, 2022. *Id.* at 6 (Galindo Dep. 48:13–25).

Garcia Recovery had custody over the Los Jarochos Trailer from April 13, 2022, until February 27, 2023. Doc. 87 at 6 (Pretrial Order ¶ 2.a.lviii.). It returned the trailer to plaintiffs after the Clerk of the Court entered a notice of default and plaintiffs agreed to pay for gasoline consumed during the return process. *Id.*

With that background, the court assesses the parties' cross-motions for summary judgment.

## III.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the

---

[5]    The exact details of their argument on this subject are murky and controverted. *See, e.g.*, Doc. 90-5 at 3–4 (Garcia Dep. 36:24–37:3) (testifying Garcia would return the trailer if plaintiffs brought paperwork from a court or Borjas); *id.* at 5 (Garcia Dep. 38:5–14) (testifying Garcia would return the trailer if someone paid for gas); Doc. 90-13 at 3–4 (Galindo Dep. 45:22–46:1) (testifying Garcia hung up on Galindo when she asked them to return the trailer).

nonmoving party' on the issue." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010)

(quoting *Anderson*, 477 U.S. at 248). And an issue of fact is "material" if it has the ability to

"affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of showing "the basis

for its motion[.]" *Celotex*, 477 U.S. at 323. A summary judgment movant can satisfy this

burden by demonstrating "that there is an absence of evidence to support the nonmoving party's

case." *Id.* at 325. If the moving party satisfies its initial burden, the non-moving party "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250

(citation and internal quotation marks omitted). To satisfy this requirement, the nonmoving

party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted). When

deciding whether the parties have shouldered their summary judgment burdens, "the judge's

function is not . . . to weigh the evidence and determine the truth of the matter[.]" *Anderson*, 477

U.S. at 249.

A court can treat cross motions for summary judgment separately, and "the denial of one

does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433

(10th Cir. 1979). But the court properly may address the legal arguments together. *Berges v.

Standard Ins.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010). Here, both summary judgment

motions and their legal arguments overlap substantially. The court thus exercises its discretion,

addressing together the legal arguments made by the dueling motions—where possible.

The court's summary judgment analysis develops in this fashion: *First*, it addresses

plaintiff Los Jarochos Mexican Food LLC's standing to sue. *Second*, the court evaluates

qualified immunity. *Third*, the court assesses plaintiffs' fraud and fraudulent misrepresentation claims. *Fourth*, the court evaluates plaintiffs' aiding and abetting claim. *Last*, the court evaluates defendants' damages-based arguments—that is, whether plaintiffs' damages are speculative, whether apportionment is proper, and whether plaintiffs are entitled to punitive damages.

## IV.    Los Jarochos Mexican Food LLC's Standing

Article III of the United States Constitution limits federal court jurisdiction to "cases" and "controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To present a case or controversy under Article III, a plaintiff must establish that he has standing to sue. *Id.* Article III standing requires the plaintiff to demonstrate: (1) an injury in fact to a legally protected interest; (2) a causal connection, meaning the injury is fairly traceable to the challenged act of the defendant; and (3) that the injury is likely redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

"To prevail at summary judgment on standing grounds, the defendant must show that the record is devoid of evidence raising a genuine issue of material fact that would support the plaintiff's ultimate burden of proving standing." *Day v. Bond*, 500 F.3d 1127, 1132 (10th Cir. 2007). But "[a]s the party seeking to invoke federal jurisdiction, the plaintiff . . . has the burden of establishing each of these three elements of Article III standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005). At summary judgment, "the plaintiff must set forth by affidavit or other evidence specific facts that, if taken as true, establish each of these elements." *Id.*

Defendants argue plaintiff Los Jarochos Mexican Food LLC doesn't have Article III standing to assert claims in this case. Doc. 90 at 31–32. Galindo and Enedino, among others,

organized Los Jarochos Mexican Food LLC after the events of April 13, 2022.  Doc. 90-16 at 2

(Def. Ex. O) (organization document executed June 6, 2022).  And the Los Jarochos Trailer—the

one at issue on plaintiffs' claims here—is titled in Galindo's name.  Doc. 90 at 31.  Defendants

suggest that the LLC, nonexistent at the time of Officer Taylor's involvement, lacks standing to

sue Officer Taylor or the City.  *Id.* ("Taylor did not do anything to the LLC, and therefore, the

LLC should be dismissed as a plaintiff.").  While defendants cite the legal standard for Article III

standing, they do little to explain which elements of standing they believe the LLC can't satisfy.

It appears that they challenge injury in fact and causation.  Defendants argue the LLC had no

property taken and heard no fraudulent misrepresentations.  *Id.*  Ultimately, they suggest,

"Taylor did not do anything to the LLC[.]"  *Id.*

        Plaintiffs' response doesn't address Article III standing—at least not in a meaningfully

fulsome fashion.  Instead, plaintiffs transform defendants' standing argument into one about the

LLC's ability to prove its damages.  *See* Doc. 99 at 39 ("Plaintiffs timely produced all their

financial documents necessary to prove their damages, and Defendants have not contended

otherwise." (internal citation omitted)); *id.* at 40 ("Now Defendants seek summary judgment

based on a lack of evidence that the LLC suffered damages, without having ever inquired into

the topic or explain why they think it matters.").

        In the end, plaintiffs' failure to address standing adequately doesn't matter.  That's so

because defendants haven't carried their initial burden at summary judgment.  Even so, the court

has an independent obligation to assure itself of a plaintiff's standing.  *Colorado Springs v.

Climax Molybdenum Co.*, 587 F.3d 1071, 1078–79 (10th Cir. 2009) ("The federal courts are

under an independent obligation to examine their own jurisdiction, and standing is perhaps the

most important of the jurisdictional doctrines." (internal quotation marks and citation omitted)).

The court—as shown below—has analyzed the LLC's standing. And it concludes plaintiffs have presented specific evidence supporting plaintiffs' standing for each remaining claim.[6]

Outlining its analysis, the court begins with injury in fact.

### *Injury in Fact*

Defendants' key argument suggests that the LLC—nonexistent at the time of the taking—can't have standing. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation cleaned up). It's important to define the injury that Los Jarochos Mexican Food LLC asserts. Plaintiffs explain that the LLC made cash rental payments for a replacement trailer (while the Los Jarochos Trailer was held by Garcia Recovery) and paid the costs of repairs to the Los Jarochos Trailer (after its return). Doc. 99 at 39; Doc. 99-1 at 2 (Galindo Aff. ¶ 4–5). Essentially, then, the injury asserted is the loss of use of the Los Jarochos Trailer for business purposes and the costs to repair it. Each of these harms necessarily occurred after the LLC had formed—and after repossession occurred on April 13, 2022. Recall also that Garcia Recovery didn't return the Los Jarochos Trailer until February 27, 2023. Doc. 87 at 6 (Pretrial Order ¶ 2.a.lviii.) (return date); Doc. 90-5 at 10–11 (Garcia Dep. 50:18–51:22) (Antonio Garcia describing trailer's return under settlement agreement). So, just because the LLC was formed after the repossession date doesn't mean—automatically—that there's no cognizable injury in fact.

Defendants rely on two out-of-circuit cases as support for the proposition that a business entity, formed after the key events in question, lacks standing. But, as plaintiffs emphasize, both cases are different.

---

[6]      The four claims remaining are:  a civil rights claim under § 1983; fraudulent misrepresentation; fraud; and aiding and abetting. *See* Doc. 87 at 27–29 (Pretrial Order ¶¶ 5.A.–D.).

*First*, defendants cite an Eastern District of Missouri case where the parties and court agreed that a plaintiff business lacked standing to assert claims stemming from receipt of an unsolicited advertisement.  *See* Doc. 90 at 32 (citing *Presswood v. Pernix Therapeutics Holdings*, No. 15-CV-592 NAB, 2016 WL 6995874, at *10 (E.D. Mo. Nov. 30, 2016)).  In *Presswood*, the business didn't "exist as an entity at the time the faxes were alleged to have been sent."  2016 WL 6995874, at *3.  Apparently, that was the moment when the harm occurred.  The *Presswood* court didn't explain in any detail why the plaintiff lacked standing—presumably because the parties agreed it didn't.  Here, by contrast, Los Jarochos Mexican Food LLC's harm occurred after the repossession on April 13, 2022.  So, *Presswood* isn't a compelling basis to conclude Los Jarochos Mexican Food LLC lacks standing simply because it didn't exist when the trailer was repossessed.  The business existed at the time it allegedly incurred the damages it seeks to recover for loss of use and repair costs.

*Second*, defendants cite a Fifth Circuit case without explaining about how it applies.  Doc. 90 at 32 (citing *Superior MRI Servs. V. Alliance Healthcare Servs.*, 778 F.3d 502, 504–05 (5th Cir. 2015)).  In *Superior*, plaintiff asserted contract claims it allegedly had acquired from its predecessor in interest.  778 F.3d at 503.  The district court had concluded plaintiff never acquired those rights and thus it lacked prudential standing to assert its predecessor's rights.  *Id.*  The Fifth Circuit affirmed.  *Id.* at 504–06.  Here, in contrast, Los Jarochos Mexican Food LLC isn't asserting anyone else's rights.  This LLC asserts its own rights based on harm occurring after Galindo, Enedino, and others organized the LLC.

Defendants haven't shown—at least on the injury in fact element—that "the record is devoid of evidence raising a genuine issue of material fact that would support the plaintiff's ultimate burden of proving standing."  *Day*, 500 F.3d at 1132.  Next up:  causation.

17

*Causation*

Defendants fare nearly the same on the causation element.  They argue that the "evidence does not support any finding that Taylor did anything to Los Jarochos Mexican Food, LLC." Doc. 90 at 31.  They suggest that when the LLC formed, "the Los Jarochos Trailer was sitting in Dodge City, Kansas, while Galindo and Garcia were disagreeing about who should be responsible for returning [the] trailer to where it belonged." *Id.*  But the LLC necessarily incurred its rental and repair expenses after Garcia Recovery repossessed the trailer on April 13, 2022.  And the record evidence would permit a reasonable factfinder to conclude these expenses are fairly traceable to Officer Taylor's actions during the repossession.  It's true that the trailer sat in Dodge City for several months after Officer Taylor's involvement.  Doc. 87 at 6 (Pretrial Order ¶ 2.a.lviii.).  But it's equally true that Officer Taylor on April 13 had encouraged plaintiffs' employees to vacate the trailer, Doc. 90-6 (Def. Ex. E) (Dashcam Video 19:55–20:15), and closed the windows and kicked the hitch during the repossession, *id.* (Dashcam Video 25:30–25:42; 35:00–35:05).  There's evidence permitting a reasonable finding that the Los Jarochos Trailer wouldn't have wound up in Dodge City if not for Officer Taylor.  That's enough evidence to suggest a "substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."  *Nova Health Sys.*, 416 F.3d at 1156.  On to the final element:  redressability.

*Redressability*

Los Jarochos Mexican Food LLC's claim also is redressable by the relief sought.  This element is satisfied when "a favorable judgment will relieve a discrete injury[.]"  *Id.* at 1158.  Here, plaintiffs seek damages compensating them for the costs they incurred renting a replacement trailer and repairing the Los Jarochos Trailer.  Doc. 87 at 27 (Pretrial Order ¶ 5.A.). The LLC's monetary harm is redressable by monetary damages.

In sum, defendants challenged Los Jarochos Mexican Food LLC's standing but have failed to carry their summary judgment burden. Defendants haven't shown the summary judgment record is devoid of evidence supporting plaintiffs' ultimate burden of proving standing. *Day*, 500 F.3d at 1132. Exercising its independent obligation to assure itself of its own jurisdiction, the court concludes a reasonable factfinder could conclude the LLC has standing. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010) (raising standing sua sponte on summary judgment motion and explaining court looks "to whether the summary judgment record supports a conclusion that the plaintiffs have standing"). The court denies defendants' summary judgment motion on standing grounds.

Next up, qualified immunity.

## V.    Qualified Immunity

Defendant Taylor argues he's entitled to summary judgment against plaintiffs' § 1983 claim because plaintiffs can't establish Officer Taylor violated plaintiffs' clearly established rights. Doc. 90 at 18. Defendant Taylor theorizes that he made a reasonable mistake of fact in concluding the Garcias had a court order authorizing the repossession. *Id.* at 21. Under these circumstances, he argues, there's no clearly established law showing he violated plaintiffs' rights. *Id.* at 22 ("[Relevant cases don't] provide direction as to what an officer should do in Officer Taylor's specific situation.").

The court begins by explaining the qualified immunity legal standard. Then, the court addresses both qualified immunity prongs. The court concludes plaintiffs have carried their burden to overcome Officer Taylor's qualified immunity argument on defendants' motion. But the court concludes it can't grant plaintiffs summary judgment in their favor on their § 1983 claim.

A.    **Legal Standard**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  But entitlement to qualified immunity demands that an underlying "mistake of fact . . . be a reasonable one."  *Singh v. Cordle*, 936 F.3d 1022, 1033 (10th Cir. 2019).

