**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**GUADALUPE QUINTO GALINDO, et al.,**

**Plaintiffs**,

**v.**

**SERGIO BORJAS, et al.,**

**Defendants**.

**Case No. 22-2414-DDC**

# MEMORANDUM AND ORDER

This case—now quite familiar to the court—involves wrongful repossession of plaintiffs' food truck. Plaintiffs allege that the repossession-gone-awry all started with defendant Sergio Borjas. Borjas allegedly breached an oral contract to provide plaintiffs with a food truck they had ordered and paid for in part. In its stead, plaintiffs allege that Borjas provided a substitute food truck—the so-called Used Sushi Trailer. When Borjas neither supplied the contracted-for food truck nor reimbursed their downpayment, plaintiffs refused to return the Used Sushi Trailer. Borjas then instigated a repossession of the Used Sushi Trailer turned food truck. But, plaintiffs allege, the repossessors took the wrong food truck—one that plaintiffs owned free and clear.

Plaintiffs then filed this sprawling lawsuit against Borjas and others, asserting more than 20 federal and state claims premised on these repossession events. Borjas never answered or otherwise defended. Meanwhile, the court released rivers of ink dismissing improperly pleaded and implausible claims, *see* Doc. 61, and determining that disputed facts required a trial on several of plaintiffs' whittled-down claims, Doc. 103. Now, plaintiffs seek a default judgment against Borjas on all claims. Doc. 122. Ignoring the court's previous whittling of their case,

plaintiffs' default-judgment motion contends that the court should declare them winners on every one of their claims—and award them more than $12 million of damages. *Id.* at 1.

The court, however, can't ignore its earlier rulings, and must divert yet more ink revisiting its effort to rein in plaintiffs' rambling suit. As a result, the court grants plaintiffs' motion only in part—entering default judgment and awarding damages and post-judgment interest on plaintiffs' breach-of-contract claim against Borjas. It denies plaintiffs' motion in all other respects. The court explains its conclusions, below, starting with the relevant background facts.

## I. Background

The following facts come from plaintiffs' Second Amended Complaint (Doc. 53). Because the court has recited the facts of this case twice already in its earlier Orders, the court includes only those facts relevant to its default-judgment ruling. When ruling on a default-judgment motion, the court takes "as true all factual allegations in the complaint, except those pertaining to the amount of damages." *Archer v. Eiland*, 64 F. App'x 676, 679 (10th Cir. 2003).

### *Plaintiffs' First Attempt to Buy a Food Trailer*

In April 2019, plaintiffs initiated a food-trailer purchase from Sergio Borjas—a food-trailer seller and a member of plaintiffs' church congregation. Doc. 53 at 6 (2A Compl. ¶¶ 30–31). Plaintiffs paid Borjas a $6,000 down payment (half of the trailer's total purchase price) at the end of April. *Id.* at 7 (2A Compl. ¶ 33). Plaintiffs never received a written contract for the trailer purchase. *Id.*

In June 2019, when the Kansas Department of Agriculture sought to schedule a trailer inspection, the trailer still hadn't arrived. *Id.* (2A Compl. ¶¶ 34–35). So, plaintiffs tracked down Borjas and demanded either their truck or their down payment. *Id.* (2A Compl. ¶ 36). Borjas could produce neither one. *Id.* He offered them instead another trailer—formerly used as a sushi

stand—which they could fix up and operate until he delivered their new trailer. *Id.* at 8 (2A Compl. ¶ 37). Plaintiffs reluctantly agreed. *Id.* (2A Compl. ¶ 40). Afterwards, plaintiffs tried several times to convince Borjas to provide the ordered trailer, a written contract, or a receipt for their down payment. *Id.* at 10 (2A Compl. ¶¶ 46–48). But they never succeeded. *Id.* Eventually, plaintiffs looked for another solution. *Id.* at 10–11 (2A Compl. ¶¶ 50–51).

***Plaintiffs' Los Jarochos Food Trailer Purchase***

So, plaintiffs ordered a second trailer, dubbed the "Los Jarochos Trailer," from another supplier in Mexico. *Id.* at 11 (2A Compl. ¶ 51). In December 2019, plaintiffs brought the Los Jarochos Trailer to Kansas and placed it on their rented land in Colby. *Id.* (2A Compl. ¶ 53). Plaintiffs relocated the Used Sushi Trailer to another part of their rented land and began running their food business out of the Los Jarochos Trailer. *Id.* (2A Compl. ¶ 54). Borjas then reemerged. He asked plaintiffs about the Used Sushi Trailer and also asked them for more money. *Id.* at 12 (2A Compl. ¶ 55). Plaintiffs responded that Borjas "could come get the old food truck as soon as he refunded them the deposit they had paid him[.]" *Id.* Plaintiffs continued to ask for their money back from Borjas, and Borjas insisted that plaintiffs return the Used Sushi Trailer. *Id.* (2A Compl. ¶ 57).

***The Repossession***

On April 13, 2022, Antonio Urista Garcia and Jesus Israel Garcia ("the Garcias"), acting as employees and agents of Garcia Recovery, LLC, arrived at plaintiffs' Los Jarochos Trailer aiming to complete a repossession. *Id.* at 13–14 (2A Compl. ¶¶ 59, 63, 65). Although not apparent to plaintiffs at the time, Borjas had hired the Garcias to repossess a food trailer from plaintiffs. *Id.* at 25, 26 (2A Compl. ¶¶ 151–52, 156). When the Garcias arrived, plaintiffs' two employees—who also are plaintiffs' relatives—were staffing the Los Jarochos business. *Id.* at 13 (2A Compl. ¶¶ 60–63).

Plaintiffs' employees told the Garcias that the trailer belonged to plaintiffs. *Id.* at 14 (2A Compl. ¶ 66). But the Garcias waved papers about—ones which included a photograph of the Los Jarochos Trailer—and said they had an order authorizing them to take custody of it. *Id.* (2A Compl. ¶¶ 67–68). Plaintiffs' employees called plaintiffs. *Id.* (2A Compl. ¶ 69). And plaintiffs' daughter called the police "*for help* to protect her parents, their employees, and their family business." *Id.* at 16 (2A Compl. ¶ 80) (emphasis in original). The City of Colby's Police Department dispatched Officer Taylor. *Id.* (2A Compl. ¶ 81).

Officer "Taylor immediately took charge of the situation" and ordered plaintiffs' employees to leave the trailer. *Id.* at 18 (2A Compl. ¶ 100). The employees, through a bilingual Los Jarochos customer, informed Officer Taylor that "the Los Jarochos Trailer was owned by Plaintiffs free and clear of any liens" and that plaintiffs would arrive in 30 minutes or less with proof of their ownership. *Id.* at 15, 19 (2A Compl. ¶¶ 74, 104–05). One employee also showed Officer Taylor and the Garcias the Used Sushi Trailer and identified it as the only trailer for which a court order might exist. *Id.* at 20 (2A Compl. ¶ 108). To determine which trailer to repossess, the Garcias "exhaustively searched for VIN and serial numbers on both" trailers but couldn't find one matching their paperwork for either trailer. *Id.* (2A Compl. ¶¶ 109–13). And so, "the Garcias concluded they could not legally take either trailer." *Id.* (2A Compl. ¶ 114).

But Officer Taylor told the Garcias "to take the Los Jarochos Trailer anyway because Plaintiffs or their employees must have removed the VIN from the Los Jarochos Trailer to prevent it from being repossessed." *Id.* (2A Compl. ¶ 115). Then Officer Taylor ordered plaintiffs' employees "to stay out of the truck so the taking could proceed." *Id.* at 21 (2A Compl. ¶ 119). Officer "Taylor remained on Plaintiffs' property until the taking was complete." *Id.* at 23 (2A Compl. ¶ 139). Indeed, he was still on the property when plaintiffs arrived, "possibly 30

minutes but at most 45 minutes from the time" when their employees first called them. *Id.* (2A Compl. ¶ 141). When plaintiffs showed Officer Taylor their proof-of-ownership documents, his response "was to tell Plaintiffs he was sorry [and that] they should find a lawyer[.]" *Id.* at 24 (2A Compl. ¶ 143).

"No court order relating to the Los Jarochos Trailer has ever been provided to Plaintiffs and no such court order ever existed[.]" *Id.* at 17 (2A Compl. ¶ 87). Garcia Recovery and Borjas, since the repossession, "both admitted the Los Jarochos Trailer belongs to Plaintiffs." *Id.* (2A Compl. ¶ 86).

***The Repossession's Aftermath***

The next day, Garcia Recovery contacted plaintiffs, apologized for taking the wrong trailer, and told plaintiffs they could come pick up the Los Jarochos Trailer. *Id.* at 26 (2A Compl. ¶ 154). Plaintiffs responded that Garcia Recovery made the mistake and should return the trailer themselves. *Id.* But, for whatever reason, Garcia Recovery refused. *Id.* And Garcia Recovery didn't respond when plaintiffs' counsel sent an email demanding the trailer's immediate return. *Id.* at 26–27 (2A Compl. ¶¶ 157–58). Plaintiffs later heard reports from friends and acquaintances of "malicious rumors circulating that [plaintiffs'] business had been busted for dealing drugs." *Id.* at 24–25 (2A Compl. ¶ 146).

On April 20, 2022, plaintiffs found and leased a temporary replacement trailer to keep their Colby location open. *Id.* at 27–28 (2A Compl. ¶¶ 160–61). Many months later, on February 27, 2023, the Garcias returned the Los Jarochos Trailer to plaintiffs. *Id.* at 28 (2A Compl. ¶ 165). The Los Jarochos Trailer had sustained damage and required repairs to return it to its condition at repossession. *Id.* at 29 (2A Compl. ¶ 166).

With that background, the court next recites the legal standard for default judgments. It then evaluates whether these facts provide a sufficient basis to award plaintiffs a default judgment against Borjas on their multiple claims.

## II. Legal Standard

Federal Rule of Civil Procedure 55 provides a two-step process for securing a default judgment: (1) entry of default and (2) entry of default judgment. Plaintiffs have satisfied the first step already. The Clerk has entered default against Borjas under Rule 55(a) because he "filed no answer or other pleading" in this case. Doc. 45 at 1. So, this Order addresses the process's second step, outlined in Rule 55(b)(2). At this step two, whether to enter "default judgment is committed to the sound discretion of the district court[.]" *Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016). In exercising this discretion, the court remains mindful that "[d]efault judgments are a harsh sanction." *In re Rains*, 946 F.2d 731, 732 (10th Cir. 1991). They are justified "only when the adversary process has been halted because of an essentially unresponsive party." *Id.* (quotation cleaned up). Otherwise, "the diligent party" may suffer "interminable delay and continued uncertainty [about] his rights." *Id.* at 733 (quotation cleaned up).