On a defendant's summary judgment motion, the court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).  When deciding "whether plaintiff has satisfied the two-fold qualified-immunity burden, insofar as there are material disputes of fact, they are construed in the light most favorable to the plaintiff."  *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 758 n.5 (10th Cir. 2021).  So, "genuine disputes of material fact" don't "prejudice a plaintiff in the qualified-immunity summary-judgment context."  *Id.*

Federal courts possess discretion to decide "which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances in the particular case at hand."

*Pearson*, 555 U.S. at 236.  Addressing the clearly established question first "may avoid the risk of deciding a case incorrectly given insufficient briefing on the constitutional violation question." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (citing *Pearson*, 555 U.S. at 239).

Keep in mind the burdens and inferences on cross motions for summary judgment.  The court "views the facts and draws reasonable inferences in the light most favorable to . . . the party opposing the summary judgment motion." *Scott*, 550 U.S. at 378 (quotation cleaned up). Here, both defendants and plaintiffs have moved for summary judgment on the § 1983 claim. The court's qualified immunity analysis thus must flip the burdens and inferences depending on which party's motion is at issue in the analysis.  For defendants' motion, the court decides whether a reasonable jury could find facts showing Officer Taylor violated a clearly established constitutional right.  *Est. of Booker*, 745 F.3d at 411.  And it must draw all inferences in the light most favorable to plaintiffs.  *See Est. of Taylor*, 16 F.4th at 758 n.5.  But when it analyzes plaintiffs' motion, the court decides whether plaintiffs have overcome qualified immunity under the facts construed in the light most favorable to defendants.

Defendants' brief just addresses the clearly-established-law prong.  *See* Doc. 90 at 18. But, because the court concludes plaintiffs have shouldered their burden to overcome qualified immunity on defendants' motion, the court evaluates both prongs of the analysis.

### B.   Constitutional Violation

To assess both the constitutional violation and clearly established prongs, the court first must preview how a private repossession might implicate constitutional rights.

1.    **State Action**

The Fourth Amendment protects "the people . . . against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  A repossession is, of course, a seizure.  "A 'seizure' occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'"  *McLinn v. Thomas Cnty. Sheriff's Dep't*, 535 F. Supp. 3d 1087, 1100 (D. Kan. 2021) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  "Under the Fourteenth Amendment, procedural due process requires notice and a pre-deprivation hearing before property interests are negatively affected by governmental actors."  *Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004), *overruled on other grounds by Pearson*, 555 U.S. 223.

The Fourth and Fourteenth Amendments only protect against *government* action.  And "for that reason they do not ordinarily apply to the repossession of a vehicle by a private party."  *McLinn*, 535 F. Supp. 3d at 1100–01.  As our Circuit put it, an "essential dichotomy" exists "between government action, which is subject to scrutiny under the" Fourth and Fourteenth Amendments, and "private conduct, which however discriminatory or wrongful, is not subject to" constitutional scrutiny.  *Marcus*, 394 F.3d at 818 (citation and internal quotation marks omitted).

This landscape begs the question, though:  When does a police officer become involved enough in a private repossession that the officer violates the Fourth and Fourteenth Amendments?  Our Circuit addressed this issue in *Marcus v. McCollum*, 394 F.3d 813.

"[O]fficers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor."  *Id.* at 818.

Officers' conduct in this context operates on a "continuum." *Id.* When "an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action." *Id.* (citation and internal quotation marks omitted). For evident reasons, this "area of the law is particularly fact-sensitive," and the Tenth Circuit requires district courts to examine the totality of the circumstances. *Id.* at 819.

*Marcus* identified several factors that can suggest state action was applied. "If the evidence showed, for example, that an officer came on the scene at the request of the repossessor and said to the debtor, 'don't interfere with this repossession,' or 'you know you're not the rightful owner of the property,' an officer might be liable." *Id.* (quotation cleaned up). This is so because an "officer's arrival with the repossessor could give the repossession a cachet of legality and have the effect of intimidating the debtor into not exercising his right to resist, thus facilitating the repossession." *Id.* (quotation cleaned up). Other factors include (i) "failing to depart before completion of the repossession," (ii) "standing in close proximity to the creditor," and (iii) "unreasonably recognizing the documentation of one party over another[.]" *Id.*

Officers also can't aid a repossession that breaches the peace. Kansas has "adopted UCC provisions allowing secured creditors to repossess property from a defaulting debtor without a judicial order if certain conditions are met. One of those conditions allows a creditor to take possession 'if it proceeds without a breach of the peace.'" *McLinn*, 535 F. Supp. 3d at 1101 (quoting Kan. Stat. Ann. §§ 84-9-609(a)(1), (b)(2)). "[I]f there is a breach of the peace, and the repossession is thereby unlawful, an officer who aids the repossession can be liable because 'it stands to reason that police should not weigh in on the side of the repossessor and assist in an illegal repossession.'" *Id.* (brackets omitted) (quoting *Marcus*, 394 F.3d at 820).

To determine whether a breach of the peace has occurred, courts apply state law. *See, e.g.*, *id.*; *see also Marcus*, 394 F.3d at 820 (applying Oklahoma law to assess breach of peace). In Kansas, "a debtor's lack of knowledge of the repossession" isn't sufficient to constitute a breach of the peace. *McLinn*, 535 F. Supp. 3d at 1102 (citing *Benschoter v. First Nat'l Bank of Lawrence*, 542 P.2d 1042, 1050 (1975)). Instead, courts should consider "whether there was entry by the creditor upon the debtor's premises" and "whether the debtor or one acting on his behalf consented to the entry and repossession." *Benschoter*, 542 P.2d at 1050 (internal quotation marks and citation omitted). But a debtor's consent isn't necessary to a lawful repossession. *See McLinn*, 535 F. Supp. 3d at 1102 (citing *Wade v. Ford Motor Credit Co.*, 668 P.2d 183, 185 (Kan. Ct. App. 1983)). In *Wade*, the Kansas Court of Appeals "downplayed the issue of consent" and "cited several cases examining whether there was a confrontation between the creditor and debtor at the time of repossession." *Id.*; *see also Marcus*, 394 F.3d at 820 (applying Oklahoma law for proposition that even "polite repossessors breach the peace if they meet resistance from the debtor" (internal quotation marks and citation omitted)); 4 White, Summers, & Hillman, Uniform Commercial Code § 34:18 (6th ed. June 2025 Update) ("The debtor's opposition, however slight and even if merely oral, normally makes any entry or seizure a breach of the peace. We believe this is sound because the law should not make a debtor physically confront a repossessor in order to sustain a claim of breach of the peace." (footnote omitted)).

*Marcus* summarized "the overarching lesson of the case law" this way: "officers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance." 394 F.3d at 819. If they aid the repossessor in that fashion, or go beyond keeping the peace, constitutional implications arise.

24

The court next evaluates whether plaintiffs here have shown that "a reasonable jury could find facts supporting a violation" of their constitutional rights, as explained in *Marcus*. *Est. of Booker*, 745 F.3d at 411. But this next section doesn't address whether plaintiffs can prove a constitutional violation for purposes of their own summary judgment motion. That's because the court concludes—when flipping the inferences in defendants' favor—plaintiffs haven't shown that the constitutional right Officer Taylor purportedly violated was established clearly. And that conclusion suffices to preclude summary judgment in plaintiffs' favor on their § 1983 claim. *See below* § V.C.2. So, in the section immediately below, the court draws all inferences in the light most favorable to plaintiffs as nonmovants on defendants' motion. *See Est. of Taylor*, 16 F.4th at 758 n.5.

### 2.    Analysis[7]

Here, the Garcias executed a private repossession. No court order authorized the Los Jarochos Trailer's repossession. Doc. 87 at 4 (Pretrial Order ¶ 2.a.xxiv.). Thus, to implicate the constitution, plaintiffs must show that a reasonable factfinder could conclude Officer Taylor intervened to aid the repossession beyond merely keeping the peace. *See Marcus*, 394 F.3d at 818 ("[O]fficers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor."). Drawing all inferences in plaintiffs' favor and viewing the summary judgment facts in the light most favorable to plaintiffs, a reasonable factfinder could conclude Officer Taylor went beyond merely keeping the peace.

---

[7]      Although the court doesn't evaluate this prong of the analysis for purposes of plaintiffs' motion, it does consider the parties' arguments on qualified immunity in both sets of briefing. After all, the parties addressed these issues in both summary judgment motions. They refer to their other briefs while making their qualified immunity arguments. *See* Doc. 97 at 17; Doc. 99 at 14. And in "the interest of good judging," the court concludes it's necessary to evaluate the arguments in their entirety. *Smith v. Kenny*, 678 F. Supp. 2d 1093, 1115 (D.N.M. 2009).

Plaintiffs identify several facts to prove Officer Taylor's assistance in the repossession. Officer Taylor arrived at the repossession at Garcia Recovery's request. Doc. 94-3 at 11–12 (Taylor Dep. 10:25–11:16). Recall that "the manner in which [an officer] was alerted to the situation" can affect whether the officer's "actions provoked a breach of the peace and whether a factfinder could infer that [the officer and repossessor] were engaged in a joint endeavor." *Marcus*, 394 F.3d at 821. In fact, arriving on the scene at the repossessor's request is one circumstance that can establish liability. *Id.* at 819 ("If the evidence showed, for example, that an officer came on the scene at the request of the repossessor and said to the debtor 'don't interfere with this repossession,' or 'you know you're not the rightful owner of the property,' an officer might be liable." (quotation cleaned up)).

Moreover, the parties dispute whether Officer Taylor knew the Garcias had no court order. *See above* § I.B. But it's undisputed that plaintiffs objected to the repossession attempt—through Bennett, their employees, and directly to Officer Taylor. Doc. 87 at 4 (Pretrial Order ¶ 2.a.xxii.); Doc. 90-6 (Def. Ex. E) (Dashcam video 05:53–06:04; 09:55–10:07). If "there is a breach of the peace, and the repossession is thereby unlawful, an officer who aids the repossession can be liable because 'it stands to reason that police should not weigh in on the side of the repossessor and assist in an illegal repossession.'" *McLinn*, 535 F. Supp. 3d at 1101 (brackets omitted) (quoting *Marcus*, 394 F.3d at 820). Our Circuit—applying a state statute similar to Kansas's—has suggested that a breach of the peace occurs if the repossessor "meet[s] resistance from the debtor." *Marcus*, 394 F.3d at 820 (quotation cleaned up) (applying Oklahoma law). Kansas courts assess whether there was a "confrontation between the repossessor and the debtor at the time and place of repossession." *Wade*, 668 P.2d at 185. Here,

plaintiffs disputed the repossession, and a reasonable factfinder thus could conclude the repossession breached the peace.

And in the face of that breach, Officer Taylor "made the decision that the repossession was going to take place[.]"  Doc. 99-2 at 147 (Taylor Dep. 146:3–5).  He advised plaintiffs' employees to vacate the trailer and stop stalling.  Doc. 90-6 (Def. Ex. E) (Dashcam Video 19:55–20:15).  While "mere approval of . . . a private party is not sufficient to justify holding the State responsible" for a private party's initiatives, *Marcus*, 394 F.3d at 818 (quotation cleaned up), Officer Taylor also physically helped effectuate the repossession.  He asked Garcia Recovery if it needed assistance with closing the awning—and he then provided that assistance.  Doc. 90-6 (Def. Ex. E) (Dashcam Video 25:30–25:42).  Officer Taylor also helped connect the trailer to the Garcias' hitch.  *Id.* (Dashcam Video 35:00–35:05).  And Officer Taylor stayed at the scene until the repossession ended.  Doc. 87 at 6 (Pretrial Order ¶ 2.a.l.); *Marcus*, 394 F.3d at 819 (emphasizing that "failing to depart before completion of the repossession" is another factor suggesting improper intervention (citing *Jones v. Gutschenritter*, 909 F.2d 1208, 1211–12 (8th Cir. 1990))).

Construed in the light most favorable to plaintiffs, these facts could move Officer Taylor's involvement beyond merely keeping the peace.  "[O]fficers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance."  *Marcus*, 394 F.3d at 819.  To recap, plaintiffs' employees vacated the trailer at Officer Taylor's behest.  Officer Taylor physically assisted the Garcias' efforts to remove the Los Jarochos Trailer.  He arrived at the Gacias' request and stayed until they succeeded in removing the trailer from the property.  All the while, Officer Taylor knew plaintiffs disputed Garcia Recovery's right to take the Los Jarochos Trailer.  A reasonable

factfinder could conclude Officer Taylor affirmatively intervened to aid the repossessor, not merely that he maintained the peace. Plaintiffs thus have carried their burden to overcome qualified immunity on the constitutional-violation prong.