Before entering a default judgment, the "court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986); *see also Hukill v. Okla. Native Am. Domestic Violence Coal.*, 542 F.3d 794, 797 (10th Cir. 2008) ("A default judgment in a civil case is void if there is no personal jurisdiction over the defendant." (quotation cleaned up)).

When deciding whether to enter a default judgment, the court must "t[ake] as true all factual allegations in the complaint, except those pertaining to the amount of damages." *Archer*, 64 F. App'x at 679. "Once the default is established, defendant has no further standing to contest

the factual allegations of plaintiff's claim for relief." *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1274 (D. Kan. 2016) (quotation cleaned up). "In addition, the court accepts the undisputed facts set forth in any affidavits and exhibits attached to the complaint or submitted in support of the motion for default judgment." *CapFinancial Props. CV1, LLC v. Highway 210, LLC*, No. 09-2465-DJW, 2011 WL 1303323, at *2 (D. Kan. Apr. 1, 2011).

Nonetheless, "'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) (quoting 10A *Wright & Miller's Federal Practice and Procedure* § 2688 (3d ed. 1998)). That is, there "must be a sufficient basis in the pleadings for the judgment entered." *Id.* (quotation cleaned up). "A court may grant judgment by default only for relief that may lawfully be granted on the well-pleaded facts alleged by the claimant." 10 *Moore's Federal Practice* § 55.32 (3d ed. 2026). Finally, the court may award damages "only if the record adequately reflects the basis for [the] award via a hearing or a demonstration by detailed affidavits establishing the necessary facts." *DeMarsh v. Tornado Innovations*, *L.P.*, No. 08-2588-JWL, 2009 WL 3720180, at *2 (D. Kan. Nov. 4, 2009) (quotation cleaned up).

The court begins with the first assignment in every federal court case—jurisdiction. This assignment requires the court to discern whether it has subject-matter jurisdiction. If so, the next task is determining whether the forum court has personal jurisdiction over the defendant at issue. If so, the court then evaluates whether there's "a sufficient basis in the pleadings for the judgment entered." *Bixler*, 596 F.3d at 762 (quotation cleaned up). The court concludes that plaintiffs have sustained their burdens on subject matter and personal jurisdiction. Next, it concludes that the facts in the Second Amended Complaint—taken as true—suffice to enter

default judgment against Borjas on just one claim—plaintiffs' breach-of-contract claim. The unchallenged facts don't "constitute a legitimate cause of action" for any of plaintiffs' other claims against Borjas. *Id.* Finally, the affidavit attached to plaintiffs' default-judgment motion adequately reflects the basis for breach-of-contract damages, so the court awards plaintiffs those damages. Start with jurisdiction.

## III. Jurisdiction

### A. Subject Matter Jurisdiction

28 U.S.C. § 1331 assigns original jurisdiction to federal courts over "all civil actions arising under the Constitution, laws, or treaties of the United States." Here, plaintiffs assert 42 U.S.C §§ 1981, 1983, 1985 and conspiracy claims. Doc. 53 at 51–54 (2A Compl. ¶¶ 370–83, 393–402) These claims arise under federal law. Plaintiffs also assert state law claims. *Id.* at 59–79 (2A Compl. ¶¶ 436–580). The court exercises supplemental jurisdictions over plaintiffs' state-law claims under 28 U.S.C. § 1367.

### B. Personal Jurisdiction

The court shouldn't enter a judgment of default "without a determination that the court has jurisdiction over the defendant." *Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 771 (10th Cir. 1997). A "plaintiff need only make a *prima facie* showing" of personal jurisdiction "if the motion is decided only on the basis of the parties' affidavits and other written materials"—as it is here. *Id.* at 773.

"'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]'" *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). The Second Amended Complaint alleges that individual defendant Sergio Borjas resides here in the District of Kansas.

Doc. 53 at 5 (2A Compl. ¶ 23). The court concludes this fact suffices to provide a prima facie showing of domicile.

The default-judgment analysis next requires the court to assess whether the pleadings contain a sufficient basis to enter a default judgment against Borjas. But, before it can do so, the court must address how the multi-defendant nature and procedural posture of this case implicate the present default-judgment motion.

## IV. Multiple Defendants

This case involves multiple defendants. The Second Amended Complaint groups them into two sets—the municipal defendants and non-municipal defendants. *Id.* at 3–6 (2A Compl. ¶¶ 10–29). Borjas is a non-municipal defendant. *Id.* at 5, 6 (2A Compl. ¶¶ 23, 28). This multiple-defendant status matters at the default-judgment stage—affecting both a default judgment's timing and, in some cases, its outcome. Here's why.

Where there are multiple defendants—some defaulting and some non-defaulting—a rule commonly referred to as the *Frow* rule comes into play. *See Wilcox v. Raintree Inns of Am., Inc.*, 76 F.3d 394, 1996 WL 48857, at *2 (10th Cir. 1996) ("This circuit has recognized and applied the *Frow* rule."). "According to the rule announced in the venerable case of *Frow v. De La Vega*, 82 U.S. 552, 554 (1872), in a case with multiple defendants, judgment should not be entered against a defaulting defendant before the case has been decided on the merits as [it applies] to the remaining defendants." *Id.* That's the timing piece. But there's more. The *Frow* rule also dictates that where "the case is ultimately decided against the plaintiff on the merits, . . . it should be dismissed as to all the defendants alike—the defaulter as well as the others." *Id.* "Essentially, the key aim of this rule is the avoidance of inconsistent judgments[.]" *Fifth Third Bank v. Morales*, No. 16-01302-CMA-STV, 2017 WL 4012120, at *1 (D. Colo. Sept. 12, 2017); *Hunt v. Inter-Globe Energy, Inc.*, 770 F.2d 145, 147 (10th Cir. 1985) (explaining that *Frow*

"avoids inconsistent liability determinations among joint tortfeasors"). "The *Frow* rule is particularly applicable when multiple defendants are alleged to be jointly and severally liable because consistent damage awards on the same claim are essential among joint and several tortfeasors." *Fifth Third Bank*, 2017 WL 4012120, at *1. But *Frow* "is also applicable in situations where multiple defendants have closely related defenses." *Wilcox*, 1996 WL 48857, at *3.

"[C]ourts have applied the *Frow* rule on summary judgment." *Id.* at *2 (recognizing that cases have extended *Frow* "to grant the benefits of successful motions to dismiss and motions for summary judgment to a defaulting defendant"). Indeed, "a summary judgment in favor of the answering defendants will accrue to the benefit of the defaulting defendant." 10A *Wright & Miller's Federal Practice & Procedure* § 2690 (4th ed. 2026). However, where "the nondefaulting defendant's defense is a personal one—infancy, for example—and would not be available to the defaulting defendant, a decision in favor of the former defendant on the basis of that defense does not inure to the benefit of the latter defendant[.]" *Id.*

Here, the municipal defendants engaged in the case. The non-municipal defendants didn't. Plaintiffs sought—and received—a Clerk's Entry of Default against all three non-municipal defendants. Doc. 44 (against Antonio Urista Garcia); Doc. 45 (against Sergio Borjas); Doc. 46 (against Garcia Recovery, LLC). Meanwhile, the municipal defendants succeeded in their bid to dismiss most of plaintiffs' claims at the motion-to-dismiss stage. *See* Doc. 61 at 64 (granting in part and denying in part dismissal motion such that just four claims—out of more than 20—survived). The municipal defendants also found limited success at summary judgment—further narrowing plaintiffs' claims. Doc. 103 at 67–68. Rather than proceed to trial, the plaintiffs and the municipal defendants settled, submitting a joint Stipulation and Agreed

Motion for Dismissal. Doc. 117. This procedural background has significant ramifications for plaintiffs' present default-judgment motion.

Many—though not all—of plaintiffs' claims against Borjas rest on a theory of conspiracy thus implicating joint and several liability. Indeed, plaintiffs' default-judgment motion repeatedly asserts as much. Doc. 122 at 9 ("As a co-conspirator, Borjas is jointly and severally liable to Plaintiffs for all damages resulting from the conspiracy[.]"); *id.* at 12 ("[A]ll damages to Plaintiffs occurred as a result of Borjas's own actions, or as a result of one or more tortious conspiracies of which Borjas was a co-conspirator for which Borjas is jointly and severally liable."). *Frow* governs treatment of such joint claims at default judgment. *See* 82 U.S. at 554 (establishing the *Frow* rule in the context of a "charge of joint fraud"); *Gen. Steel Domestic Sales, LLC v. Chumley*, 306 F.R.D. 666, 669 (D. Colo. 2014) (finding risk of logically inconsistent judgments where allegedly offending acts resulted directly from "one or more agreement(s) among all Defendants" (quotation cleaned up)). So, to the extent the municipal defendants' dismissal and summary-judgment arguments succeeded, the benefit of those successful arguments accrue to Borjas—but with one proviso: as long as the asserted defenses weren't personal to the non-defaulting defendants.

But not all the at-issue claims fall in the *Frow* category. Plaintiffs also asserted some claims against Borjas only. And Garcia Recovery has assigned its breach-of-contract claim against Borjas to plaintiffs. The court hasn't considered these claims on any dispositive-motion briefing, nor did any non-defaulting defendant have occasion to assert a closely related defense. So, *Frow* doesn't govern the Borjas-only claims or the assigned claims. The court's analysis begins there. Then, the court evaluates whether the municipal defendants' successful arguments accrue to Borjas's benefit under *Frow*.

## V. Claims Asserted Only Against Borjas

The Second Amended Complaint asserts breach-of-contract and intentional-infliction-of-emotional-distress (IIED) claims against Borjas alone. Doc. 53 at 65, 75 (2A Compl. ¶¶ 477, 551). And plaintiffs' default-judgment motion seeks damages premised on these two claims. Doc. 122 at 2–3, 8–9. So, taking all factual allegations in the complaint as true, the court must "consider whether the unchallenged facts constitute a legitimate cause of action" for each claim. *Bixler*, 596 F.3d at 762 (quotation cleaned up). To do so, the court assesses whether there's "a sufficient basis in the pleadings" to enter judgment. *Id.* (quotation cleaned up). Start with plaintiffs' breach-of-contract claim.