###    C.    Clearly Established

"[Q]ualified immunity turns on the objective reasonableness of the official's actions, considering the laws clearly established at the time the official acted." *Kan. Motorcycle Works USA, LLC v. McCloud*, 569 F. Supp. 3d 1112, 1123 (D. Kan. 2021) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). To determine whether the law is clearly established, the court looks to "controlling authority or a robust consensus of cases[.]" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation cleaned up). This kind of authority usually takes the form of case law. *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (identifying "on-point Supreme Court or published Tenth Circuit decision" or "the clearly established weight of authority from other courts" as sufficient (quotation cleaned up)). This standard doesn't require plaintiffs to identify a perfect match in the form of "a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). But plaintiffs must provide a close match—that is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

"[N]early every right—if viewed at a sufficiently high level of generality—is clearly established." *Kan. Motorcycle Works*, 569 F. Supp. 3d at 1123–24 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). So, the court must engage in a "narrowly tailored and context-specific exercise." *Id.* at 1123. The "precise contours of the right must have been so clear that every reasonable official in that circumstance would have understood that what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct." *Id.* at 1124.

28

Trying to shoulder their qualified immunity burden, plaintiffs rely on *Marcus*.  Doc. 99 at

13–18.  Because qualified immunity—and the underlying substantive law—are "fact-sensitive"

inquiries, the court outlines the *Marcus* facts in more detail, below.  *See Marcus*, 394 F.3d at 819

("This area of the law is particularly fact-sensitive, so the circumstances must be examined in

their totality." (quotation cleaned up)).

        1.       ***Marcus v. McCollum***

In *Marcus*, a car repossessor contacted a police officer before the repossession began so

that the officer could watch and "be aware of the situation."  *Id.* at 816.  During the repossession,

the car owner's wife emerged from her residence and protested the repossessor's right to the car.

*Id.*  Noting the developing dispute, the police officer called for backup and three other officers

quickly arrived.  *Id.*  Once on scene, officers allegedly told the owner's wife and her minor son

"to stop their interference" and instructed them to let the repossessors "do what they're going to

do and take it up in small claims court."  *Id.*  Officers also allegedly warned that "if the situation

escalated, 'someone' would be going to jail."  *Id.*  And officers may have poked the car owner's

minor son forcefully in the chest several times, knocking him backwards.  *Id.*  The repossessor

showed police nothing more than a piece of paper with a vehicle identification number on it.  *Id.*

Officers never asked for more documentation.  *Id.*

On defendants' summary judgment motion, our Circuit declined to apply qualified

immunity in those circumstances because "[g]enuine issues of material fact exist[ed] regarding

whether reasonable officers, facing the circumstances of this case, would consider the actions

here violative of plaintiffs' constitutional and statutory rights."  *Id.* at 824.  Plaintiffs had carried

their burden to overcome qualified immunity.  *See id.*  In so deciding, the Circuit concluded

"[s]tate law limiting self-help to those in situations where a breach of the peace is avoided, and

federal law recognizing that an unlawful repossession can amount to state action and a deprivation of property actionable under § 1983, are both clearly established." *Id.*; *see also McLinn*, 535 F. Supp. 3d at 1103 ("The law in the Tenth Circuit was clearly established at the time of the incident that an officer at a private repossession may act to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor." (internal quotation marks and citation omitted)).

### 2.    A Fact Distinction

Officer Taylor responds—in essence—that he made a reasonable mistake of fact that takes his conduct outside *Marcus*'s clearly established realm. According to defendant, he believed the Garcias had a court order justifying repossession. Doc. 90 at 21. If an officer assists a court-authorized repossession, the same Fourth and Fourteenth Amendment issues don't arise. And according to defendants, "*Marcus* does not provide direction as to what an officer should do" in this specific situation, operating under such a belief. *Id.* at 22. This uncertainty suffices, defendants argue, to show that the right wasn't clearly established. *See id.* So, in defendants' view, plaintiffs can't carry their qualified immunity burden.

To show a right is clearly established, a plaintiff must "overcome a claim that the official made a . . . reasonable 'mistake of fact[.]'" *Deutsch v. Jordan*, 618 F.3d 1093, 1099 (10th Cir. 2010) (quoting *Pearson*, 555 U.S. at 231); *see also Franco v. Bd. of Cnty. Comm'rs*, 609 F. App'x 957, 959 (10th Cir. 2015) ("[Q]ualified immunity protects a government officer who has made a reasonable mistake of fact."). And if plaintiffs have overcome defendants' mistake-of-fact argument—then this case looks factually akin to *Marcus*'s articulation of the clearly established law.

Complicating matters more, the parties dispute whether Officer Taylor truly believed the Garcias had a court order to repossess the Los Jarochos Trailer.  *See above* § I.B.  If Officer Taylor knew the Garcias didn't have a court order—as plaintiffs suggest—then he made no mistake of fact that could remove this case from *Marcus*'s realm.  But if Officer Taylor reasonably believed the Garcias had a court order—as defendants suggest—then a reasonable officer might've not understood their conduct was unlawful.  The court discusses both alternatives, below.

### *Defendants' Motion*

When deciding defendants' summary judgment motion, the court accepts "plaintiffs' version of contested facts, along with the undisputed facts."  *Marcus*, 394 F.3d at 823–24.  Assume then, that Officer Taylor knew Garcia Recovery lacked a court order.  *Marcus* sets out the clearly established rule that an officer violates the constitution by assisting a self-help repossession beyond simply keeping the peace.  *See McLinn*, 535 F. Supp. 3d at 1103.  And on this case's facts, drawing inferences in plaintiffs' favor, those facts look like those at issue in *Marcus*.  394 F.3d at 824 (declining to apply qualified immunity because facts supported inference that reasonable police officers were aware their conduct was unlawful).

Consider the substantial overlap between *Marcus* and the facts here.  The repossessor contacted the officer.  Doc. 94-3 at 11–12 (Taylor Dep. 10:25–11:16); *Marcus*, 394 F.3d at 816.  The parties disputed the repossessor's rights to that property.  Doc. 90-6 (Def. Ex. E) (Dashcam video 05:53–06:04) (explaining plaintiffs had proof the Los Jarochos Trailer was fully paid for); *Marcus*, 394 F.3d at 821.  And the officers told the plaintiffs to allow the repossession to proceed.  Doc. 90-6 (Def. Ex. E) (Dashcam Video 10:14–11:00); *Marcus*, 394 F.3d at 821.  Indeed, more so than in *Marcus*, Officer Taylor physically assisted Garcia Recovery's efforts to

31

remove the trailer from the premises by adjusting the awnings and hitch.  Doc. 90-6 (Def. Ex. E)
(Dashcam Video 25:30–25:42; 35:00–35:05).  The record thus shows that a "reasonable officer
in those circumstances would understand that intervening on the side of the repossessor in this
manner was contrary to the rule set forth in *Marcus*."  *McLinn*, 535 F. Supp. 3d at 1104.
Assuming Officer Taylor didn't actually believe the Garcias had a court order, "every reasonable
official would have understood that what [Officer Taylor did] violates" the *Marcus* rule.  *Reichle
v. Howards*, 566 U.S. 658, 664 (2012).  For purposes of defendants' motion, plaintiffs have
overcome qualified immunity.[8]

### *Plaintiffs' Motion*

To grant plaintiffs summary judgment in their favor on their § 1983 claim, the court
would have to find that Officer Taylor isn't entitled to qualified immunity, even when the
inferences are flipped in his favor.  *See Lundstrom v. Romero*, No. 07-759 JCH/WDS, 2011 WL
13269406, at *2 (D.N.M. Dec. 29, 2011) (explaining on motion to reconsider that even "when
viewing the evidence and making inferences in the light most reasonable to Defendants, it
becomes clear that the [Tenth Circuit's earlier] reasoning on . . . qualified immunity . . . does not

---

[8]        Though the parties briefly cite *Wood v. Welch*, No. 22-2279-DDC, 2024 WL 2880405 (D. Kan.
June 7, 2024), it's important to differentiate between that case and this one.  There, the court concluded it
wasn't clearly established that an officer violated the plaintiffs' constitutional rights through his
involvement in a self-help repossession.  *Id.* at *9.  The officer in *Wood* diffused a volatile situation by
ordering the tow company to return to plaintiffs' house after it had left the scene.  *Id.* at *8.  He also had
explained to plaintiffs that they "had to return the vehicle" and the tow company had the repossession
paperwork.  *Id.*  And the officer remained on the scene until the repossession completed.  *Id.*  But,
importantly, the parties didn't dispute whether the repossessor had a right to repossess the vehicle.  *Id.*
Ultimately, the court concluded that a reasonable officer in these circumstances wouldn't have known—
based on *Marcus*—that his conduct violated clearly established law.  *Id.* at *8–9.

But in this case, Officer Taylor knew the parties disputed whether Garcia Recovery was entitled
to repossess the Los Jarochos Trailer.  And he permitted the Garcias to remove the trailer anyway.  One
could view this conduct as convening a "curbside courtroom," which *Marcus* proscribes.  394 F.3d at 820
("A curbside courtroom, in which officers decide who was entitled to possession, is precisely the situation
and deprivation of rights to be avoided." (quotation cleaned up)).

compel this Court to grant summary judgment to Plaintiffs"). On plaintiffs' summary judgment

motion, the court must construe the facts in the light most favorable to defendant, as nonmovant.

*Scott*, 550 U.S. at 378 (resolve disputed facts in light most favorable to nonmovant). So, assume

Officer Taylor believed Garcia Recovery had a court order authorizing repossession. Defendant

is correct—*Marcus* doesn't establish clearly that the constitution is violated where the officer in

a self-help repossession mistakenly believes he's involved in a court-ordered repossession. Doc.

90 at 22.

    While qualified immunity protects government officials who make mistakes of fact, those

mistakes must prove *objectively* reasonable. *See Singh*, 936 F.3d at 1033. So, if Officer Taylor's

mistake of fact was unreasonable, qualified immunity can't shield him. Plaintiffs argue Officer

Taylor's mistake of fact was unreasonable because of Officer Taylor's quick review of the

Garcias' documents, reliance on their word, failure to look for a judge's signature, and

knowledge that the notary notarized Borjas's signature. *See* Doc. 99 at 16–17. What's more,

plaintiffs emphasize, had Officer Taylor "believed he was dispatched to enforce a court order,"

then "he would have insisted on compliance with its terms." Doc. 99 at 19. Essentially, they

argue, a "rudimentary examination" would've shown that the document applied to a trailer with a

particular VIN number and that number didn't match any number on plaintiffs' trailer. *Id.*; Doc.

90-3 at 1 (Def. Ex. B) (listing serial number); Doc. 87 at 5 (Pretrial Order ¶ 2.a.xlvii.) (VIN

didn't match between trailer and paperwork).

    It's undisputed that Officer Taylor "skimmed" the Garcias' paperwork, relied on their

statements that they had an order, and didn't look for a judge's signature. *See* Doc. 90-4 at 27–

28 (Taylor Dep. 203:20–204:5) (acknowledging Officer Taylor "skimmed" the Garcias

documents); Doc. 99-3 at 206 (Taylor Dep. 205:14–19) (explaining how Officer Taylor relied on

the Garcias' word because they told him they had an order); *id.* at 147 (Taylor Dep. 146:19–24)

(affirming that Officer Taylor didn't "have a good answer" for why he "didn't look for a judge's

signature"). Officer Taylor also knew the notary had notarized Borjas's signature.[9] Doc. 94-3 at

79–80 (Taylor Dep. 78:15–79:17).

But Officer Taylor was informed the Garcias had secured a court order to repossess the

trailer.[10] He noticed the words "State of Kansas, Seward County" on the repossession document.

Doc. 90-4 at 16 (Taylor Dep. 139:3–17). And he testified that he wanted to ensure the

repossession went quickly to "try to maintain peace." Doc. 90-4 at 24 (Taylor Dep. 183:13–

16).[11] The documents Officer Taylor viewed also included a photograph of the Los Jarochos

Trailer. Doc. 101-5 at 3 (Taylor Dep. 75:4–18).[12] And Officer Taylor knew the Garcias couldn't

---

[9]     The parties dispute whether Officer Taylor believed Borjas was the seller on April 13, 2022. *See* Doc. 94 at 10 (plaintiffs asserting Officer Taylor "recognized at the time of the tow that Borjas was the seller or the manufacturer of the trailer" (citing Doc. 94-3 at 80 (Taylor Dep. 79:11–17))); Doc. 97 at 6 (defendants suggesting Officer Taylor didn't "know who Borjas was . . . on April 13, 2022 (citing Doc. 97-3 at 5–6 (Taylor Dep. 78:19–79:10))).

[10]     Plaintiffs argue "[n]o one told Taylor there was a court order[.]" Doc. 99 at 16. But both parties present statements of fact indicating the Garcias informed Officer Taylor they had a court order. *See* Doc. 90 at 7 (defendants citing Doc. 90-4 at 22 (Taylor Dep. 147:6–9) for proposition that Garcia Recovery informed him they had a "court order[,]" causing him to "not look[] at the document more thoroughly"); Doc. 99 at 11 (plaintiffs' statement of additional facts explaining "Taylor took the Garcias at their word when they told him [the document] was a court order" (first citing Doc. 99-2 at 58, 76, 83, 139, 140–141 (Taylor Dep. 57:1–19, 75:1–3, 82:2–4, 138:14–16, 139:1–2; 139:7–17; 139:24–140:11); and then citing Doc. 99-6 at 4–5)).