### A. Breach of Contract

Plaintiffs premise their breach-of-contract claim on an oral contract for the sale of a food truck made between Borjas and plaintiffs Guadalupe Quinto Galindo and Endino Mendez Preza in April 2019. Doc. 53 at 66 (2A Compl. ¶¶ 479–80, 483). Borjas agreed to order and deliver a food truck—conforming to Galindo and Preza's specifications—in 45–60 days for $12,000. *Id.* (2A Compl. ¶ 481). Half of the price was due up front. The other half due at delivery. *Id.* Plaintiffs paid Borjas $6,000 by check on April 23, 2019, starting the delivery-deadline clock. *Id.* at 7, 66 (2A Compl. ¶¶ 33, 481); Doc. 53-2 at 1 (Pl. Ex. A). Borjas breached the contract when he failed to deliver a conforming truck by the contractual deadline. *Id.* at 67 (2A Compl. ¶ 487). Indeed, Borjas never delivered the promised food truck at all. *Id.* at 66 (2A Compl. ¶ 485).[1]

---

[1] The court notes its concern with the timeliness of plaintiffs' breach-of-contract claim against Borjas. Kan. Stat. Ann. § 60-512 provides that the statute of limitations for an oral contract is three years. And it's "'axiomatic that the three-year period commences to run from the date of the breach of the contract.'" *Lopez v. Davila*, 526 P.3d 674, 682 (Kan. Ct. App. 2023) (quoting *Wolf v. Brungardt*, 524 P.2d 726, 732 (Kan. 1974)). Here, the oral contract terms required Borjas to deliver the food truck 45–60 days after plaintiffs submitted the first half of the payment. Doc. 53 at 66 (2A Compl. ¶¶ 481–83).

Under Kansas law, a breach-of-contract claim has five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013). "Whether a contract exists depends on the intentions of the parties . . . . In order to form a binding contract, there must be a meeting

---

Plaintiffs paid Borjas $6,000 on April 23, 2019—setting Borjas's delivery deadline in mid-to-late June 2019. *Id.* (2A Compl. ¶ 483). The Second Amended Complaint confirms that Borjas failed to deliver the trailer by the contractual deadline. *Id.* at 67 (2A Compl. ¶ 487). So, Borjas breached the contract in June 2019, meaning the statute of limitations ran in June 2022. Plaintiffs filed this case on October 12, 2022, Doc. 1—several months too late.

But generally—because it's an affirmative defense—"a statute of limitations may not be raised *sua sponte*[.]" *United States v. Mitchell*, 518 F.3d 740, 748 (10th Cir. 2008). The Supreme Court has approved narrow exceptions to this general rule. *Arizona v. California*, 530 U.S. 392, 412 (2000). But those exceptions require "special circumstances" where the affirmative defense implicates, not just the parties', but also the judiciary's interests. *Id.* at 412–13. As our Circuit explains it, the adversarial justice system presumes that "the parties [are] responsible for raising their own defenses." *Mitchell*, 518 F.3d at 749. A narrow exception to this general party-presentation principle inheres only where "the issue implicates the court's power to protect its own important institutional interests." *Id.* Statutes of limitations don't fit the bill. *Id.* at 748 ("Statutes of limitations have traditionally been construed as benefitting litigants, not the court.").

What's more, the default-judgment context reinforces the need for restraint. As the D.C. Circuit has noted, the Supreme Court never has sanctioned *sua sponte* action on a forfeited affirmative defense where "the defendant on whose behalf the court acted [was] entirely absent from the litigation." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1110 (D.C. Cir. 2019). Indeed, the D.C. Circuit has added each parties' presence as a prerequisite to applying *Arizona*'s narrow exception: "it is clear that federal courts may depart from the party presentation principle and rules of forfeiture only in distinct and narrow circumstances in which the judiciary's own interests are implicated *and the forfeiting party is present in the litigation*." *Id.* at 1112 (emphasis added).

In the default judgment context, then, the court remains agnostic to its statute-of-limitations concerns. And so, the court simply notes the issue here and sets it aside. Other courts in our Circuit have done the same. *See Lim v. Boone*, No. 20-167-F, 2021 WL 7259038, at *2 (D. Wyo. June 8, 2021) (explaining that the court "ignores the statute of limitations issue for purposes of" default-judgment motion because defendants "waived their statute of limitations affirmative defense by defaulting"); *O'Neill v. Cal. Farms, Inc.*, No. 12-00676-WYD-KMT, 2013 WL 5467074, at *12 n.7 (D. Colo. Sept. 30, 2013) (collecting cases and finding on default judgment motion that because "a statute of limitations is an affirmative defense, and thus can be waived, the court cannot properly raise the issue on its own motion").

of the minds on all the essential elements." *Unified Sch. Dist. No. 446 v. Sandoval*, 286 P.3d 542, 546 (Kan. 2012). "The terms of an oral contract and the consent of the parties may be proven by the parties' acts and by the attending circumstances[.]" *Id.*

Taking the factual allegations in the Second Amended Complaint and those set forth in the attached exhibits as true—as the default-judgment setting requires—the court concludes that plaintiffs' breach-of-contract claim qualifies as "a legitimate cause of action[.]" *Bixler*, 596 F.3d at 762. That is, there's "a sufficient basis in the pleadings for the" court to enter judgment on this case's Second Amended Complaint. *Id.* (quotation cleaned up). Plaintiffs' $6,000 check helps tick multiple boxes. Plaintiffs wrote the check, dated April 23, 2019, to Sergio Borjas, and it's stamped as deposited the next day. Doc. 53-2 (Pl. Ex. A). The parties' acts of writing and depositing the check demonstrate their consent, ticking the existence-of-a-contract box. The deposited check also demonstrates sufficient consideration to support the contract and plaintiffs' performance under its terms—the second and third elements. Plaintiffs' allegations likewise suffice for the last two breach-of-contract elements—breach and damages. Borjas failed to deliver a conforming food truck by the contractual deadline—indeed, he never delivered one. Doc. 53 at 66, 67 (2A Compl. ¶¶ 485, 487). And Borjas refused to rescind the contract, reimburse plaintiffs, or compensate plaintiffs in any other fashion. *Id.* at 68 (2A Compl. ¶¶ 501–02). Plaintiffs thus lost their $6,000 payment to Borjas. *Id.* at 33 (2A Compl. ¶ 208). And plaintiffs spent $12,838 attempting to convert a nonconforming food truck (the Used Sushi Trailer) for the same use and then spent another $16,000 to purchase a conforming trailer (the Los Jarochos Trailer) from another dealer. Doc. 122-3 at 2 (Turner Aff. ¶¶ 6–7). The court concludes it's proper to issue a default judgment on this breach-of-contract claim.

**B. IIED**

Plaintiffs also assert an IIED claim just against Borjas. The Second Amended Complaint hangs this claim on Borjas "deliberately set[ting] in motion a scheme comprised of extreme and outrageous conduct to prey on Plaintiffs by misleading them, extorting them, putting pressure on them when they were at their most vulnerable, slandering them in their community, gaslighting them, wrecking their business, and making them vulnerable and dependent." Doc. 53 at 76 (2A Compl. ¶ 553). Presumably, the scheme plaintiffs reference began with Borjas failing to perform the contract obligating him to provide a food truck, as outlined in the breach-of-contract discussion, above. *See* § V.A. But the default-judgment motion indicates the scheme also includes the alleged conspiracy. Doc. 122 at 8 (identifying one of the aims of the conspiracy as "intentionally inflicting grievous emotional distress upon Plaintiffs").

The conspiracy involved Borjas hiring Garcia Recovery LLC to tow plaintiffs' food truck—which the Second Amended Complaint characterizes as an "illegal taking." Doc. 53 at 25, 29 (2A Compl. ¶¶ 152, 169). An attached exhibit indicates that Borjas indeed instigated the repossession of a food truck from plaintiffs' property. Doc. 53-10 (Pl. Ex. I). But the Second Amended Complaint also acknowledges significant confusion about *which* food truck's repossession—the Used Sushi Trailer or the Los Jarochos Trailer—Borjas had commissioned. Doc. 53 at 19–21 (2A Compl. ¶¶ 106–18). And, it indicates, the food truck Garcia Recovery ultimately repossessed—the Los Jarochos Trailer—had a different VIN number than the one Borjas had provided in his repossession request. *Id.* at 20 (2A Compl. ¶ 111); Doc. 53-10 at 2. The difference in VIN numbers led the Garcias to conclude that "they could not legally take either trailer." Doc. 53 at 20 (2A Compl. ¶ 114). And the Second Amended Complaint asserts that the "Garcias would not have taken the Los Jarochos Trailer if [Officer] Taylor hadn't told

them to" do so. *Id.* (2A Compl. ¶ 116). Indeed, according to the Second Amended Complaint, Borjas told a mutual friend that "what Garcia Recovery did was not what Borjas asked them to do[.]" *Id.* at 25 (2A Compl. ¶ 151). Instead, in Borjas's view, "Plaintiffs had stolen his trailer (presumably referring to the Used Sushi Trailer)" and Borjas wanted that trailer returned to him. *Id.*

The question for the court—in light of these factual allegations which it takes as true—is whether Borjas's alleged role as contract-breacher and repossession-instigator suffices to state a legitimate IIED cause of action in Kansas.

An IIED claim under Kansas law has four elements: "(1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe." *Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010). Under Kansas law, IIED claims—also called "tort of outrage" claims—have two threshold requirements "which must be met and which the court must, in the first instance, determine[.]" *Id.* *One*, the court must assess whether "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" *Id.* And *two*, "the emotional distress suffered by plaintiff" must reach such an "extreme degree [that] the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Id.* Start with defendant's conduct.

In expounding on the first threshold requirement, the Kansas Supreme Court has explained that "to provide a sufficient basis for an action to recover for emotional distress, conduct must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.* Here, the conduct in question is two-fold: breaching a

contract and commissioning the repossession of a food truck. Kansas precedent closely informs the issue, and it reveals that such conduct won't suffice to sustain an IIED claim.

The Kansas Supreme Court's touchstone outrage case, *Taiwo v. Vu*, deemed the defendant's conduct sufficiently atrocious to support an IIED claim where she: intentionally and maliciously assaulted, battered, and falsely imprisoned the plaintiff; lied to law enforcement (twice); filed a false police report; and induced an employee to lie to the police. 822 P.2d 1024, 1029–30 (Kan. 1991). That's a far cry from breaching a contract and commissioning a repossession—even a repossession gone awry. "Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress." *Hollis v. Aerotek, Inc*, No. 14-2494-SAC, 2015 WL 773313, at *5 (D. Kan. Feb. 24, 2015). Indeed, the Kansas Court of Appeals refused to recognize an IIED claim in a case where—like this one—a contract gone sour had triggered drastic action.