        Despite plaintiffs' stated fact, some of the cited evidence from the summary judgment record reflects uncertainty whether the Garcias said the document was a court order or just an order. *See, e.g.*, Doc. 99-2 at 141 (Taylor Dep. 140:4–17) (answering that the Garcias "stated they had an order"); Doc. 90-4 at 22 (Taylor Dep. 147:6–10) (explaining that Garcia's statement that the document "was a court order" affected his behavior). The court thus concludes it is disputed whether the Garcias stated the document was a court order. But again, the court construes the disputed facts in the light most favorable to defendant on plaintiffs' motion.

[11]     This fact is controverted, *see* Doc. 102 at 3, but on plaintiffs' motion the court draws the inferences in the light most favorable to defendant, the nonmovant.

[12]     Plaintiffs suggest Officer Taylor decided to tow the trailer based on the photographs, not the supposed court order. *See* Doc. 94 at 14; Doc. 94-3 at 148 (Taylor Dep. 147:11–23) (Officer Taylor

find the trailer's VIN number.  Doc. 87 at 6 (Pretrial Order ¶ 2.a.xlviii.).  Viewing the evidence

in the light most favorable to Officer Taylor, a reasonable juror could infer Officer Taylor did

not know that the VIN number on the document differed from the VIN number of the Los

Jarochos Trailer.  He was told, instead, that the VIN number appeared like it was welded off.

*See* Doc. 94-5 at 6 (Pl. Ex. 4) (Def. ROG Response No. 7).  But Officer Taylor knew that the Los

Jarochos Trailer matched the photographs affixed to the document he was told was an order.

Doc. 90-4 at 8 (Taylor Dep. 21:20–22); Doc. 90-7 (Def. Ex. F) (photo of trailer).

Plaintiffs also argue that Officer Taylor's knowledge of Department Policy 426—

describing procedures for both civil and court-ordered repossessions—highlights the

unreasonableness of his actions.  *See* Doc. 102 at 5–6.  In defendants' view, Policy 426 isn't

relevant because Officer Taylor reasonably believed Garcia Recovery had a court order.  Doc. 97

at 14.  Plaintiffs emphasize that this was the procedure Officer Taylor followed at the tow.  Doc.

102 at 5; Doc. 99-3 at 17 (Taylor Dep. 16:7–15).  Plaintiffs never explain how Officer Taylor's

awareness of Department Policy 426 shows he made an unreasonable mistake of fact in believing

a court order existed in the first place.  At best, Officer Taylor's knowledge of Policy 426

---

explaining that he "was working off the fact that they had photos from the seller, along with what I
interpreted to be a court order"); *id.* at 194 (Taylor Dep. 193:19–24) (Taylor describing that he decided
which trailer based on the photos and what Garcias said); Doc. 90-6 (Def. Ex. E) (Dashcam video 0:45–
1:35; 2:20; 12:31–35; 15:45–16:08) (clips of the repossession where Officer Taylor matches the photos to
the Los Jarochos Trailer).  Defendants argue, on their motion, that this evidence doesn't support the
proposition that Officer Taylor decided to tow a trailer based on the photographs.  *See* Doc. 101 at 6
(arguing this proposition isn't supported by the evidence).

A reasonable factfinder could conclude Officer Taylor based his decision to allow the Garcias to
tow the trailer on the photographs.  There's more than a mere scintilla of evidence to support that
interpretation.  *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) ("The mere existence of
scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is
genuine; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable
jury could find in favor of the nonmovant." (quotation cleaned up)).  But since there's more than a
scintilla of evidence, the court can't resolve this disputed fact.  So, the court views the inferences in the
light most favorable to Officer Taylor as a nonmovant on plaintiffs' motion.

confirms he knew a court order was important.  *See* Doc. 99-3 at 144 (Taylor Dep. 143:16–18).

An objectively reasonable officer could know all there is to know about the policy but conclude,

reasonably, that the Garcias had a court order.

Viewing the evidence in the light most favorable to Officer Taylor, as nonmovant, an

objectively reasonable officer could reach the same factual conclusion as Officer Taylor

reached—that he was helping to execute a court-ordered repossession.  And plaintiffs haven't

identified any Tenth Circuit or Supreme Court authority suggesting that "every reasonable

official would have understood that what [Officer Taylor did] violates" plaintiffs' constitutional

rights.  *Reichle*, 566 U.S. at 664 (quotation cleaned up); *see also* Doc. 90 at 21–22 (arguing no

rule prohibits officer assistance in a court-ordered repossession).  So, plaintiffs aren't entitled to

summary judgment on their § 1983 claim.

### 3.  Conclusion on Clearly Established Law

It's well established that qualified immunity is a legal question for the court to decide.

*See Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir. 1991) ("The claim of qualified immunity

presents a question of law; the court cannot avoid the question by framing it as a factual issue."

(internal quotation marks and citation omitted)).  But in our Circuit, the jury may resolve

qualified-immunity-based questions "in exceptional circumstances where historical facts are so

intertwined with the law that a jury question is appropriate as to whether a reasonable person in

the defendant's position would have known that the conduct violated the right at issue."

*Gonzales v. Duran*, 590 F.3d 855, 859 (10th Cir. 2009) (quotation cleaned up).  The "predicate

for submitting a qualified immunity question to the jury is the existence of disputed issues of material fact—that is, the question of what actually happened."[13]  *Id.*

Here, there's a dispute of material fact—whether Officer Taylor knew the Garcias lacked a court order.  Taking Officer Taylor's view of that fact, an objectively reasonable officer could draw the same mistaken conclusion he did.  Qualified immunity shields officers who make reasonable mistakes of fact.  *See Pearson*, 555 U.S. at 231.  That's sufficient for Officer Taylor to survive plaintiffs' summary judgment motion.  But taking plaintiffs' view of the facts, Officer Taylor knew the Garcias lacked a court order.  And reasonable officers would understand that Officer Taylor's conduct at the self-help repossession violated the rule in *Marcus*.  That's sufficient for plaintiffs to survive summary judgment on defendants' motion.

Given the unique procedural posture here on the cross motions for summary judgment, and the conclusions the court makes when flipping the inferences about the disputed facts, the court concludes there's a jury question.  *See Gonzalez*, 590 F.3d at 859 (special interrogatory about the facts appropriate when historical facts are intertwined with the law).  The court thus denies each side's summary judgment motion on the qualified immunity issue and, more broadly, the § 1983 claim.

## VI.   Fraud & Fraudulent Misrepresentation

Plaintiffs assert claims against Taylor and the City for both fraud and fraudulent misrepresentation.  Doc. 87 at 22–24 (Pretrial Order ¶¶ 4.a.ii.–iii.).  Both sides of the caption moved for summary judgment on these claims, and the court takes up the motions together.

---

[13]     Our Circuit also explains that the court, in these circumstances, should submit special interrogatories to the jury to establish the facts—not to answer the qualified immunity legal questions.  *Gonzalez*, 590 F.3d at 860.

As the court has stated earlier in this case, "the elements for fraudulent misrepresentation and fraud [under Kansas law] parallel one another."  Doc. 61 at 48.  To prove fraudulent misrepresentation, a plaintiff must establish five elements:

> (1) The defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; and (5) the other party sustained damages by relying upon the representations.

*Conard v. Drilling*, 564 P.3d 425, 2025 WL 501313, at *10 (Kan. Ct. App. Feb. 14, 2025) (explaining fraudulent misrepresentation and fraudulent inducement are two terms meaning the same thing); *Stechschulte v. Jennings*, 298 P.3d 1083, 1096 (Kan. 2013) (outlining these five elements in claim for "fraudulent inducement"); *Kelly v. VinZant*, 197 P.3d 803, 808 (Kan. 2008) (outlining similar five elements for fraud claim).

Muddying the waters a bit, the Kansas Supreme Court also has articulated the fraud and fraudulent misrepresentation elements a bit differently than the above language from *Conard*. And in this case, the parties' arguments turn on the distinction between those statements of the law.  As the Kansas Supreme Court explained, fraud includes "an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage."  *Gerhardt v. Harris*, 934 P.2d 976, 1013 (Kan. 1997); *Garver v. Roth Cos.*, No. 19-cv-2354-TC-KGG, 2022 WL 228287, at *4 (D. Kan. Jan. 26, 2022) (citing *Gerhardt* and outlining same elements for fraudulent misrepresentation).

Defendants argue the "'ands' and 'ors' are important" to this recipe.  Doc. 101 at 11. According to them, the "element that the party knew the statement to be false is a standalone, essential element[.]"  *Id.*  Defendants assert that plaintiffs haven't adduced any evidence that

38

Officer Taylor knew his court-order-based statements were untrue, or that he intended to deceive or recklessly disregarded the truth.  Doc. 90 at 25.  And, in defendants' view, either one of those shortfalls—independently—suffice to grant defendants summary judgment.  *See* Doc. 101 at 11.  Plaintiffs respond, arguing that—"at a minimum"—"the evidence shows that Taylor's statements about having a court order were made with a reckless disregard for the truth."  Doc. 99 at 28.  Also, they assert that Officer Taylor needn't have known the statements were false also.  Doc. 102 at 12–13.

Here, the court relies on the more precise articulation of five elements for fraud or fraudulent misrepresentation, as described by the Kansas Supreme Court in *Stechschulte* and *Kelly*.  Knowledge of falsity stands opposite reckless disregard for the truth—a plaintiff can base a fraud or fraudulent misrepresentation claim on either one.  *Ensminger v. Terminix Int'l Co.*, No. 92-1402-MLB, 1993 WL 186179, at *2 (D. Kan. May 13, 1993) ("[A] plaintiff seeking recovery under a theory of fraud need not show actual knowledge of the falsity of the statement, but may recover by showing a reckless disregard for the truth."); *Miles v. Love*, 573 P.2d 622, 632 (Kan. Ct. App. 1977) (affirming trial court's conclusion that defendant with "no actual knowledge" of falsity and statements that weren't "made with reckless disregard for the truth" wasn't liable for fraud); Restatement (Second) of Torts § 526, cmt. e (recognizing that "is not necessary that the maker know the matter is not as represented[,]" but it's sufficient if "false representation has been made without belief in its truth or recklessly, careless of whether it is true or false").

With the elements settled, the court takes the first three, in turn, and assesses whether defendants, plaintiffs, or neither are entitled to summary judgment on that element.  The court's

analysis ends there because just those first three demonstrate neither party deserves judgment as a matter of law on these fraud-based claims.

## A.    False Statement of Fact

Plaintiffs' fraudulent misrepresentation and fraud claims assert that Officer Taylor made four false statements.[14]  *First*, he asserted that there was a court order to tow the trailer.  Doc. 87 at 23 (Pretrial Order ¶ 4.a.ii.).  *Second*, there was nothing he could do to stop the tow.  *Id.*  *Third*, he asserted that that plaintiffs would need to go to court to get their trailer back.  *Id.*  And, *finally*, Officer Taylor asserted he had found a matching VIN number.  *Id.*  Defendants never suggest that Officer Taylor didn't make these statements, or that the statements were true.  *See generally* Doc. 90; Doc. 97; Doc. 101.  So, the court's analysis assumes Officer Taylor made false statements of fact.

## B.    Knowledge of Falsity or Reckless Disregard for the Truth

### *Knowledge of Falsity*

Defendants contend plaintiffs can't establish Officer Taylor knew his statements about a court order were false.  Doc. 90 at 26.  But it's controverted whether Officer Taylor believed Garcia Recovery had a court order.  If a jury concluded Officer Taylor knew the document wasn't a court order, then a reasonable jury could find plaintiffs had established the knowledge element.  *Cf. Scott*, 550 U.S. at 378 (resolve disputed facts in light most favorable to nonmovant).  Defendants' argument that plaintiffs can't prove knowledge of falsity thus doesn't provide a reason to grant defendants summary judgment.

---

[14]    Plaintiffs' summary judgment motion identifies slightly different false statements, focused on the presence of a court order.  *See* Doc. 94 at 23.  But the Pretrial Order controls here.  *See* Fed. R. Civ. P. 16(d) (explaining that the pretrial order "controls the course of the action unless the court modifies it").  And the Pretrial Order states the false representations in the fashion identified here.  *See* Doc. 87 at 23 (Pretrial Order ¶ 4.a.ii.).

But, things flip when the court considers plaintiffs' summary judgment motion seeking judgment in their favor on these claims. Recall that plaintiffs needn't prove knowledge to succeed on a fraud-based claim. They also can prove Officer Taylor made the statements with reckless disregard for their truth. *See Stechschulte*, 298 P.3d at 1096 (outlining elements); *Ensminger*, 1993 WL 186179, at *2 (emphasizing reckless disregard as alternative to knowledge). On plaintiffs' summary judgment motion, the court flips the inference to favor defendants.

### Reckless Disregard

Consider defendants' arguments trying to stave off plaintiffs' bid to secure summary judgment in their favor on the fraud and fraudulent misrepresentation claims. In a nutshell, defendants contend plaintiffs haven't established that Officer Taylor demonstrated a reckless disregard for the truth by stating that the Garcias had a court order.