In that case, *Kape Roofing & Gutters, Inc. v. Chebultz*, the parties disputed the amount due on a contract for roofing and guttering work that Kape Roofing had completed on defendant's home. No. 113,025, 2016 WL 3655893, at *1 (Kan. Ct. App. July 8, 2016). As the parties' relationship deteriorated, Kape filed a mechanic's lien against defendant's home by submitting "a false affidavit." *Id.* at *12. Defendant counterclaimed for the tort of outrage, alleging that "Kape's intentional outrageous conduct in filing a mechanic's lien and seeking foreclosure and sale of [defendant's] home unnecessarily caused [defendant] extreme and severe emotional distress." *Id.* at *2. But the Court of Appeals found the "tort of outrage claim unsustainable with this record." *Id.* at *11. Granted, the Court of Appeals found such conduct was "reprehensible." *Id.* at *12. Nevertheless, it wasn't "so extreme as to be 'intolerable in a civilized society.'" *Id.* So too, here.

The relationship between the parties here deteriorated after Borjas failed to fulfill his contractual obligation to supply plaintiffs' specified food truck. This relational break led to an attempt by Borjas to secure property which plaintiffs possessed. But even taking the Second Amended Complaint's allegations as true, it appears that Borjas may have intended to instigate repossession of the Used Sushi Trailer, not the Los Jarochos Trailer. Setting that aside for a moment, imagine that plaintiffs' allegations squarely demonstrate that Borjas intended for Garcia Recovery to repossess the Los Jarochos trailer—not the Used Sushi trailer. Even in that worst-case scenario, Borjas's conduct resembles the false affidavit and attempted home foreclosure in *Kape Roofing*. And the Kansas appellate court classified such conduct as reprehensible—but not intolerable. So, plaintiffs' outrage claim fails on the first threshold requirement. But it also fails on the second: plaintiffs' factual allegations—taken as true—don't demonstrate sufficiently severe emotional distress to support an IIED claim.

Recall that the standard for sufficiently severe distress is that "no reasonable person should be expected to endure it." *Valadez*, 229 P.3d at 394. The Kansas Supreme Court has composed a list of distress symptoms that don't make the cut: "Elevated fright, continuing concern, embarrassment, worry, and nervousness do not by themselves constitute sufficient harm to a plaintiff to warrant the award of damages for outrage." *Id.* at 395. Kansas's high court rattles off a litany of other symptoms that don't clear the severity bar: "It is fair to say that headaches, sleeplessness, irritability, anxiety, depression, listlessness, lethargy, intermittent nightmares, and the like would probably not suffice anywhere." *Id.* (quotation cleaned up). And the Kansas Supreme Court rounds out its sufficiently severe discussion by clarifying that "the absence of psychiatric or medical treatment, including medication, weighs against a finding of extreme emotional distress." *Id.* And, the Kansas court notes, if symptoms are strictly mental—

and not physical—severity inheres only where the symptoms are "long lasting and debilitating." *Id.*

Here, the Second Amended Complaint explains that "[p]laintiffs and their family were devasted, angry, hurt, confused, gaslighted, frustrated, afraid, intimidated, and in shock." Doc. 53 at 34 (2A Compl. ¶ 223). And it asserts, without further detail, that one plaintiff's "mental distress was and remains extreme and severe." *Id.* at 76 (2A Compl. ¶ 554). It also describes emotional distress stemming from "malicious rumors . . . that the business had been busted for dealing drugs[,]" rumors that resulted in plaintiffs' son receiving ridicule at school. *Id.* at 25 (2A Compl. ¶ 146). And it explains that the event giving rise to this lawsuit was "a time of craziness, uncertainty, and fear" and that one plaintiff "cried every morning and still cries a lot." *Id.*

The affidavit attached to the default-judgment motion echoes the emotional distress described in the Second Amended Complaint. It explains that plaintiffs experienced "immense" "pain and suffering . . . including their minor son[.]" Doc. 122-3 at 6 (Turner Aff. ¶ 21). And the affidavit attributes much of that suffering to "the false rumors, predictably and intentionally caused by Borjas's conspiracy, that [plaintiffs] were deadbeats who had failed to make their business payments, and worst of all, drug dealers whose trailer had been confiscated by the police as part of an investigation into criminal activity." *Id.* The affidavit then describes the IIED damages as follows: "Plaintiffs suffered at least $3,700,000 in pain and suffering identified and detailed by Galindo and Preza, and $6,624.55 through September 2025 in associated medical costs." *Id.*

Most of the emotional distress described in the Second Amended Complaint and the affidavit lacks the requisite severity under Kansas law to sustain an IIED claim. Instead, the distress falls into the fright-concern-embarrassment-worry-nervousness category which, *Valadez*

determined, won't suffice. 229 P.3d at 395. But one distress allegation merits further attention—the associated medical costs.

*Valadez* noted that the absence of medical treatment would "weigh[] against a finding of extreme emotional distress." *Id.* It stands to reason that the converse is also true: the presence of medical treatment would favor finding extreme emotional distress. And the default-judgment motion's attached affidavit identifies "associated medical costs" that, one assumes, resulted from medical treatment for mental distress. Doc. 122-3 at 6 (Turner Aff. ¶ 21). But the affidavit gives no more detail about this medical treatment. *See generally* Doc. 122-3. It never clarifies, for example, what the medical costs involved, how precisely the costs derived from emotional distress, or who received the billed treatment—plaintiffs or their son. Nor does the affidavit detail whether the treatment involved medication, a factor *Valadez* implies matters. *See* 229 P.3d at 395. The Second Amended Complaint doesn't cure the affidavit's ambiguity. Indeed, it never mentions medical treatment of any kind. *See generally* Doc. 53. On the record before the court, one reference to "associated medical costs"—without more—doesn't demonstrate the severity required to sustain an IIED claim under Kansas law. And so, plaintiffs' claim fails the second IIED threshold requirement, as well.

In sum, clearing neither threshold of IIED's substantial hurdle, plaintiffs' IIED claim doesn't constitute a legitimate cause of action—even under plaintiffs' unchallenged facts. That is, the court doesn't find "a sufficient basis in the pleadings" to enter judgment against Borjas on plaintiffs' IIED claim. *Bixler*, 596 F.3d at 762 (quotation cleaned up). The court thus denies plaintiffs' default-judgment motion to the extent it's premised on their IIED claim.

This conclusion completes the analysis of those claims asserted just against Borjas. Before the court takes up *Frow* and the municipal defendants' successful arguments, one other

previously unaddressed claim merits attention—Garcia Recovery's breach-of-contract claim against Borjas that a settlement assigns to plaintiffs.

**VI. Claims Assigned to Plaintiffs by Garcia Recovery LLC**

Plaintiffs' motion next seeks a judgment for the "breach of contract damages owed to Garcia Recovery LLC and assigned to plaintiffs." Doc. 122 at 3 (quotation cleaned up). Plaintiffs assert that Borjas breached his contract with Garcia Recovery, whom he hired to tow and store plaintiffs' food truck. *Id.* at 4. And, plaintiffs explain, Garcia Recovery subsequently assigned their contract claims against Borjas to plaintiffs. *Id.* Indeed, plaintiffs separately filed a Joint Stipulation Assigning Claims and Motion to Dismiss Garcia Defendants (Doc. 121). There, Garcia Recovery LLC and Antonio Urista Garcia (collectively, the Garcia defendants) jointly stipulate with plaintiffs that the Garcia defendants have assigned "all their liens and claims against Sergio Borjas to Plaintiffs as part of a settlement reached between the Plaintiffs and the Garcia Defendants[.]" Doc. 121 at 1. And they jointly ask the court to recognize the assignment and dismiss the Garcia defendants with prejudice. Take those requests one at a time, and start with the assignment of the breach-of-contract claims under Kansas law.

"Kansas law requires that every legal action be prosecuted by the real party in interest." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 674–75 (10th Cir. 2007) (citing Kan. Stat. Ann. § 60–217(a)). "In causes of action arising from a contract, only parties to the contract may enforce the contract because the person who possesses the right sought to be enforced is the real party in interest." *Id.* at 675 (quotation cleaned up). But Kansas law also permits assignment "under a contract to a third party." *Id.*; *see Alldritt v. Kan. Centennial Glob. Exposition, Inc.*, 371 P.2d 181, 187 (Kan. 1962) ("[A] cause of action for damages for breach of contract is assignable."). Our Circuit applies state contract law to determine the validity of such an assignment. *See Bertels v. Farm Bureau Prop. & Cas. Ins. Co.*, 123 F.4th 1068, 1074 (10th Cir.

2024) (applying Kansas contract law). Under Kansas law, "all contracts 'must be supported by consideration' to be 'enforceable.'" *Id.* (quoting *State ex rel. Ludwick v. Bryant*, 697 P.2d 858, 861 (Kan. 1985)). "A 'forbearance to prosecute or defend a claim or action, or to do an act which one is not legally bound to perform, is usually a sufficient consideration for a contract based thereon[.]'" *Id.* (quoting *Ludwick*, 697 P.2d at 862).

Here, plaintiffs and the Garcia defendants recite that, according to the terms of their settlement of this lawsuit, the Garcia defendants assigned to plaintiffs "any and all mechanics' liens and other claims they do or may have against Sergio Borjas[.]" Doc. 121 at 2. And premised on that settlement, the parties move to dismiss "any and all claims between them with prejudice." *Id.* The Garcia defendants failed to answer or otherwise appear in this lawsuit, resulting in a Clerk's Entry of Default against them. Doc. 44; Doc. 46. Sufficient consideration—plaintiffs' forbearance to file a default-judgment motion against the Garcia defendants—thus supports the assignment, making it enforceable. And so, the court grants plaintiffs and the Garcia defendants' joint motion to recognize the assignment and dismiss the Garcia defendants with prejudice.