Defendants argue "'a representation of a fact that the maker believes to be true does not become fraudulent by reason of its being so carelessly or incompetently expressed as to be misleading.'" Doc. 90 at 26–27 (quoting Restatement (Second) of Torts § 528 cmt. a)). Defendants' quoted passage concerns representations *expressed* negligently—*e.g.*, "when the word 'not' is inadvertently omitted[.]" Restatement (Second) of Torts § 528 cmt. a. That restatement passage doesn't precisely address the issue here. Plaintiffs allege Officer Taylor's misconduct was deliberately telling them that the Garcias had a court order—not that he negligently expressed whether they had a court order.

Our Circuit's Bankruptcy Appellate Panel has explained that "a misrepresentation is fraudulent if the speaker 'does not have the confidence in the accuracy of his representation that he states or implies.'" *In re Johnson*, 477 B.R. 156, 171 (B.A.P. 10th Cir. 2012) (quoting

Restatement (Second) of Torts § 526(b)).  Essentially, the speaker fraudulently misrepresents a fact if he is "*conscious* that he has merely a belief in its existence and *recognizes* that there is a chance, more or less great, that the fact may not be as it is represented." *Id.* (emphases in original).  Importantly, negligence alone won't suffice to show a reckless disregard.  Restatement (Second) of Torts § 526 cmt. d ("The fact that the representation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability . . . for a fraudulent misrepresentation[.]").  But negligence "is evidence from which his lack of honest belief [in the truth of the facts] may be inferred." *Id.*  And, as the Kansas Supreme Court has explained, a "representation made innocently and in good faith does not constitute fraud." *Waxse v. Reserve Life Ins. Co.*, 809 P.2d 533, 587 (Kan. 1991).

In defendants' view, Officer Taylor simply repeated a false statement he had heard from Garcia Recovery.  Doc. 90 at 26.  And, they argue, his mistaken belief—whether negligently held or not—isn't sufficient to establish fraudulent misrepresentation.  Doc. 97 at 18.  Even assuming Officer Taylor believed Garcia Recovery had a court order to repossess the Los Jarochos Trailer, the question is whether all reasonable jurors would find Officer Taylor acted with reckless disregard for the truth in repeating that belief.  If not, plaintiffs aren't entitled to summary judgment on their fraud and fraudulent misrepresentation claims.

Plaintiffs emphasize a number of facts supporting their argument.  Doc. 99 at 31.  For starters, they argue Officer Taylor didn't act reasonably in forming his purported belief that the Garcias had a court order.  Officer Taylor simply skimmed the documents the Garcias showed him.  Doc. 94-3 at 204–05 (Taylor Dep. 203:22–204:5).  And, plaintiffs argue, any person "glancing at the document" would've known it wasn't a court order.  Doc. 99 at 29.  After all, the words "order," "court," and "judge" never appear in the document.  Doc. 99-5 at 8 (Pl. Ex.

42

5).  Officer Taylor didn't "have a good answer" why he never looked for a judge's signature on the document.  Doc. 94-3 at 147 (Taylor Dep. 146:19–24).

Plaintiffs also informed Officer Taylor that they owned and held title to the Los Jarochos Trailer.  Doc. 94-5 at 6 (Pl. Ex. 4).  And the Garcias told Officer Taylor they couldn't find a VIN number on either the Los Jarochos Trailer or Used Sushi Trailer matching their repossession paperwork.  Doc. 87 at 6 (Pretrial Order ¶ 2.a.xlviii.).  But the Garcias told Officer Taylor the VIN number on the Los Jarochos Trailer may have been welded over.  Doc. 97-3 at 22–23 (Taylor Dep. 192:15–193:14).  These facts, in plaintiffs' view, reflect that Officer Taylor's "cavalier attitude toward whether or not a court order authorized his actions is just the type of reckless disregard envisioned by Kansas case law."  Doc. 102 at 14.

While the facts would allow a reasonable jury to conclude Officer Taylor acted with reckless disregard, a reasonable jury also could decide the issue the opposite way.  A reasonable jury could conclude Officer Taylor believed the Garcias had a court order and didn't doubt it.  Officer Taylor testified as much.  *See* Doc. 94-3 at 183–84 (Taylor Dep. 182:24–183:3) (answering "no" to question whether he "doubt[ed] the court order at any point").  It's not clear that Officer Taylor lacked "confidence in the accuracy of his representation[.]"  *In re Johnson*, 477 B.R. at 171 (quotation cleaned up).  And, while Officer Taylor didn't read the documents carefully, the Kansas Supreme Court has rejected a fraudulent misrepresentation claim where the parties mistakenly believed a fact based on a failure to read an agreement carefully.  *See Albers v. Nelson*, 809 P.2d 1194, 1198 (Kan. 1991) (recognizing defendant "believed the documents pertained to a loan transaction and did not read the agreement carefully because the parties were rushed to get everything finished").  *But see Blizzard Energy, Inc. v. Alexandrov*, 438 P.3d 315, 2019 WL 1746834, at *12 (Kan. Ct. App. Apr. 19, 2019) (concluding jury could have found

failure to review entire document "constituted reckless disregard for the truth" of the remaining statements in the document). A reasonable factfinder could find that Officer Taylor was *not* "conscious that he merely [had] a belief in [the court order's] existence and recognize[d] that there [was] a chance, more or less great, that the fact may not be as it [was] represented." Restatement (Second) of Torts § 526 cmt. e. So, a dispute of material fact precludes summary judgment for plaintiffs on their fraud and fraudulent misrepresentation claims.

Defendants' motion presents one more argument that, if persuasive, would demand summary judgment against plaintiffs' fraud-based causes of action. Defendants argue plaintiffs can't produce evidence reflecting an intent to deceive. As explained next, the court doesn't find this argument persuasive, so it doesn't entitle defendants to judgment as a matter of law.

## C. Intent

Flip back to defendants' summary judgment motion. They argue plaintiffs can't present sufficient evidence to support a finding that Officer Taylor intended to deceive them. Doc. 90 at 26. Recall that plaintiffs must prove defendants "made the representations intentionally for the purpose of inducing another party to act upon them[.]" *See Conard*, 2025 WL 501313, at *10; Restatement (Second) of Torts § 531 cmt. c ("A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct.").

Defendants' motion argues plaintiffs can't prove the intent element because Officer Taylor "had nothing to gain from the Garcias taking the Los Jarochos Trailer." Doc. 90 at 26. Officer Taylor had never met any of the players in this case before arriving on the scene of the repossession. Doc. 90-2 at 1 (Taylor Aff. ¶¶ 3, 5, 7). Defendants hypothesize: "If Taylor intended to deceive Plaintiffs so as to deprive them of their food truck, why would he have

waited at the scene and spoke with both Turner and Galindo about how to get the trailer back as quickly as possible?"  Doc. 90 at 26.  Plaintiffs respond, arguing that Officer Taylor "most likely knew that he did not have" a court order, and that he knew he needed one.  Doc. 99 at 31.  And plaintiffs argue that Officer Taylor knew admitting he didn't have a court order would have violated Department policy.  *Id.*  Plaintiffs suggest Officer Taylor later "tried to cover up his mistakes" by filing a police report that "he had located the VIN number on the trailer that was taken[.]"  *Id.*; *see also* Doc. 99-2 at 50 (Taylor Dep. 49:12–25) (paperwork sentence reading the "VIN number was located [on] the hitch where they advised it should be" and Officer Taylor testifying that is incorrect and "not a well-written sentence").

Plaintiffs' briefing on their own motion further argues that Officer Taylor's statements were "calculated to make Plaintiffs comply with his orders to turn the trailer over to Garcia[.]" Doc. 102 at 15; Doc. 90-6 (Def. Ex. E) (Dashcam video 07:07–19) (Officer Taylor conveying that Garcia Recovery is "gonna take the truck" and has "court orders" to repossess it).  Plaintiffs also point out that Officer Taylor made the challenged statements "to encourage Plaintiffs' employees to comply with Taylor's instructions and to make the repossession go more smoothly."  Doc. 94 at 28; Doc. 90-6 (Def. Ex. E) (Dashcam video 19:55–20:15) (encouraging plaintiffs' employees to vacate the trailer).  Defendants reference this argument as one showing Officer Taylor had no intent to deceive—instead, he just wanted to ensure the repossession occurred.  Doc. 97 at 19.

These facts—taken in the light most favorable to plaintiffs—would permit a reasonable factfinder to infer Officer Taylor had the requisite intent to support a fraud claim.  To recap, assume Officer Taylor knew a court order was important, Doc. 99-2 at 144 (Taylor Dep. 143:16–18), and knew the Garcias lacked one.  But he told plaintiffs and their employees that a court

order authorized the repossession to encourage them to turn over the trailer—ensuring the repossession happened. A factfinder could conclude Officer Taylor "made the representations intentionally for the purpose of inducing another party to act upon them[.]" *Conard*, 2025 WL 501313, at *10. So, defendants' arguments on the intent element of the fraud-based claims don't entitle them to summary judgment in their favor, either.

In sum, neither side's arguments based on the knowledge/reckless disregard element merit summary judgment for any party. The same is true on the intent element. The court thus denies summary judgment for both parties on these fraud-based claims.[15]

## VII.    Aiding & Abetting

Defendants also moved for summary judgment on plaintiffs' aiding and abetting arguments. Doc. 90 at 27. "[A]iding and abetting is a theory used to impose vicarious liability[.]" *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1231 (Kan. 1991). Kansas courts have defined the elements of civil aiding and abetting to include:

> (1) The party whom the defendant aids must perform a wrongful act causing injury; (2) at the time the defendant provides assistance, he or she must be generally aware of his or her role in part of an overall tortious or illegal activity; and (3) the defendant must knowingly and substantially assist in the principal violation.

*York v. InTrust Bank, N.A.*, 962 P.2d 405, 424 (Kan. 1998) (citing *Ridenhour*, 811 P.2d at 1232). In their summary judgment motion, defendants suggest the evidence in the summary judgment record won't permit plaintiffs to establish the second element: Officer Taylor's general awareness of his role in an overall tortious or illegal activity. Doc. 90 at 27. As a result, they

---

[15]    The court doesn't address whether plaintiffs present sufficient evidence creating triable issues on the remaining elements of a fraud or fraudulent misrepresentation claim. The court concluded the knowledge or reckless disregard for the truth element preclude summary judgment for plaintiffs. And defendants didn't move for summary judgment on any elements not addressed here.

argue, plaintiffs can't establish defendants' liability for aiding and abetting Borjas or Garcia Recovery. *Id.* at 27–28.

But here's the problem for defendants. Officer Taylor's general awareness appears, once again, to turn on whether he believed there was a court order. Plaintiffs argue that "[a]ll of the reasons that Officer Taylor should have known the importance of having a court order, and should have known that the document was not a court order . . . are discussed in the previous sections[.]" Doc. 99 at 33 (quotation cleaned up). Plaintiffs incorporate these arguments by reference. *Id.* at 34. In summary, if Officer Taylor didn't believe a court order existed, a reasonable jury could conclude (based on the other evidence in the summary judgment record) that he generally was aware that the repossession was wrongful. Plaintiffs repeatedly told him that they owned the trailer outright—and that they had documents to prove it. And, when a self-help civil repossession is disputed, it constitutes a breach of the peace. So, completing the repossession in those circumstances is unlawful. Officer Taylor knew Borjas's signature was notarized on the document, Doc. 94-3 at 79–80 (Taylor Dep. 78:15–79:17), but it's controverted whether Officer Taylor knew that Borjas was the seller of the vehicle, *see above* note 6. Assume a jury concludes Officer Taylor knew the Garcias were enforcing a document—containing Borjas's signature—that wasn't a court order. The jury then could infer "the presence of [the general-awareness] element"—namely, that Borjas and the Garcias were engaged in an unlawful repossession attempt. *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137–38 (10th Cir. 2016) (quotation cleaned up). Because a reasonable jury could return a verdict in favor of plaintiffs here, defendants aren't entitled to summary judgment on this claim, either.[16]

---

[16]    Aiding-and-abetting liability is vicarious—it attaches liability for the underlying wrongs committed by another person. *Ridenhour*, 811 P.2d 1232 ("The theory of liability affects who is liable for what, since an aider and abettor is liable for damages caused by the main perpetrator[.]"). Plaintiffs originally asserted some 17 claims directly against the Garcia defendants and about 22 claims against

## VIII.  Contract- and Used-Sushi-Trailer-Based Damages

Defendants' motion asks the court to grant summary judgment against a portion of plaintiffs' damages, asserting they are speculative[17] and, as a matter of law, not caused by Officer Taylor or the City.  Doc. 90 at 30.  Plaintiffs seek damages from these defendants based on Borjas's breach of a contract for a food truck.  Doc. 87 at 27–29 (Pretrial Order ¶ 5) (asserting Officer Taylor's actions "have prevented the plaintiffs from recovering any of their $18,838.00 in contract damages from Sergio Borjas").