But an enforceable assignment doesn't translate invariably to a default judgment in plaintiffs' favor. To be sure, plaintiffs now stand in the shoes of the Garcia defendants. *See Cincinnati Specialty Underwriters Ins. Co. v. Urbano*, 687 F. App'x 778, 779–80 (10th Cir. 2017) ("[D]ue to the assignment of the Lodge's claims against CSUIC, Appellants stood in the shoes of the Lodge."). And "'the assignee of a claim has standing to assert the injury in fact suffered by the assignor.'" *US Fax L. Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000)). Yet

plaintiffs' bid for default judgment runs into another standing issue—not whose shoes plaintiffs stand in, but when they assumed that position.

"It is well established that any party, including the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation." *Scott v. Allen*, 153 F.4th 1088, 1093 (10th Cir. 2025) (quotation cleaned up). "[S]tanding is determined at the time the action is brought." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quotation cleaned up). So, courts evaluate standing "when the complaint was first filed"—even if the complaint is later amended. *Id.* (quotation cleaned up). Our Circuit addresses "standing on a claim-by-claim basis." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021) (quotation cleaned up). That is, "a plaintiff may have standing to bring some, but not all, claims raised in a complaint." *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021).

Several courts—including our own—have held that a plaintiff cannot establish Article III standing retroactively or, likewise, cure a standing deficiency with a later-acquired assignment. *See Blair-Naughton, L.L.C. v. Diner Concepts, Inc.*, No. 06-1183-JTM, 2007 WL 4463584, at *2 (D. Kan. Dec. 17, 2007) (holding that defendant had "no standing" to assert counterclaim against plaintiff where "the purported assignment occurred after [defendant] initiated its claims against [plaintiff]" because "[s]tanding is determined at the time an action is commenced" and "courts have rejected retroactive attempts to create standing by use of eleventh-hour assignments"); *see also MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*, 965 F.3d 1210, 1219–21 (11th Cir. 2020) (explaining that an "assignee must possess the assigned right on the day it filed the complaint" and this "requirement cannot be met retroactively" (quotation cleaned up)); *Berger v. Weinstein*, 348 F. App'x 751, 756 n.4 (3d Cir. 2009) (affirming trial court's dismissal of action

based on lack of Article III standing and noting that the "assignments [plaintiff] received from Payees" after the lawsuit was commenced "do nothing to establish standing under Article III because standing must be established as of the time the lawsuit is brought" (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008))). And this rule makes sense. "As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue." *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 780 (Fed. Cir.), *amended on reh'g in part by* 104 F.3d 1296 (Fed. Cir. 1996).

Here, plaintiffs face a timing problem. The Garcia defendants assigned their breach-of-contract claims to plaintiffs *after* plaintiffs had filed suit. Although the Second Amended Complaint contemplates an assignment agreement between plaintiffs and the Garcia defendants, Doc. 53 at 70 (2A Compl. ¶ 519), plaintiffs' original Complaint identifies nothing of the sort, *see generally* Doc. 1. Indeed, the Second Amended Complaint pinpoints the date of the assignment agreement: "on or about February 20, 2023." Doc. 53 at 70 (2A Compl. ¶ 519). That's more than four months after plaintiffs filed their lawsuit. Doc. 1 (filed October 12, 2022). Besides, the Second Amended Complaint merely describes an *agreement* to assign the claims—not a perfected assignment itself. Doc. 53 at 29 (2A Compl. ¶ 167). "A mere agreement to assign, or tentative proceedings in expectation of an assignment, or a promise to pay a certain portion of a claim when collected, do not constitute an assignment[.]" *Turner v. Williams*, 221 P. 267, 269 (Kan. 1923) (quotation cleaned up). On the record before the court, nothing documents an actual assignment until December 4, 2025—more than three years after plaintiffs had filed this lawsuit. Doc. 121 at 2, 3. The record thus indicates that plaintiffs lacked standing to assert the Garcia defendants' claim against Borjas as assignees when they filed their Complaint.

This standing conclusion precludes entry of a default judgment in plaintiffs' favor on the Garcia defendants' breach-of-contract claim. *See Poulin Ventures, LLC v. MoneyBunny Co.*, No. 19-cv-01031-JCH-GBW, 2022 WL 326286, at *7 (D.N.M. Feb. 3, 2022) (denying motion for default judgment on claim that plaintiff lacked standing to assert). The court thus denies plaintiffs' Motion for Default Judgment (Doc. 122) to the extent it seeks default judgment on the breach-of-contract damages Borjas allegedly owes the Garcia defendants.

## VII. Claims Asserted Against All Defendants

Finally, plaintiffs' default-judgment motion seeks damages from Borjas for "deprivation of civil rights and state law torts." Doc. 122 at 4. The court already has weighed in on these claims—addressing them over the course of 64 pages when ruling on the municipal defendants' Partial Motion to Dismiss (Doc. 55). Indeed, at the motion-to-dismiss stage, the court dismissed 17 of plaintiffs' 21 claims against the municipal defendants. Doc. 61 at 64. Now, plaintiffs ask the court to grant them a default judgment against Borjas on these very claims. *See* Doc. 122 at 9 ("Plaintiffs are entitled to a declaration that they have prevailed on, and Borjas is liable under, each and all of Plaintiffs' claims in [this] suit."). Enter the *Frow* rule.

Recall that, under *Frow*, a successful ruling "in favor of the answering defendants will accrue to the benefit of the defaulting defendant"—provided the asserted defense isn't personal to the answering defendants. 10A *Wright & Miller's Federal Practice & Procedure* § 2690 (4th ed. 2026). And where an "action is dismissed, it should be dismissed as to the defaulting party as well as the remaining defendants." *Id.* That's so because it's "incongruous and unfair to allow [a plaintiff] to prevail against Defaulting Defendants on a legal theory rejected by the . . . court with regard to the Answering Defendants in the same action." *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532–33 (9th Cir. 2001) (finding district court abused its discretion and

violated the *Frow* principle where it entered final default judgments "that directly contradicted its earlier ruling in the same action").

So, the court reviews its earlier rulings to determine whether, under *Frow*, they apply with equal force to Borjas as a defaulting defendant. The court starts with plaintiffs' claims asserted under federal statutes 42 U.S.C. §§ 1981, 1983, 1985(3), 1986 and a general federal conspiracy claim.

### A. Federal Claims: Counts I(1), I(2), I(3), I(4), and II(1)

Plaintiffs' Second Amended Complaint brings five federal claims: (1) a § 1983 claim for deprivation of their constitutional rights; (2) a § 1985(3) claim for an illegal conspiracy; (3) a § 1986 claim for failing to stop a civil-rights conspiracy; (4) a § 1981 claim for racial discrimination against plaintiffs' rights to make and enforce contracts; and (5) an amorphous, general conspiracy claim. In support of these claims, plaintiffs' default motion explains that Borjas conspired with "the Garcia Defendants and the City Defendants to intentionally steal the Plaintiffs' property and intentionally cause as much economic, reputational, and emotional harm as possible to the Plaintiffs." Doc. 122 at 5. This alleged conspiracy provides the legal theory for Borjas's liability under plaintiffs' federal claims. But even the slightest scrutiny reveals the flaws of this legal theory.

As the Second Amended Complaint describes the conspiracy, Borjas hired Garcia Recovery. Doc. 53 at 29 (2A Compl. ¶ 169). Then, Garcia Recovery communicated with the police before going to repossess plaintiffs' food truck and, once there, shared papers and photographs with Officer Taylor. *Id.* (2A Compl. ¶¶ 173–74). After that, Garcia Recovery and Officer Taylor together "represented that Garcia Recovery had a court order authorizing them to take the Los Jarochos Trailer, whereas no such order existed." *Id.* (2A Compl. ¶ 174). Garcia

Recovery and Officer Taylor thus "cooperated and followed one another['s] lead to complete the taking of Plaintiffs' property before Plaintiffs could arrive on the scene." *Id.* (2A Compl. ¶ 175).

The court already has concluded that these conspiracy allegations fail to support plaintiffs' federal claims against Officer Taylor. Doc. 61 at 23–32. And the shortcomings that compelled that earlier dismissal apply with equal force to plaintiffs' claims against Borjas. Start with the federal claims requiring illegal animus: § 1985(3) and § 1981 claims.

For starters, the court's motion-to-dismiss Order established that a § 1985(3) conspiracy claim requires discriminatory animus. Doc. 61 at 23–24. Indeed, "§ 1985(3) does not apply to all tortious, conspiratorial interferences with the rights of others[.]" *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (quotation cleaned up). Instead, § 1985(3) applies "only to conspiracies motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (quotation cleaned up). So, to state a claim, "a plaintiff must establish that a class-based or racially discriminatory motive lurks behind the conspiratorial activities." *Babbar v. Ebadi*, 216 F.3d 1086, 2000 WL 702428, at *9 (10th Cir. 2000).

Here, the Second Amended Complaint alleges that illegal animus motivated the non-municipal defendants—which would include Borjas. Doc. 53 at 52 (2A Compl. ¶ 378). It never alleges class-based discriminatory animus, focusing just on racial prejudice instead. *See id.* at 43 (2A Compl. ¶ 304) ("The illegal animus alleged throughout the Complaint includes racial prejudice and discrimination against Plaintiffs because they are indigenous peoples of Mexico, *i.e.*, Native Americans."). But the court already has concluded that "plaintiffs haven't pleaded any facts to establish the Garcias or Borjas's illegal animus." Doc. 61 at 29. The court found "no basis to infer racial or class-based discriminatory animus." *Id.* Indeed, the court found all racial animus allegations in the Second Amended Complaint conclusory, rejecting plaintiffs'

argument that Officer Taylor's alleged conduct and preferential treatment sufficed to demonstrate racial animus. *Id.* at 22. Evidently, plaintiffs have forgotten this earlier ruling; their default-judgment motion directs the court to no facts indicating that the court should alter that conclusion. *See generally* Doc. 122.

Conclusory allegations that simply assert illegal animus—without supporting facts—won't suffice at default judgment. *See Amair, Inc. v. Gapex Aviation SP. Z o.o.*, No. 15-02596-CMA-KLM, 2019 WL 1651828, at *6 (D. Colo. Apr. 17, 2019) ("Plaintiff's allegations are vague and conclusory and, therefore, not deemed to be true for purposes of default judgment."); *In re Wood*, No. 09-24402, 2010 WL 5415833, at *2 (Bankr. D. Utah Sept. 30, 2010) ("Without any factual allegations to support the Trustee's conclusory statements, the complaint is insufficient to support a default judgment on this claim."). The court thus denies plaintiffs' motion for default judgment against Borjas on their § 1985 claim. It already has concluded that plaintiffs' allegations of the requisite illegal animus to support a § 1985 claim are solely conclusory and, under the *Frow* rule, plaintiffs can't evade the same outcome here.