"It is textbook tort law that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation."  *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 589 U.S. 327, 331 (2020) (quotation cleaned up).  Plaintiffs seek these damages based on all four of their remaining claims—§ 1983, fraud, fraudulent misrepresentation, and aiding and abetting.  *See* Doc. 87 at 27–29 (Pretrial Order ¶ 5.A.–D.).  Section 1983, fraud, and fraudulent misrepresentation demand a causal link between the damages sought and the defendants' conduct.  *See Carey v. Piphus*, 435 U.S. 247, 257–28 (1978) (recognizing that tort rules "defining the elements of damages and the prerequisites for their recovery, provide the starting point for the inquiry under § 1983"); *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012)

---

Borjas.  *See generally* Doc. 53 (2d Am. Compl.).  And plaintiffs never specify which of these alleged torts Officer Taylor aided and abetted.  *See* Doc. 87 at 24 (Pretrial Order ¶ 4.a.iv.) ("Taylor and the other Defendants, aided by one another, performed wrongful acts that caused injuries.  Each of them was generally aware of his role as part of an overall illegal or tortious . . . activity[.]").

Defendants have argued plaintiffs can't prove Officer Taylor was generally aware of his role in *any* tortious activities performed by the others.  Doc. 90 at 27–28 (providing supporting facts).  But the court's analysis above rejects that notion—a reasonable factfinder could conclude Officer Taylor was aware of his role in some underlying wrongful activity.  So, the court doesn't go farther than defendants do in specifying which of these alleged torts Officer Taylor might have aided and abetted.  Defendants just argue a single element—and a reasonable factfinder could conclude that element is satisfied.

[17]    Defendants never develop their speculative damages assertion.  *See* Doc. 90 at 30–31.  Instead, defendants merely emphasize their causation arguments.  So, the court only addresses the causation arguments.

(Tenth Circuit clarifying that "'[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his action'"—*i.e.*, factual and legal cause (alterations in original) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961))); *Favela v. City of Las Cruces*, 398 F. Supp. 3d 858, 898 (D.N.M. 2019) ("A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations." (quotation cleaned up)); *Est. of Sowards v. City of Trenton*, 125 F. App'x 31, 42 (6th Cir. 2005) ("[T]he district court was correct in limiting the damages [on motion in limine] to only those actual injuries Sowards suffered as a result of the warrantless entry." (cited with approval in *James v. Chavez*, 511 F. App'x 742, 751 (10th Cir. 2013))); *Conard*, 2025 WL 501313, at *10 (elements of fraudulent misrepresentation requiring plaintiff to prove it "sustained damages by relying upon the representations"); *Kelly*, 197 P.3d at 808 (same for common-law fraud). Aiding and abetting imposes vicarious liability for damages flowing from the underlying tort. *Jones v. Cmty. Bank of Wichita*, 390 P.3d 127, 2017 WL 840249, at *7 (Kan. Ct. App. Mar. 3, 2017) ("[A]n action based on aiding and abetting requires a showing of damages. Aiding and abetting requires a wrongful act that causes injury.").

Given these overarching principles, the court evaluates, *first*, defendants' argument as it applies to plaintiffs' § 1983 and fraud-based claims. *Then*, it assesses the aiding and abetting claim.

### 1.     For § 1983, Fraud, and Fraudulent Misrepresentation

Defendants argue plaintiffs have "no cognizable legal theory or principal of causation" linking defendants to these contract damages. Doc. 90 at 31. And, in their view, plaintiffs can't explain how repossessing the Los Jarochos Trailer prevented plaintiffs from recovering their

contract damages from Borjas. *Id.* In fact, defendants emphasize, plaintiffs are seeking to recover those very damages in this lawsuit from Borjas. *Id.*; *see also* Doc. 45 (Clerk's Entry of Default Against Sergio Borjas); Doc. 87 at 31 n.5 (Pretrial Order) (indicating plaintiffs will move for default judgment against Borjas post-trial).

It's undisputed. Borjas failed to satisfy his contractual obligations in 2019, well before the repossession took place on April 13, 2022. Doc. 87 at 2–3 (Pretrial Order ¶¶ 2.a.ii.–viii.); *id.* at 3–6 (Pretrial Order ¶ 2.a.xvii.–lvi.). But plaintiffs' story—attempting to link Officer Taylor to damages flowing from that breach—goes like this: Plaintiffs and Borjas agreed that Borjas would return the plaintiffs' $6,000 deposit if plaintiffs would return the Used Sushi Trailer. Doc. 99 at 27; Doc. 99-1 at 2–3 (Galindo Aff. ¶ 7). But Borjas never responded to any of plaintiffs' other communication efforts. Doc. 99 at 27; Doc. 99-1 at 3 (Galindo Aff. ¶ 8). Instead of honoring his agreement with plaintiffs, Borjas tried to "extract more money" from plaintiffs by repossessing the Los Jarochos Trailer improperly. Doc. 99 at 27. And by "hand[ing] Plaintiffs' trailer over to Borjas and Garcia," Officer Taylor "made Plaintiffs[] vulnerable to Borjas's machinations, and thereby was critical to Borjas's plan to avoid repaying Plaintiffs." *Id.* at 28. Somehow, plaintiffs argue, Officer Taylor "advanced Borjas's overall scheme" and "caused Plaintiffs' deal to get their money back to fall through." *Id.* (quotation cleaned up).

Plaintiffs' argument just won't tote. The $18,838 contract-based damages break down as follows: "(1) the $6,000 deposit Plaintiffs paid to Borjas, (2) $6,000 in estimated losses for having to use the Used Sushi van, (3) $6,000 in estimated costs to render the Used Sushi van serviceable, (4) $288.00 in value of time to render the Used Sushi van serviceable, (5) $400.00 Plaintiffs paid to Borjas in gas money, and (6) $150.00 for the banner to cover the sushi logo on the Used Sushi Trailer." Doc. 90 at 17 (defendants' statement of facts, deemed uncontroverted

by plaintiffs' failure to comply with Rule 56(c)); Doc. 90-15 at 1 (Def. Ex. N) (plaintiffs'
itemized damages in First Supplemental Initial Disclosures). And, as plaintiffs point out, Borjas
never communicated again with plaintiffs after their conversation about swapping the Used Sushi
Trailer for the $6,000 deposit. Doc. 99-1 at 3 (Galindo Decl. ¶ 8).

      Plaintiffs have adduced no evidence suggesting they incurred any of these damages *after*
Officer Taylor's involvement at the Los Jarochos Trailer's repossession. So, there's no record
evidence suggesting that Officer Taylor's conduct at the repossession (or his allegedly fraudulent
statements) caused this particular harm to plaintiffs. What's more, the parties agree that Officer
Taylor never met Borjas. Doc. 90 at 3 (defendants' statement of facts, deemed uncontroverted
by plaintiffs' failure to comply with Rule 56(c)); Doc. 90-2 at 1 (Taylor Aff. ¶ 7). Plaintiffs
argue Officer Taylor caused plaintiffs' deal with Borjas to fall through—the agreement to return
the Used Sushi Trailer in exchange for $6,000. Doc. 99 at 28. But it's not clear how
repossessing a different trailer—the Los Jarochos Trailer—hindered a deal centered on returning
the Used Sushi Trailer. Plaintiffs' theory stretches reason. *See GeoMetWatch Corp. v. Behunin*,
38 F.4th 1183, 1200–01 (10th Cir. 2022) ("To defeat a motion for summary judgment, evidence,
including testimony, must be based on more than mere speculation, conjecture, or surmise."
(quotation cleaned up)). And, more fundamentally, plaintiffs haven't identified any evidence in
the record allowing a factfinder to link Officer Taylor or his challenged conduct to the $18,838
in contract- and Used-Sushi-Trailer-based damages. Plaintiffs must seek those damages
elsewhere.

      Defendants have carried their summary judgment burden to show the "absence of
evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Plaintiffs, in
response, haven't presented any genuinely disputed material facts creating a triable causation

issue connecting defendants to these contract-based damages.  *See Anderson*, 477 U.S. at 250 (nonmovant "must set forth specific facts showing that there is a genuine issue for trial" (quotation cleaned up)).  No reasonable factfinder could conclude Officer Taylor or the City caused these damages.  Thus, no reasonable factfinder could hold these defendants liable for plaintiffs' damages based on their contract with Borjas and use of the Used Sushi Trailer.  Defendants deserve summary judgment based on this defense—as least for purposes of plaintiffs' § 1983, fraud, and fraudulent misrepresentation claims.

## 2.    For Aiding and Abetting

Liability for these contract- and Used-Sushi-Trailer-based damages under an aiding and abetting theory requires a different analysis.  Aiding and abetting attaches vicarious liability for underlying tortious conduct by another.  *Ridenhour*, 811 P.2d at 1232 ("The theory of liability affects who is liable for what, since an aider and abettor is liable for damages caused by the main perpetrator[.]"); Restatement (Third) of Torts:  Liab. for Econ. Harm § 28 cmt. a ("Aiding and abetting wrongful conduct is not a freestanding tort.  It is a basis on which a defendant is held liable for the tort that was aided and abetted, though some or all of the elements of the tort were fulfilled by the conduct of another.").  So, Officer Taylor might face liability for these damages if he aided and abetted an underlying tort causing them.  Neither party addresses this nuanced point.  So, the court declines to evaluate whether plaintiffs could succeed in securing these damages under an aiding and abetting theory from defendants.  And the court denies defendants' summary judgment motion to the extent it argues plaintiffs can't seek these damages on their aiding and abetting claim.

IX.    **Apportionment of Damages for § 1983**

Defendants next argue—for purposes of plaintiffs' § 1983 claim—that the court should apportion any possible damages between Officer Taylor and the other defendants. Doc. 90 at 23. In the process of towing the trailer, Garcia Recovery also had damaged the Los Jarochos Trailer. Doc. 87 at 6 (Pretrial Order ¶ 2.a.lvii.). During the fall and winter of 2022, the Los Jarochos Trailer wasn't winterized or stored indoors, further damaging the trailer. *Id.* (Pretrial Order ¶ 2.a.lx.). By the time plaintiffs received the Los Jarochos Trailer back, biological waste and infestation damage had taken a toll. *Id.* (Pretrial Order ¶ 2.a.lix.). Plaintiffs request damages for the failure to winterize the trailer. *See id.* at 27 (Pretrial Order ¶ 5.A.). They also seek damages based on the rental cost of a replacement trailer. *Id.* In defendants' view, plaintiffs can't recover from them any damages associated with their "nearly year-long deprivation of the Los Jarochos Trailer." Doc. 90 at 23.

Start with the general rule. "Multiple tortfeasors who concurrently cause indivisible injury are jointly and severally liable; each can be held liable for the entire injury." *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996) (in § 1983 action); *Herrera v. Santa Fe Pub. Schs.*, 41 F. Supp. 3d 1188, 1283 (D.N.M. 2014) (citing *Northington* and addressing apportionment argument on § 1983 summary judgment). And the burden is on the defendants to disprove this general rule, "whether or not all wrongdoers are before the court." *Northington*, 102 F.3d at 1569. Tortfeasors who can't "prove the extent to which the harm resulted from other concurrent causes" are "liable for the entire harm." *Id.* "Each defendant is a concurrent cause" if their "conduct was a substantial factor in bringing the injury about." *Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) (quotation cleaned up). Put another way:

> Damages are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of

each cause to a single harm. Damages for any other harm cannot be apportioned to two or more causes. In other words, a jury should apportion damages where there is a reasonable basis for doing so but the jury cannot be required to apportion damages where the injury is indivisible.

*Jensen v. West Jordan City*, 968 F.3d 1187, 1197 (10th Cir. 2020) (quotation cleaned up).[18]

The court decides the legal question "whether the harm to the plaintiff is capable of apportionment among two or more causes[.]" Restatement (Second) of Torts § 434 cmt. d. "Once it is determined that the harm is capable of" apportionment, "actual apportionment of the damages" is a fact question for the jury. *Id.*

Defendants ask the court to conclude they are entitled to a jury instruction on apportionment. Doc. 90 at 23; Doc. 101 at 10 ("Even if Taylor were not entitled to qualified immunity, he is entitled to an apportionment instruction."). And defendants also suggest that "no reasonable mind" could conclude defendants are responsible for damages associated with the "Los Jarochos Trailer's extended stay in Dodge City." Doc. 101 at 10. But plaintiffs emphasize that Officer Taylor's conduct "was a cause-in-fact of everything that happened to the trailer" after April 13, 2022. Doc. 99 at 22.