This conclusion proves dispositive for plaintiffs' § 1986 claim as well. *Vreeland v. Huss*, No. 118-00303-PAB-SKC, 2020 WL 3447768, at *3 (D. Colo. June 24, 2020) ("Importantly, the finding of a conspiracy under section 1985 is a predicate to liability under section 1986."); *see also Brown v. Reardon*, 770 F.2d 896, 907 (10th Cir. 1985) ("The district court did not err in finding that the § 1986 claim is dependent upon the existence of a valid claim under § 1985."). Finally, the no-racial-animus conclusion likewise implicates plaintiffs' § 1981 claim against Borjas.

As the court recited in its motion-to-dismiss Order, Doc. 61 at 15, section "1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts,

and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Reynolds v. Sch. Dist. No. 1, Denver*, 69 F.3d 1523, 1532 (10th Cir. 1995) (quoting 42 U.S.C. § 1981(a)–(b)). A "prima facie case of discrimination under § 1981" requires the plaintiff to establish: "(1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir. 2001). It's the second element that presents a problem for plaintiffs. Earlier, the court concluded that the Second Amended Complaint's allegations don't suffice to support racial discrimination as Borjas's motivation. Doc. 61 at 29. This conclusion also precludes a default judgment in favor of plaintiffs on their § 1981 claim.

The other two federal claims asserted against Borjas—under § 1983 and the general conspiracy claim—both rely on concerted action. *See* Doc. 53 at 40–41 (2A Compl. ¶ 277) (identifying plaintiffs' § 1983 and § 1986 claims as asserted directly just against the municipal defendants and against all defendants "participating in concert"); *id.* at 54–55 (2A Compl. ¶¶ 403–05) (alleging general conspiracy claim under "Concerted Participation" heading). Again, the court already has assessed the concerted action alleged by the Second Amended Complaint. Doc. 61 at 25–27. And its motion-to-dismiss Order concluded that the concerted action alleged represented mere parallel action which was "'just as consistent with independent conduct as it [was] with a conspiracy.'" *Id.* at 27 (quoting *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012)). The court thus dismissed the claims against Officer Taylor relying on concerted action and a meeting of the minds. *Id.* at 24–27, 30–32. This conclusion didn't rely on a defense personal to Officer Taylor. So, under *Frow*, the dismissal of plaintiffs' concerted-action-based

claims accrues to the benefit of Borjas, the defaulting defendant. *Wright & Miller's Federal Practice & Procedure* § 2690.

Plaintiffs thus don't deserve a default judgment against Borjas on any of their federal claims. Next, the court assesses whether dismissals of plaintiffs' state-law claims likewise accrue to Borjas's benefit.

**B. State Law Claims**

The court dismissed all but three of plaintiffs' state-law claims at the motion-to-dismiss stage. Only the claims for fraudulent-misrepresentation, fraud, and aiding-and-abetting survived against the answering defendants. Doc. 61 at 64. The court reviews the bases for those dismissals, next, to ascertain whether their benefit likewise accrues to Borjas under *Frow*. It starts with plaintiffs' claims premised on state criminal statutes.[2]

**1. State Criminal Statute Claims: Counts IV(1), IV(2), VI(2), VI(3), and VI(4)**

Plaintiffs asserted five claims invoking four Kansas criminal statutes—Kan. Stat. Ann. §§ 21-6102, 21-5801, 21-5803, and 21-5415. Implicitly acknowledging the strangeness of bringing civil causes of action under criminal statutes, plaintiffs claimed: "Private rights of action for the denial of civil rights have been available since at least Reconstruction." *See, e.g.*, Doc. 53 at 59 (2A Compl. ¶ 434). Perhaps finding it difficult to conjure a private right of action from thin air, at the motion-to-dismiss stage plaintiffs abandoned their theory that civil liability under the "ancient common law" provides a private right of action under criminal statutes. Doc. 61 at 39–40. And the court concluded that plaintiffs' alternative theory—that the criminal

[2] The court doesn't review the basis for its dismissal of the other state-law claim, Count III, Doc. 61 at 37–38, because the Second Amended Complaint didn't assert this claim against Borjas but only against the "City, the City Council, Barrett, and the Department," Doc. 53 at 56 (2A Compl. ¶ 412).

statutes provide "'the duty necessary to allege a tort claim sounding in negligence'"—also failed. *Id.* at 40 (quoting Doc. 59 at 11). That was so because none of plaintiffs' claims qualified as negligence claims—all the claims asserted intentional conduct. *Id.* at 41–42. Yet the legal theory plaintiffs espoused to state claims under criminal statutes applies just to negligence claims. *Id.* This dismissal inures to Borjas's benefit under *Frow*. Where plaintiffs' theory relies on employing criminal statutes to state a negligence claim—and then plaintiffs assert no negligence claim—the "unchallenged facts" don't "constitute a legitimate cause of action" under those criminal statutes. *Bixler*, 596 F.3d at 762 (quotation cleaned up). The court thus denies plaintiffs' default judgment motion as it relies on plaintiffs' state-criminal-statute claims.

### 2. Trespass[3] Against Chattels and Conversion Claims: Counts V(2) and VI(1)

Plaintiffs assert that defendants trespassed against chattels when they "occupied, took possession of, and removed the Los Jarochos Trailer to the exclusion of Plaintiffs[.]" Doc. 53 at 61 (2A Compl. ¶ 448). Plaintiffs also bring a conversion claim on a similar theory: that defendants "without authorization . . . assumed or exercised the right of ownership . . . over goods or personal chattels belong to Plaintiffs[.]" *Id.* at 62–63 (2A Compl. ¶ 459).

"A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217 (A.L.I. 1965). And the "tort of conversion is defined in

---

[3] The Second Amended Complaint also asserted a trespass-against-land claim under Kansas law, captured in Count V(1). Doc. 53 at 60–61 (2A Compl. ¶¶ 443–46). But in the motion-to-dismiss briefing, plaintiffs conceded that "the land itself was a public business parking lot" and withdrew that claim against Officer Taylor. Doc. 59 at 12 n.7. This problem with the legal sufficiency of a claim, particularly when explicitly identified by plaintiffs, precludes the court from granting a default judgment against Borjas based on that claim. *See Bixler*, 596 F.3d at 762 (requiring "court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law" (quotation cleaned up)). So, to the extent plaintiffs' motion requests default judgment on their trespass-against-land claim, the court denies it.

Kansas as the 'unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'" *Leathers v. Leathers*, 856 F.3d 729, 757 (10th Cir. 2017) (quoting *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)). Conversion's "required intent is shown by the use or disposition of property belonging to another[.]" *Id.* (quoting *Millennium Fin. Servs., LLC v. Thole*, 74 P.3d 57, 64 (Kan. Ct. App. 2003)).

At the motion-to-dismiss stage, the municipal defendants argued that the Garcias—not Officer Taylor—occupied the food truck, exercising dominion and control over it. Doc. 56 at 13. So, the court considered whether Officer Taylor's role as an the Garcias' enabler in that effort sufficed to support a viable trespass-against-chattels or conversion claim. The court explained that, according to plaintiffs' allegations, Officer Taylor never had physical contact with the chattel and never himself exercised dominion or control over the chattel. Doc. 61 at 44–45. Nor had he assumed or exercised ownership over the trailer. *Id.* at 46. And the court concluded that such a role—that of a mere enabler—doesn't incur liability under either legal theory. *Id.* at 45, 47. The court also noted that plaintiffs provided no authority to the contrary, and the court's independent research likewise found none. *Id.* at 45.

Like Officer Taylor, Borjas never physically occupied or exercised control over the Los Jarochos food truck—not even allegedly. Indeed, the food truck remained in the Garcias' possession until plaintiffs recovered it on February 22, 2023. Doc. 122-3 at 5 (Turner Aff. ¶ 16). Instead, Borjas, too, functioned as something of an enabler—instigating the Garcias' repossession by executing a contract with them. Doc. 53-10 (Pl. Ex. I). Borjas thus benefits from the dismissal of these claims in the same way Officer Taylor did.

To be sure, Borjas's enabling role differed from that of Officer Taylor: while Officer Taylor "orchestrated the repossession" on the scene, Doc. 59 at 13, Borjas executed paperwork with the Garcias to instigate repossession, Doc. 53 at 14 (2A Compl. ¶ 68); Doc. 53-10 (Pl. Ex. I). Plaintiffs' default-judgment motion never argues that Borjas's instigating role suffices to support a trespass-against-chattels or conversion claim against him. *See generally* Doc. 122. Nor does their motion ever reference any authority that such an instigating role could create legitimate causes of action under these Kansas laws.

The court thus denies plaintiffs' motion to the extent it requests a default judgment against Borjas on their trespass-against-chattels and conversion claims. The court already has concluded that an enabler role doesn't support such claims.

**3. Defamation: Count XI**

Plaintiffs also assert a defamation claim against Borjas premised on two statements. *First*, plaintiffs allege that Borjas told plaintiffs' pastor and—on information and belief others—that "Plaintiffs had stolen his trailer; when in fact he knew he had leased the Used Sushi Trailer to Plaintiffs as part of a contractual transaction in an effort to mitigate his own failure to perform" the contract. *Id*. at 74 (2A Compl. ¶ 543). *Second*, plaintiffs allege that "Borjas filed a petition in open court stating that Plaintiffs had failed to pay him $12,500.00 they owed him for a truck he had sold them; when in fact it was Borjas who had failed to perform under the contract[.]" *Id.* at 74–75 (2A Compl. ¶ 545). These allegations can't carry a plausible defamation claim.

"A defamation claim involves '(1) false and defamatory words; (2) communication to a third person; and (3) harm to the reputation of the person defamed.'" *Smith v. Williams*, No. 20-2224-EFM, 2023 WL 6462904, at *7 (D. Kan. Oct. 4, 2023) (quoting *Byers v. Snyder*, 237 P.3d

1258, 1270 (Kan. Ct. App. 2010)). Under Kansas law, "a plaintiff may not rest on presumed damages but must allege and prove actual damages in a defamation action." *Ali v. Douglas Cable Commc'ns*, 929 F. Supp. 1362, 1384 (D. Kan. 1996) (applying Kansas law). Those damages must include "injury to reputation," because in Kansas "damage to one's reputation is the essence and gravamen of an action for defamation." *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1243 (Kan. 1982). Proof of injury to reputation "typically entails showing that persons were deterred from associating with the plaintiff, that the plaintiff's reputation had been lowered in the community, or that the plaintiff's profession suffered." *Ali*, 929 F. Supp. at 1385.