## A.     Entitlement to Apportionment Jury Instruction

Plaintiffs argue the apportionment question is better addressed when the parties submit proposed jury instructions, not at summary judgment. *Id.* (arguing defendants ask for a "general

---

[18]      In *Jensen*, the Circuit applied this rule when evaluating apportionment of damages on multiple claims or theories of relief. 968 F.3d at 1197 (emphasizing plaintiff "may recover" damages "under any claim," but "only once"). Plaintiffs suggest the *Jensen* standard thus doesn't apply to apportioning damages between alleged tortfeasors, rather than claims. Doc. 99 at 21. But *Jensen* relied on the Restatement (Second) of Torts § 433A for this legal rule. *Jensen*, 968 F.3d at 1197. And that provision in the Restatement applies "whenever two or more causes have combined to bring about harm to the plaintiff, and each has been a substantial factor in producing the harm[.]" Restatement (Second) of Torts § 433A cmt. a; *McReynolds v. Bigler*, No. 88-1343-C, 1990 WL 171064, at *6 (D. Kan. Oct. 15, 1990) (concluding court correctly instructed jury—"[c]onsistent with § 433A"—to determine the percentages of party and nonparty fault contributing to the "event which brings about the injuries"). The rules in *Jensen* and *Northington* thus are compatible.

ruling" before "the issues for trial have been sharpened by summary judgment, motions in limine, and other pretrial processes" (quotation cleaned up)).  To be sure, none of the supporting cases defendants cite arose in the summary judgment context.  And Rule 56 contemplates summary judgment motions on claims, defenses, or "part of each claim or defense[.]"  Fed. R. Civ. P. 56(a).  Thus, a "summary judgment motion is not the proper" method to "pursue a desired jury instruction." *Dickson v. Gleason*, No. 12CV01187 DS, 2014 WL 988782, at *2 (D. Utah Mar. 13, 2014) ("[T]he purpose of a summary judgment motion is to 'isolate and dispose of factually unsupported claims or defenses.'" (quoting *Celotex*, 477 U.S. at 323–24)).  These principles convince the court to defer deciding whether defendants deserve an apportionment instruction—the legal issue.

**B.      How to Apportion**

Even if the court concluded defendants were entitled to apportionment of damages on plaintiffs' § 1983 claim, the court couldn't decide the underlying factual questions that remain: how to apportion any compensatory damages.

In plaintiffs' view, the damages to the trailer are a *single* harm—and indivisible injury incapable of apportionment.  Doc. 99 at 22 (seeking monetary recovery for damage to their trailer "from the time it was illegally removed from their lot, until the time they legally recovered it[,]" including costs of renting another trailer to mitigate their damages).  In defendants' view, the taking itself and the wrongful retention are *separate* harms—and the court should apportion damages (preemptively) between the alleged tortfeasors.  Doc. 90 at 23 (suggesting apportionment is justified because the trailer's taking is "distinct and divisible" from the trailer's wrongful retention).  Even if the injury is a single harm, defendants argue that there's a reasonable basis for dividing the damages depending on each alleged tortfeasor's contribution.

55

*Id.* (arguing, alternatively, that "there is a reasonable basis for apportioning the damages amongst the defendants in this action"). And defendants argue, at bottom, that no reasonable factfinder could attribute the failure-to-winterize damages and rental-trailer damages to Officer Taylor. Doc. 101 at 10–11 (explaining that reasonable minds could dispute whether plaintiffs or Garcia Recovery was responsible, but "no reasonable mind can blame Taylor or the City"). The court may remove that question from the jury only if "the evidence is such that reasonable men could come to only one conclusion." Restatement (Second) of Torts § 434 cmt. d. And here, "reasonable men" could reach different conclusions. The same goes for reasonable women.

So, even if the court resolved the legal question whether defendants are entitled to an apportionment instruction, the court still must deny summary judgment on this argument.

## X.    Punitive Damages

### A.    Against the City

Defendants argue plaintiffs can't recover punitive damages against the City. Doc. 90 at 28. Plaintiffs never respond. *See generally* Doc. 99. And it's straightforward: under the Kansas Tort Claims Act (KTCA), a "governmental entity shall not be liable for punitive . . . damages[.]" Kan. Stat. Ann. § 75-6105(c). Defendants are entitled to summary judgment on this point. The court rejects plaintiffs' punitive damages claim against the City.

### B.    Against Officer Taylor Under § 1983

Punitive damages are available under § 1983 when the conduct at issue is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (internal quotation marks and citation omitted). Reckless or callous indifference "requires that the defendant have acted 'in the face of a perceived risk that [his] actions will violate federal law.'"

*Eisenhour v. Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). Punitive damages don't require "egregious misconduct." *Id.* "It is defendant's mental state, not the scope of the harm, that counts." *Id.* And this standard is a subjective one. *See Duke v. Garcia*, No. 11-CV-784-BRB/RHS, 2014 WL 1333182, at *6 (D.N.M. Feb. 28, 2014) (explaining that the "evidence must show [defendant] actually perceived a risk that his conduct would violate federal law"). To grant defendants' summary judgment motion on this point, "it must conclude that 'no reasonable jury could find the punitive damages standard satisfied.'" *Scott v. City of Tulsa*, 775 F. Supp. 3d 1190, 1211 (N.D. Okla. 2025) (quoting *Shapiro v. Rynek*, 212 F. Supp. 3d 990, 999 (D. Colo. 2016) (concluding issues of material fact precluded ruling on punitive damages)).

Genuine issues of material fact preclude summary judgment against the punitive damages claim. Start with the undisputed facts that undercut a finding of Officer Taylor's reckless or callous indifference. It's undisputed that Officer Taylor had never met any of the parties before the repossession event. Doc. 90-2 at 1 (Taylor Aff. ¶¶ 3, 5, 7). And it's undisputed that Officer Taylor stayed at the scene until well after the repossession ended to speak with plaintiffs about how to get their trailer back. Doc. 87 at 6 (Pretrial Order ¶ 2.a.l.). And Officer Taylor didn't review the Garcias' documentation in much detail. Doc. 90-4 at 27–28 (Taylor Dep. 203:20–204:5) (acknowledging Officer Taylor "skimmed" the Garcias documents). But there's also summary judgment facts that could allow a reasonable jury to conclude Officer Taylor was reckless or demonstrated callous indifference.

As discussed, the parties dispute whether Officer Taylor knew the Garcias didn't have a court order. Construing that fact in the light most favorable to plaintiffs, assume Officer Taylor

believed the Garcias lacked a court order.[19]  Plaintiffs suggest Officer Taylor ignored the absence

of a matching VIN number on the trailer.  Doc. 99 at 35; Doc. 87 at 6 (Pretrial Order ¶ 2.a.xlviii.)

(Officer Taylor knew the Garcias couldn't find the VIN); Doc. 94-5 at 6 (Pl. Ex. 4) (Def. ROG

Response No. 7) (Officer Taylor told the VIN looked like it was welded over).  And he tried to

rush plaintiffs' employees to vacate the trailer.  Doc. 99 at 35; Doc. 90-6 (Def. Ex. E) (Dashcam

Video 19:55–20:15; 20:35–53; 21:00–22:02).  Plaintiffs attested to Officer Taylor that they had

the required paperwork entitling them to possess the Los Jarochos Trailer.  Doc. 99 at 35–36;

Doc. 90-6 (Def. Ex. E) (Dashcam Video 09:55–10:07).  And Officer Taylor even helped the

Garcias close the trailer's windows and attach the hitch.  Doc. 99 at 36; Doc. 90-6 (Def. Ex. E)

(Dashcam Video 25:30–25:42; 35:00–35:05).  What's more, Officer Taylor had received training

about civil standbys when he worked for the Sheriff's Department.  Doc. 99-2 at 201–03 (Taylor

Dep. 200:9–202:3) (describing training received concerning civil disputes and repossessions,

including Thomas County Deputy Cox's case); *McLinn*, 535 F. Supp. 3d at 1100–03 (addressing

alleged constitutional violations stemming from Thomas County Deputy Cox's involvement in

private repossession).

These facts would allow a reasonable jury to infer that Officer Taylor acted recklessly or

callously "in the face of a perceived risk that [his] actions will violate federal law."  *Eisenhour*,

897 F.3d at 1281 (quotation cleaned up).  If the jury concluded Officer Taylor knew no court

order authorized the repossession, it could infer from the remaining facts that Officer Taylor

perceived his actions as ones assisting the Garcias to violate plaintiffs' rights.  The court can't

resolve this dispute at summary judgment and must deny defendants' motion on this point.

---

[19]     This is yet another place in their briefing where plaintiffs argue Officer Taylor "should have" known the documents weren't a court order.  *See* Doc. 99 at 36–37.  But as discussed, plaintiffs elsewhere argue Officer Taylor *did* know the documents weren't a court order.  *See above* § I.B.  The court must treat this fact as controverted, despite plaintiffs' arguments that switch back and forth on the issue.

### C.    Against Officer Taylor Under Kansas Tort Claims Act

A similar outcome applies to defendants' punitive damages argument under the KTCA. A plaintiff can recover punitive damages under the KTCA only if the individual defendant acted with actual fraud or actual malice. Kan. Stat. Ann. § 75-6105(c). Our court has concluded that this standard is akin to the § 1983 punitive damages standard. *See Phye v. Thill*, No. 06-1309-MLB, 2007 WL 4180399, at *3 (D. Kan. Nov. 21, 2007). Above, the court concluded genuine disputes of material fact preclude summary judgment on punitive damages under the § 1983 claim. And it also concluded genuine disputes of material fact preclude summary judgment for either party on plaintiffs' fraud and fraudulent misrepresentation claims. *See above* § VI. The court reaches the same conclusion here.

In sum, the court grants defendants' motion to the extent it seeks to preclude punitive damages against the City. But the court denies the motion on defendants' other punitive damages arguments.

## XI.    Defendants' Motion to Designate Place of Trial (Doc. 91)

This next motion tells a tale of two less-than-ideal forums—and asks the court to choose between them. All of the events described above occurred in Colby, Kansas. Some of the witnesses reside there. Plaintiffs originally designated the Kansas City courthouse as the place of trial. *See* Doc. 87 at 2 (Pretrial Order ¶ 1.c.). Defendants now ask the court to move the trial to Wichita. Doc. 91 at 1. Neither courthouse neighbors Colby, but defendants argue Wichita is closer. *Id.* at 2.

### A.    Legal Standard

Under D. Kan. Rule 40.2(e), the court isn't bound by a party's designated place of trial and may determine the place of trial "upon motion or in its discretion." When determining the

proper place for trial, the court "generally look[s] to the same factors relevant to motions for change in venue under 28 U.S.C. § 1404(a)." *Lopez-Aguirre v. Bd. of Cnty. Comm'rs*, No. 12-2752-JWL, 2014 WL 853748, at *1 (D. Kan. Mar. 5, 2014). Section 1404(a) grants "broad discretion in deciding a motion to transfer based on a case-by-case review of convenience and fairness." *ABF Freight Sys., Inc. v. McMillian*, No. 17-2324-JWL, 2018 WL 4154014, at *1 (D. Kan. Aug. 30, 2018).

The District of Kansas cases identify these factors as ones court should consider when deciding where to designate the place of trial: "(1) plaintiff's choice of forum, (2) the convenience of the witnesses, (3) the accessibility of witnesses and other sources of proof, (4) the possibility of obtaining a fair trial, and (5) all other practical considerations that make a trial easy, expeditious, and economical." *McDermed v. Marian Clinic, Inc.*, No. 14-2194-EFM-KMH, 2014 WL 6819407, at *1 (D. Kan. Dec. 2, 2014) (citing *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991)). The moving party bears the burden to establish that the existing forum is an inconvenient one. *Id.* Here, defendants bear that burden, and they must establish that "convenience and fairness" favor Wichita over Kansas City. *See ABF Freight*, 2018 WL 4154014, at *1. They haven't done so. The court explains why with a brief analysis of each factor, below.

### B.    Analysis

#### 1.    Plaintiffs' Choice of Forum

"Unless [the § 1404(a)] factors weigh strongly in the defendant's favor, the 'plaintiff's choice of forum should rarely be disturbed.'" *Tiffany v. City of Topeka*, No. 09-2232-CM, 2009 WL 1683515, at *1 (D. Kan. June 16, 2009) (quoting *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992)). But this factor is "largely inapplicable if the plaintiff does not reside" in the

location designated for trial.  *Menefee v. Zepick*, No. 09-2127-JWL, 2009 WL 1313236, at *1
(D. Kan. May 12, 2009); *see also Benson v. Hawker Beechcraft Corp.*, No. 07-2171-JWL, 2007
WL 1834010, at *2 (D. Kan. June 26, 2007) (concluding that "the rationale for allowing the
plaintiff to dictate the forum evaporates" when the plaintiff lives outside his choice of forum).
*But see Tiffany*, 2009 WL 1683515, at *1 (explaining that this factor "weighs only slightly in
favor of plaintiff" in such a situation).  Also, "courts have given little weight to a plaintiff's
choice of forum 'where the facts giving rise to the lawsuit have no material relation or
significant connection to the plaintiff's chosen forum.'"  *McDermed*, 2014 WL 6819407, at *2
(quoting *Cook v. Atchison, Topeka & Santa Fe Ry. Co.*, 816 F. Supp. 667, 669 (D. Kan. 1993)).

  Here, plaintiffs chose Kansas City.  Doc. 87 at 2 (Pretrial Order ¶ 1.c.).  Defendants argue
that plaintiffs aren't located in Kansas City.  Doc. 91 at 3.  And, defendants emphasize, none of
the events underlying this lawsuit occurred in or near Kansas City.  *Id.*  Defendants thus suggest
this factor "carries little weight[.]"  *Id.* (citing *Escalante v. Williams*, No. 17-cv-2035-HLT-
KGG, 2018 WL 4341268, at *2 (D. Kan. Sept. 11, 2018)).  Defendants are correct:  plaintiffs
Galindo and Enedino don't live in Kansas City, and none of the case's events occurred there.
So, plaintiffs' choice of forum doesn't deserve much weight.  *See McDermed*, 2014 WL
6819407, at *2.