The municipal defendants argued successfully at the motion-to-dismiss stage that plaintiffs' defamation claim failed to allege the reputational harm required under this formulation's third prong. Doc. 61 at 52–54. The court concluded that plaintiffs had failed to allege that Officer Taylor's statements to a third person—a Los Jarochos customer who tried to help plaintiffs' employees communicate with the police—deterred that person from associating with plaintiffs. *Id.* at 53. And it also concluded that plaintiffs' allegation that "'reputational insults'" had harmed their business was nothing more than a "conclusory harm." *Id.* (quoting Doc. 53 at 33 (2A Compl. ¶ 209)). The very same problem—the absence of allegations about harm—plagues plaintiffs' defamation claim against Borjas. The Second Amended Complaint never alleges that Borjas's statements to plaintiffs' pastor that plaintiffs had stolen his trailer deterred the pastor from associating with plaintiffs. And its allegations of reputational harm remain conclusory.

Perhaps recognizing the thinness of their harm allegations, plaintiffs attach an affidavit to their default-judgment motion. It purports to identify plaintiffs' reputational damages more specifically. It attests that "the very-public taking of Plaintiffs' trailer by the Colby City Police

and Garcia Recovery LLC devastated Plaintiffs' reputation in the small town of Colby[.]" Doc. 122-3 at 6 (Turner Aff. ¶ 19). And then it itemizes this purported harm, attesting that the "business lost $131,941.79 in net revenue . . . as a result of the damage to Plaintiffs' reputation and prestige; in addition to $500,000 in other reputation and long-term losses[.]" *Id.* (Turner Aff. ¶ 20). The affidavit thus concludes that "Borjas's conspiracy caused $631,941.79 in damages to Plaintiffs in direct economic losses and reputational losses as a result of the impression left on the community by the wrongful taking of Plaintiffs' trailer." *Id.* But plaintiffs link those reputational losses to the wrongful taking of the food truck—not Borjas's statement to their pastor or his state-court lawsuit. While the affidavit's damage assessment may indicate that "plaintiff's reputation had been lowered in the community," *Ali*, 929 F. Supp. at 1385, it fails to connect that downgraded reputation to Borjas's words.

The court thus concludes that the shortcoming dooming plaintiffs' defamation claim for the answering defendants applies with equal force now. Nothing in the pleadings suffices to support a finding that the alleged defamatory words resulted in the alleged reputational harms. So, the court denies the portion of plaintiffs' motion seeking a default judgment on their defamation claim against Borjas.

**4. Conspiracy: Count XI(1)**

Plaintiffs' sprawling operative pleading next asserts a conspiracy claim under state law against Borjas. Doc. 53 at 77–78 (2A Compl. ¶¶ 566–70). They premise this state conspiracy claim on the same allegations as their federal conspiracy claim.

Under Kansas law, an "actionable civil conspiracy occurs when the following elements are proved: '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as

the proximate result thereof.'" *Hefner v. Deutscher*, 525 P.3d 1173, 2023 WL 2618765 at *16 (Kan. Ct. App. 2023) (quoting *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991)). "Because direct evidence is rarely available, a civil conspiracy may be proved by circumstantial evidence." *Vetter v. Morgan*, 913 P.2d 1200, 1206 (Kan. Ct. App. 1995). So "plaintiffs need not show an express agreement" to demonstrate a meeting of the minds, but "they must show specific facts which support the inference of an agreement." *In re Motor Fuel Temperature Sales Pracs. Litig.*, No. 07-1840, 2012 WL 976039, at *8 (D. Kan. Mar. 22, 2012).

The court dismissed plaintiffs' state-law conspiracy against the answering defendants. Doc. 61 at 54–57. It reasoned that the facts plaintiffs had alleged didn't suffice to demonstrate the requisite meeting of the minds. *Id.* Specifically, the court reviewed cases which successfully alleged Kansas law conspiracy claims and identified four characteristics of allegations sufficient to demonstrate a meeting of the minds: interrelatedness, common interest, hierarchical position, and directed behavior. *Id.* at 55–56. The court then concluded that plaintiffs' allegations in the present case don't align with these characteristics. Instead, as the answering defendants argued, Officer Taylor and the Garcias disagreed about the proper course of action—*i.e.*, when they couldn't locate the VIN number on the Los Jarochos trailer. *Id.* at 54–55 (citing Doc. 56 at 8). And they acted independently of one another—*i.e.*, when Officer Taylor remained on the scene after the repossession and spoke with plaintiffs. *Id.* at 55 (citing Doc. 60 at 3).

This no-meeting-of-the-minds conclusion applies equally to plaintiffs' conspiracy claim against Borjas. The Second Amended Complaint never alleges that Borjas knew or ever had spoken with Officer Taylor. *See generally* Doc. 53. His only tie-in to the conspiracy thus came through the Garcias—the persons he had hired to repossess a food truck. *Id.* at 19 (2A Compl. ¶ 106); Doc. 53-10 (Pl. Ex. I). But none of plaintiffs' allegations show that the Garcias and

Borjas were interrelated with a common interest. Nor do they demonstrate a hierarchical structure permitting Borjas to direct the behavior of the Garcias, or vice-versa. Instead, plaintiffs allege a contractual relationship, where the Garcias function as agents of Borjas. Doc. 53 at 26 (2A Compl. ¶ 156). An allegation as provincial and mundane as one party hiring another party to complete a job doesn't manifest any of the four meeting-of-the-mind characteristics. So, the court denies plaintiffs' bid for default judgment based on their state-law conspiracy claim.

**5. Substantial Assistance: Count XI(3)**

The final claim against the answering defendants dismissed at the motion-to-dismiss stage was plaintiffs' substantial-assistance claim. Doc. 61 at 62–63. The court explained that liability for substantial assistance requires plaintiffs to "'have raised [an] argument that the [defendants'] conduct constituted a breach of any duty that [they] had to plaintiffs.'" *Id.* (quoting *Kan. Waste Water, Inc. v. Alliant Techsystems, Inc.*, No. 02-2605-JWL, 2005 WL 1109456, at *21 (D. Kan. May 9, 2005)). And it concluded that plaintiffs had failed to allege such a breach of duty—using the phrase just twice in the Second Amended Complaint: first when listing the substantial-assistance elements and then again in a boilerplate paragraph. *Id.* at 63 (citing Doc. 53 at 79 (2A Compl. ¶¶ 577, 579)). So, the court dismissed the substantial-assistance claim as insufficiently pleaded. The same insufficient pleading dooms the claim against Borjas, as well. Under *Frow*, Borjas benefits from the answering defendants' dismissal arguments. The court thus denies plaintiffs' motion to the extent it seeks a default judgment against Borjas on plaintiffs' substantial-assistance claim.

This conclusion leaves just three claims that the court hasn't considered—fraud, fraudulent misrepresentation, and aiding and abetting. Those three claims survived the motion-to-dismiss and summary-judgment stages of this case. *See* Doc. 61 at 47–51, 58–62; Doc. 103 at

37–47. So, there's no benefit that defendant Borjas may receive under *Frow* on these three claims. The court thus completes its review of these final claims under the typical default-judgment standard, one it reiterates below for ease of reference.

### C. State Law Claims That Survived Dismissal and Summary Judgment

Recall that, on a motion for default judgment, the court must "'consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Bixler*, 596 F.3d at 762 (quoting 10A *Wright & Miller's Federal Practice and Procedure* § 2688). That is, there "must be a sufficient basis in the pleadings for the judgment entered." *Id.* (quotation cleaned up). "A court may grant judgment by default only for relief that may lawfully be granted on the well-pleaded facts alleged by the claimant." 10 *Moore's Federal Practice* § 55.32 (2026). Apply this standard, *first*, to plaintiffs' fraud and fraudulent-misrepresentation claims against Borjas.

#### 1. Fraud and Fraudulent Misrepresentation: Counts VIII(1) & VIII(2)

Plaintiffs assert fraud and fraudulent-misrepresentation claims against Borjas premised on the following allegation:

> Borjas fraudulently made misrepresentations of fact and law by preparing and providing the papers . . . purporting to authorize Garcia Recovery to take the Los Jarochos Trailer, for the purpose of inducing Garcia Recovery to take the trailer; and inducing Plaintiffs and their employees to exit the vehicle, stay outside the vehicle, and allow non-Municipal Defendants to illegally take the trailer.

Doc. 53 at 71–72 (2A Compl. ¶ 526). A couple paragraphs later, plaintiffs further clarify the chain of allegedly fraudulent statements: "Taylor, Garcia, and Garcia Recovery fraudulently made misrepresentations of fact and law by representing that the papers . . . were a court order; and inducing Plaintiffs and their employees to exit the vehicle, stay outside the vehicle, and allow non-Municipal Defendants to illegally take the trailer." *Id.* at 72 (2A Compl. ¶ 528).

As the court's earlier Orders explained, under Kansas law, "the elements for fraudulent misrepresentation and fraud parallel one another." Doc. 61 at 48; *see also* Doc. 103 at 38. To assert a fraudulent-misrepresentation claim, a plaintiff "must establish that the defendant made an untrue statement of fact while knowing it to be untrue and with intent to deceive or with reckless disregard as to the truth, the plaintiff justifiably relied on the statement, and as a result of this justifiable reliance, the plaintiff suffered damage." *Garver v. Roth Cos.*, No. 19-CV-02354-TC-KGG, 2022 WL 228287, at *4 (D. Kan. Jan. 26, 2022) (citing *Gerhardt v. Harris*, 934 P.2d 976, 981 (Kan. 1997)). Similarly, the Kansas Supreme Court has identified that the "elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment." *Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004) (citing *Gerhardt*, 934 P.3d at 981).

Both fraudulent-misrepresentation and fraud claims thus require the plaintiff to have justifiably relied on the *defendant*'s untrue statement of fact. Kansas law permits indirect or third-party reliance. That is, as Kansas Court of Appeals has recognized, "under certain circumstances, a plaintiff may recover for fraudulent misrepresentation under Kansas law where reliance occurred indirectly." *Hernandez v. Pistotnik*, 472 P.3d 110, 120 (Kan. Ct. App. 2020). But in such "third party or indirect reliance" cases, a claim lies "'only if plaintiffs establish that (1) they received the information from someone who received it from defendant; (2) defendant intended the information to be conveyed to them and (3) they justifiably relied on the information.'" *Id.* (quoting Restatement (Second) of Torts § 533 (A.L.I. 1977)).