  But plaintiffs suggest the court should honor their choice of forum because Kansas City is
"more convenient for plaintiffs than . . . Wichita."  Doc. 96 at 2.  They emphasize that "every
single party[,] witness[,] and named party for Plaintiffs has a place to stay, sleep, and eat in
Kansas City, but not Wichita."  *Id.* at 3.  That's because Adriana Turner, plaintiffs' daughter
and party witness, lives in Kansas City.  *Id.* at 2.  Plaintiffs didn't provide, and the court didn't
identify, any cases suggesting plaintiffs' financial interests bolster the choice-of-forum factor's

weight. *See Legleiter v. Rush Cnty., Kan. Bd. of Comm'rs*, No. 22-2137-JWB-GEB, 2022 WL

4465077, at *3 (D. Kan. Sept. 26, 2022) (concluding plaintiff's ability to stay with family

during trial in city he didn't live in did "not convince the Court any additional weight should be

given to Plaintiff's trial designation").

What plaintiffs' argument shows, though, is a personal connection to Kansas City. So,

the court concludes the choice-of-forum factor favors plaintiffs a bit more than defendants

suggest. *Cf. Bright v. BHCMC, LLC*, No. 17-2529-JWL-GEB, 2018 WL 398450, at *2–3 (D.

Kan. Jan. 12, 2018) (giving "reduced weight" to plaintiff's choice of forum where facts had "no

connection to Kansas City" and plaintiff provided "no personal connection to Kansas City").

But even still, plaintiffs' choice of Kansas City weighs just slightly in plaintiffs' favor. *See

Tiffany*, 2009 WL 1683515, at *1.

### 2.    Convenience and Accessibility of Evidence

The "relative convenience of the forum is a primary, if not the most important, factor to

consider in deciding a motion to transfer." *Menefee*, 2009 WL 1313236, at *2. A plaintiff's

proposed forum must be "substantially inconvenient" to warrant a change in forum. *Id.* A

proposed trial location is substantially inconvenient if all or practically all the witnesses reside

in a different location and traveling to the proposed trial location would impose a substantial

burden on them. *Id.* (holding that there was an "enormous disparity in convenience between

Kansas City and Wichita" because all witnesses would have to travel 200 miles from Wichita to

Kansas City); *LeTourneau v. Venture Corp.*, No. 15-2629-JAR, 2018 WL 489096, at *3–5 (D.

Kan. Jan. 19, 2018) (concluding Wichita was more convenient trial location than Kansas City

where out-of-state witnesses would incur similar travel costs in both locations, but Wichita was

"substantially more convenient" for witnesses traveling from Great Bend, Kansas); *Lopez-*

*Aguirre*, 2014 WL 853748, at *2 (granting motion to designate Topeka as the place of trial rather than Kansas City because the "great majority of witnesses [were] located in the Topeka area" and holding trial in Kansas City would "cause much more disruption" to these witnesses); *Nkemakolam v. St. John's Mil. Sch.*, 876 F. Supp. 2d 1240, 1248 (D. Kan. 2012) (denying a motion to move the trial from Kansas City to Topeka because "the presence of a large airport makes Kansas City a more convenient forum for plaintiffs, who must travel to Kansas" and while "Topeka might be marginally more convenient for [defendant] and its witnesses, that factor is at least counterbalanced by the loss in convenience to plaintiffs and other witnesses residing outside the state . . . that would occur with a transfer to Topeka").

In showing a substantially inconvenient forum, defendants must "identify the witnesses and their locations, indicate the quality or materiality of their testimony, and indicate that depositions from witnesses who are unwilling to come to trial would be unsatisfactory and the use of compulsory process would be necessary." *LeTourneau*, 2018 WL 489096, at *3 (internal quotation marks and citation omitted). Our court has explained that "convenience of the *non-party* witnesses is the most important factor to be considered." *Smith v. Textron Aviation Inc.*, No. 23-2291-JAR-TJJ, 2023 WL 8762376, at *2 (D. Kan. Dec. 19, 2023) (quotation cleaned up) (emphasis added).

Defendants emphasize here that "almost all of the witnesses . . . are located in Western Kansas, primarily Colby and Dodge City." Doc. 91 at 4. Just one of plaintiffs' witnesses lives in Kansas City. Doc. 96 at 4. But, as defendants note, Kansas City is the "most distant federal courthouse from the vast majority of the witnesses in this case." Doc. 91 at 4. Wichita, by contrast, is "much closer." *Id.* By defendants' calculations, Colby is 289 miles from Wichita and 370 miles from Kansas City. *Id.* at 2. Dodge City is 154 miles from Wichita, but 333 miles

from Kansas City.  *Id.*  While Wichita is closer to most of the witnesses than Kansas City, neither courthouse is right next door.

Let's take stock of the witnesses the parties identify in their briefs:

- Eight reside in Colby (10 hour round-trip to Kansas City compared to 8 hour round-trip to Wichita).  *See* Doc. 91-2 at 1–2 (listing party witnesses Galindo, Enedino, and Taylor, along with non-party witnesses Gabino, Ortiz, and Barrett); Doc. 98 at 2 (identifying non-party witnesses Marks and Davis).

- Two reside in Dodge City (10 hour round-trip to Kansas City compared to 5 hour round-trip to Wichita).  Doc. 91-2 at 2–3 (listing Antonio Urista Garcia and Jesus Israel Garcia).

- One resides in Liberal (12 hour round-trip to Kansas City compared to 7 hour round-trip to Wichita).  *Id.* at 2 (listing Borjas).

- One resides in Kansas City (no travel compared to 6 hour round-trip to Wichita). Doc. 96 at 2 (identifying Turner).[20]

Start with the lowest hanging fruit.  Kansas City is more convenient for Turner, one of plaintiffs' "key witness[es]," who lives in Kansas City.  Doc. 96 at 2.

Next, consider the largest batch of parties and witnesses—those residing in Colby. Plaintiffs and their Colby-based witnesses seemingly would find Kansas City more convenient. *See* Doc. 96 at 4.  And our court concluded in another case that "the difference in travel time between Wichita and Kansas City is . . . marginal for those parties or witnesses residing in Colby[.]"  *Koel v. Citizens Med. Ctr., Inc.*, No. 21-2166-HLT-TJJ, 2023 WL 4531373, at *4 (D.

---

[20]    The court takes judicial notice of Google Maps estimated driving distances between each of the cities.  *See LeTourneau*, 2018 WL 489096, at *4 n.32 (taking judicial notice of Google Maps).

Kan. July 13, 2023).  The "marginal improvement in travel times does not rise to the level of substantial inconvenience[.]"  *Id.*  So, for defendants' Colby-based witnesses, Kansas City isn't inconvenient enough to justify a change of trial location.

Finally, for the two witnesses located in Dodge City, and the one witness located in Liberal, Kansas City requires significantly more travel time.  *See Bright*, 2018 WL 398450, at *4 ("A trial in Kansas City would require the Dodge City parties and witnesses to travel approximately 336 miles one way.  Holding the trial in Wichita reduces their travel by half, to 158 miles." (quotation cleaned up)).  Defendants can carry their convenience-factor burden by showing "all or practically all the witnesses reside in a different forum and traveling to the proposed forum is a substantial burden."  *LeTourneau*, 2018 WL 489096, at *3 (internal quotation marks and citation omitted).  But even if Kansas City presents a substantial burden for three witnesses, the benefits are marginal for the remainder (Colby-based witnesses).  *See Koel*, 2023 WL 4531373, at *3 (advantage of Wichita was slight for some witnesses, and marginal improvement in travel times for remaining Colby witnesses didn't make Kansas City substantially inconvenient).

At bottom, neither forum is perfect—both require travel for most witnesses.  The difference between Kansas City and Wichita is marginal for the Colby-based parties and witnesses, who comprise nine of the 12 witnesses identified by the parties.  But Kansas City is inconvenient for the other three witnesses.  Defendants haven't shown Kansas City is "substantially inconvenient."  *LeTourneau*, 2018 WL 489096, at *5.[21]  The court concludes this

---

[21]     Plaintiffs also suggest Kansas City is a more convenient forum because "most of Plaintiffs' documentary evidence in this case is located" in Kansas City.  Doc. 96 at 2.  But defendants label this argument a red herring.  Doc. 98 at 2.  As defendants emphasize, all evidence was exchanged electronically between the parties.  *Id.*  The court agrees that the accessibility of evidence thus isn't a compelling basis to favor Kansas City over Wichita as place of trial.  *See Legleiter*, 2022 WL 4465077, at

factor is neutral, at best.

### 3.    Fair Trial

The parties don't express any fair trial concerns in either forum.  And the court finds none.  It's convinced either forum would produce a fair trial.  This factor is neutral.

### 4.    Other Factors—"All Other Considerations"

The court also may consider various other factors when determining the place of trial. These factors could include "costs in the form of mileage, meals, and hotel expenses" incurred by holding trial in plaintiffs' proposed location.  *Hughes v. Blue Cross and Blue Shield of Kan., Inc.*, No. 12-2339-JTM, 2012 WL 3644845, at *4 (D. Kan. Aug. 24, 2012).  The court also may consider the potential for delay in calling witnesses.  *Jones v. Wichita State Univ.*, No. 06-2131-KHV-GLR, 2007 WL 1173053, at *2 (D. Kan. Apr. 19, 2007).

Defendants argue each of these factors weighs in favor of Wichita as the place of trial. Doc. 91 at 4.  In their view, all of the parties, witnesses, and counsel will incur greater mileage expenses traveling to Kansas City, as opposed to Wichita.  *Id.* at 4–5.  And they suggest the risk of delay in calling witnesses is reduced by moving the location to Wichita.  *Id.* at 5.  Defendants also argue "Wichita's relative proximity to western Kansas is significant, and could be the difference between a one-day round trip or an overnight trip to the other end of the state."  Doc. 98 at 3.  Plaintiffs urge the court to consider their earlier arguments about their—and their witnesses'—connection to Kansas City.  Doc. 96 at 6; *see also id.* at 3 (emphasizing plaintiffs and their witnesses would have a place to stay and eat in Kansas City, but not Wichita).

The majority of this case's players will save on mileage and travel time by holding the trial in Wichita.  And both parties suggest their witnesses would save money on lodging in their

---

*5 (recognizing digital nature of personnel and medical records makes records' location "hold little importance in determining convenience" (quotation cleaned up)).

chosen forums. But defendants likely would incur "lodging expenses at either location if they are at trial for the duration[,]" while plaintiffs will avoid hotel expenses by staying with family in Kansas City. *Legleiter*, 2022 WL 4465077, at *5. This factor thus tips in favor of plaintiffs, but only slightly.[22]

### 5.    Considering the Factors

This is a battle of two forums—each one relatively distant from the location most pertinent to the case. It's defendants' burden to establish that the existing forum is inconvenient, such that "convenience and fairness" favor Wichita over Kansas City. *See McDermed*, 2014 WL 6819407, at *1; *ABF Freight*, 2018 WL 4154014, at *1. Two of the four factors prove neutral here—they're about 50/50. But the other two factors tipped ever so slightly plaintiffs' way. The court thus concludes defendants haven't carried their burden to establish the inconvenience of Kansas City. The court denies defendants' Motion to Designate Wichita as Place of Trial (Doc. 91).

## XII.    Conclusion

Here's the scoreboard on the parties' various motions. The court denies plaintiffs' Motion to Strike (Doc. 100) because it fails to provide a basis for striking the argument section of defendants' summary judgment motion.

The court grants defendants' Motion for Summary Judgment (Doc. 89) on just two points: *First*, defendants can't be liable for Borjas-contract-based damages incurred before Officer Taylor's involvement at the repossession—at least on plaintiffs' § 1983, fraud, and fraudulent misrepresentation claims. And, *second*, punitive damages aren't recoverable against

---

[22]    The court also may evaluate counsels' convenience, but it gets "little, if any, weight." *Legleiter*, 2022 WL 4465077, at *6 (quotation cleaned up). Defendants argue plaintiffs' counsel—located in Oakley, Kansas, and Dallas, Texas—is closer to Wichita. Doc. 91 at 2, 4. The court recognizes defendants' argument, but doesn't give it much weight.

the city.  The court denies defendants' motion in all other respects because disputed material facts preclude ruling in defendants' favor.  The court also denies plaintiffs' Motion for Summary Judgment (Doc. 93) in its entirety for the same reason.

Lastly, the court denies defendants' Motion to Designate Wichita as Place of Trial (Doc. 91) because defendants haven't shown the § 1404(a) factors favor Wichita over Kansas City under the circumstances.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion to Strike (Doc. 100) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion for Summary Judgment (Doc. 89) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Summary Judgment (Doc. 93) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Designate Place of Trial (Doc. 91) is denied.

**IT IS SO ORDERED.**

**Dated this 11th day of August, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**