Here, plaintiffs relied on the Garcias' and Officer Taylor's false statement that there was a court order—but not on Borjas's statement that plaintiffs owed him money on the trailer.

Indeed, the Second Amended Complaint clarifies that plaintiffs didn't examine Borjas's documents. Doc. 53 at 72 (2A Compl. ¶ 530). And it alleges that neither plaintiffs nor their employees ascertained Borjas's involvement with repossession on the day of the event. *Id.* at 19 (2A Compl. ¶ 106) ("[N]one of Plaintiffs nor their employees realized that day that Garcia Recovery was working for Borjas[.]"). What's more, to the extent any discussion of nonpayment for the Los Jarochos Trailer entered the conversation, *id.* at 15 (2A Compl. ¶ 75), plaintiffs didn't rely on it—they disputed it, *id.* at 16 (2A Compl. ¶ 84). Plaintiffs thus never allege that they relied—at the repossession—on Borjas's allegedly false statement that plaintiffs owed him money on the trailer, even as indirectly relayed by the Garcias or Officer Taylor. Instead, they allege that plaintiffs relied on Garcia Recovery and Officer Taylor's false statements about a court order. *Id.* at 16, 30 (2A Compl. ¶¶ 83, 176); *id.* at 71 (2A Compl. ¶ 525) ("Taylor and the Garcias fraudulently made misrepresentations of fact and law by telling Plaintiffs and their employees they had a court order authorizing them to take the Los Jarochos Trailer, for the purposes of inducing Plaintiffs and their employees to exit the vehicle, stay outside the vehicle, and allow non-Municipal Defendants to illegally take the trailer.").

So, there's no sufficient basis in the pleadings to support a fraudulent misrepresentation or fraud claim, even under an indirect or third-party theory.

One final claim remains: aiding and abetting.

### 2. Aiding and Abetting: Count XI(2)

Plaintiffs also allege an aiding and abetting claim against all defendants, asserting that "[o]ne or more Defendants aided by one or more other Defendants performed a wrongful act that caused injury[.]" *Id.* at 78 (2A Compl. ¶ 572).

"[A]iding and abetting is a theory used to impose vicarious liability[.]" *Ridenhour*, 811 P.2d at 1231. Kansas courts have defined the elements of civil aiding and abetting to include:

> (1) The party whom the defendant aids must perform a wrongful act causing injury; (2) at the time the defendant provides assistance, he or she must be generally aware of his or her role in part of an overall tortious or illegal activity; and (3) the defendant must knowingly and substantially assist in the principal violation.

*York v. InTrust Bank, N.A.*, 962 P.2d 405, 424 (Kan. 1998) (citing *Ridenhour*, 811 P.2d at 1231–32). The Kansas Supreme Court has embraced six factors to evaluate whether a given plaintiff's allegations establish the requisite substantial assistance to support an aiding-and-abetting claim: "[1] The nature of the act encouraged, [2] the amount of assistance given by the defendant, [3] his presence or absence at the time of the tort, [4] his relation to the other . . . [5] his state of mind. . . . [and 6] duration of the assistance provided." *Ridenhour*, 811 P.2d at 1232 (quotation cleaned up); *see also Rowell v. King*, 234 F. App'x 821, 827 (10th Cir. 2007) ("The Kansas Supreme Court has adopted six factors 'to determine if the aid is sufficient to establish liability under an aiding and abetting theory.'" (quoting *Ridenhour*, 811 P.2d at 1234)). On the same wavelength as that sixth factor, Kansas courts consider "the length of time an alleged aider and abettor has been involved with the tortfeasor," because it "affects the quality and extent of their relationship and probably influences the amount of aid provided." *Ridenhour*, 811 P.2d at 1232. The length of the relationship between the defendant and the tortfeasors also provides "evidence of the defendant's state of mind." *Id.*

Here, Borjas's involvement with the wrongful taking of the Los Jarochos Trailer is limited to the documents he executed to instigate a repossession. Doc. 53-10 (Pl. Ex. I). Plaintiffs never allege that Borjas joined the scene of the repossession. *See generally* Doc. 53. Nor do plaintiffs ever allege that Borjas represented to anyone that he had a court order to repossess the Los Jarochos Trailer. *See generally id.* So, for the pleadings to provide a sufficient basis to support a default judgment on an aiding and abetting claim, Borjas instigating the

repossession must qualify as "knowingly and substantially assist[ing] in the principal violation." *York*, 962 P.2d at 424. But plaintiffs' allegations suggest just the opposite.

For starters, plaintiffs allege that the paperwork Borjas provided didn't determine how the repossession played out. Doc. 53 at 20 (2A Compl. ¶¶ 114–15) ("Based on their comparison of the two trailers to the paperwork they had been provided, the Garcias concluded they could not legally take either trailer. Taylor told the Garcias . . . to take the Los Jarochos Trailer anyway[.]"). Instead, it was Officer Taylor's instruction to the Garcias—not Borjas's paperwork—that led the Garcias to take the wrong trailer. *Id.* (2A Compl. ¶ 116) ("The Garcias would not have taken the Los Jarochos Trailer if Taylor hadn't told them to."). These facts don't support a plausible finding of substantial aid.

Consider the six factors articulated above. Ticking them off, *first*, plaintiffs' allegations indicate that the nature of the act was the wrongful repossession of the Los Jarochos Trailer. *Second*, the only assistance Borjas provided in that wrongful repossession was when he executed documents for the repossession of a food truck with a different VIN number. *Id.* at 20 (2A Compl. ¶ 111). *Third*, plaintiffs never allege Borjas was present when the wrongful taking occurred. *See generally id.* *Fourth*, the Second Amended Complaint alleges that Borjas hired Garcia Recovery. *Id.* at 29 (2A Compl. ¶ 169). And it alleges that Garcia Recovery was acting as an agent of Borjas. *Id.* at 26 (2A Compl. ¶ 156). It never alleges that Borjas knew Officer Taylor. *See generally id.* *Fifth*, in asserting Borjas's state of mind, plaintiffs allege that Borjas told a mutual friend that "what Garcia Recovery did was not what Borjas asked them to do, and it was not Borjas's problem." *Id.* at 25 (2A Compl. ¶ 151). *Finally*, the duration of the assistance provided was brief—the time required to execute the repossession documents. Taking these factors together, only the allegation that Garcia Recovery was acting as Borjas's agent

could support a finding of substantial aid. The other five factors tip in the other direction. The court thus concludes that there's nothing "substantial" in the pleadings to support an aiding and abetting default judgment against Borjas.

This conclusion completes the sufficiency analysis for all claims asserted against Borjas. The court holds that only plaintiffs' breach-of-contract claim constitutes a legitimate cause of action. All the other claims lack a sufficient basis to enter a judgment. And so, the court grants default judgment against Borjas on plaintiffs' breach-of-contract claim alone. One final task remains: determining the damages.

## VIII. Damages

Recall that the court may award damages "only if the record adequately reflects the basis for [the] award via a hearing or a demonstration by detailed affidavits establishing the necessary facts." *DeMarsh*, 2009 WL 3720180, at *2 (quotation cleaned up). That's so because "although a default judgment establishes liability, it does not answer whether any particular remedy is appropriate." *Poulin Ventures*, 2022 WL 326286, at *7 (quotation cleaned up).

For all its struggles, plaintiffs' default-judgment motion helpfully identifies the breach-of-contract damages owed to plaintiffs. And it supports those damages with a detailed affidavit. Doc. 122-3 at 1–2 (Turner Aff. ¶¶ 5–8). Those damages account for the amount plaintiffs paid Borjas on the food truck contract ($6,000). *Id.* (Turner Aff. ¶ 5). And the claimed damages include the costs plaintiffs spent to make the Used Sushi Trailer adequate while waiting for the delivery of the ordered truck ($12,838). *Id.* at 2 (Turner Aff. ¶ 6). Finally, the damages include the difference in the price plaintiffs had to pay for the Los Jarochos Trailer vis-à-vis the trailer they contracted with Borjas to purchase ($4,000). *Id.* (Turner Aff. ¶ 7). Those damages total $22,838.00. *Id.* (Turner Aff. ¶ 8). The court thus awards contract damages against Borjas in the amount of $22,838.00.

Plaintiffs also request post-judgment interest. 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." And courts routinely find post-judgment interest appropriate as it "achieves the statutory goal of compensating the plaintiff while removing defendant's incentive to delay payment of the judgment." *Mathiason*, 187 F. Supp. 3d at 1281 (quotation cleaned up); *see also DeMarsh v. Tornado Innovations, L.P.*, No. 08–2588–JWL, 2009 WL 3720180, at *7 (D. Kan. Nov. 4, 2009) (awarding post judgment interest on default); *Albert v. Wesley Health Servs.*, No. 00–2067–KHV, 2001 WL 503241, at *3 (D. Kan. May 10, 2001) (same). The court thus grants plaintiffs' request and awards plaintiffs post-judgment interest at the statutory rate provided in 28 U.S.C. § 1961(a).

## IX. Other Requested Relief

Plaintiffs' default-judgment motion requests three more forms of relief not yet addressed by this Order. *First*, it asks for costs and attorneys' fees. Doc. 122 at 11. Plaintiffs have proffered nothing—no time sheets, no rates, nothing—to demonstrate the reasonableness of its attorneys' fees. The court thus denies this request, but without prejudice to refiling a properly supported motion. *Second*, plaintiffs also request a declaration that they're the rightful holders of the Used Sushi Trailer. *Id.* at 12. But title for the Used Sushi Trailer was never at issue in this lawsuit. The court thus denies this request. *Last*, plaintiffs request "an order granting Plaintiffs the ongoing authority to commence supplemental proceedings under Fed. R. Civ. P. 69 until Plaintiffs have recovered all monies owed to them by Borjas[.]" *Id.* But the court hasn't entered judgment as of this writing, so this request is premature and the court denies it. Plaintiffs may move separately for judgment-enforcement relief after the court has entered judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Default Judgment against Sergio Borjas (Doc. 122) is granted in part and denied in part, all as set

forth in this Order. The court directs the Clerk of the Court to enter judgment against Sergio Borjas in the amount of $22,838.00, plus any post-judgment interest which may accrue.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion to Dismiss Garcia Defendants (Doc. 121) is granted.

**IT IS SO ORDERED.**

**Dated this 12th day of August, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**